**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

NEAL ENGWALL, DEAN TREW,
CHRISTIE SIKORA, CAROL BRIAM,
ROBERT SMITH,
JERRY LIVERS,
MARSHA WOODS,
FRANK RUDD,
GREG BUNN,
EARL SCHUBE,
ARVIND SHRESTHA,
JOSH KENT,
MARK SCHULZE,
RON RICHARDSON,
CHRISTOPHER LAFAY,
ROBERT MILTON,
STEVE MIRAGLIA,
STEVE BLAUER,
MATTHEW DONIGHER,
THAHIRIH DONIGER,
KIM ELLIS,
WAYNE ENGLISH,
ROBERT GRIFFFEN,
NANCY CUMMINGS,
MARJORIE DAHLBERG, et al; all individuals,
derivatively on Behalf of PRIATEK, LLC,

                        Plaintiffs,

        vs.

BOBBY TINSLEY, an individual, BRIAN
QUIMBY, an individual, SKUXCHANGE, LLC,
I2W TAMPA BAY, LLC , iTOUCH ORLANDO, LLC, et al.

                        Defendants,

                and,

PRIATEK, LLC, a Delaware Limited Liability Company,

                        Nominal Defendant.

_____/

<u>**DERIVATIVE COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs, on behalf of Priatek, LLC ("Priatek"), bring the following Derivative Complaint (the "Complaint") against certain members of the Board of Directors of Priatek (the "Board"), for breach of fiduciary duty and aiding and abetting the same; against SKUX etc…. and alleges:

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

2.      Supplemental jurisdiction for state law claims is conferred by 28 U.S.C. §1367, as the Plaintiff's state and federal claims arise out of a common nucleus of operative facts, as more fully set forth below.

3.      Pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. §1965, venue is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<u>**PARTIES**</u>

**PLAINTIFFS**

5.      Plaintiffs are, and at all relevant times have been, holders of membership units of Priatek.  Plaintiffs will continue to hold Priatek membership units through the resolution of this action.  Plaintiffs became members under the original Operating Agreement for Priatek, LLC.  A subsequent, Amended Operating Agreement, was entered into between the Priatek Investors and the Board of Managers.

**NOMINAL DEFENDANT**

6.      Nominal Defendant Priatek, LLC ("Priatek") is a Delaware limited liability company headquartered in Saint Petersburg, Florida.

**DEFENDANTS**

7.    **Priatek "Minority Members"/Investors – as individual defendants**

    (a)    Hoshi Tamboli- investor in Priatek

    (b)    Linda Swenson- investor in Priatek

    (c)    Bob Quintana- investor in Priatek

    (d)    Matt and John Diaz- investors in Priatek

    (e)    John Glasscock- investor in Priatek and former board member.

8.    **Priatek Board 1 members as individual Defendants ("Priatek Board 1")**

    (a)    John Glasscock: Member since the latter part of 2015. Board member for two years (2016 to 2018).

    (b)    John Colby- Founder of Priatek since 2009. He was the COO/CFO as well as the Secretary on the Board of Directors. Resigns on March 20, 2019.

    (c)    Brian Quimby- Investor in Priatek. Board Member since 2014. Principal owner of I2W TAMPA BAY, LLC ("I2W") (which is now called FreePlay Media.). Resigns on March 20, 2019.

    (d)    Vijay Patel- Investor in Priatek. Board of Director since 2016. Resigns on March 20, 2019.

    (e)    Krishna Nallamshetty- Investor in Priatek since 2014. He was also a board member of Priatek from April 2018 to November 2018. Resigned November 6, 2018.

    (f)    Jim Sampey- Advisor at Priatek then he became a board member from April to September of 2018. Resigns on September 19, 2018.

    (g)    Kenneth Douglas- Board Member of Priatek from April to September of

2018. Resigns on September 19, 2018.

9.    **Priatek Board 2 members – collectively and as individual Defendants ("Priatek Board 2")**

    (a)    Gregory Karch- attorney. Non investor board member from January 2020 to present.

    (b)    Scott Matthews- owner of a kiosk company in Orlando called iTouch Orlando, LLC ("iTOUCH").  He is a non-investor board member of Priatek from January 2020 to present.

    (c)    Gary Clarin- Investor in Priatek. Board Member from January 2020 to present.

    (d)    Bruce Kamm- Investor in Priatek. Board Member from January 2020 to present.

    (e)    Mike Brazerol- Investor in Priatek. Board Member from January 2020 to present.

10.   **Priatek Executive Team – as individual defendants ("Priatek Executive Team")**

    (a)    Jeremy Ramos, Vice President of Engineering and Co-Founder of Priatek and also equity ownership interest in I2W

    (b)    John Colby, COO/CFO of Priatek and Co-Founder until August of 2018 - He was converted to solely COO.

    (c)    Bobby Tinsley- originally VP of Sales of Priatek; he received a lateral move to VP of Innovation with Blockchain

    (d)    Bob Zaccardo- VP of Business Development of Priatek

(e)     Jim Buckley- Director of Marketing of Priatek

(f)     Richard Waters – consultant for Priatek

11.   **SKUXCHANGE, LLC ("SKUX") – VendXOR, a block chain company**

(a)     Jim Sampey- Co- Founder and CEO of SKUX.

(b)     Kenneth Douglas- Co-Founder and EVP of SKUX.

(c)     Bobby Tinsley- Co-Founder and EVP of SKUX.

(d)     Bob Zaccardo- Co-Founder and EVP of SKUX.

(e)     Bob Quintana- former advisor for Priatek/VendXOR. Currently advisor for SKUX

(f)     David Chidekel- former legal advisor of Priatek's blockchain.

(g)     Moshe Joshua- Former head of blockchain technology for Priatek. Currently Chief Technology Officer of SKUX

(h)     Jon Najarian- former advisor for Priatek/VendXOR. Currently advisor for SKUX

12.   **I2W (fraudulent transfer of IP and kiosks) eventually becomes Free Play**

(a)     Brian Quimby- Principal owner of I2W which owned Priatek kiosks

(b)     Jeremy Ramos- Partial owner of I2W which owned Priatek kiosks

13.   **iTOUCH**

(a)     Scott Matthews- Current Priatek Board member and CEO of iTouch

(b)     Greg Karch- Current Priatek Board member and owner of DLT Law Group which is a Registered Agent of iTouch

## <u>DERIVATIVE ALLEGATIONS</u>

14. Plaintiffs bring this action derivatively in the right and for the benefit of Priatek to redress the breaches of fiduciary duty, tortious interference, and other violations of law by Defendants as alleged herein.

15. Plaintiffs have owned shares of Priatek membership units continuously during the period of the misconduct described herein and continue to hold membership units of Priatek.

16. Plaintiffs will adequately and fairly represent the interests of Priatek and its members in enforcing and prosecuting Priatek's rights.

## DEMAND FUTILITY ALLEGATIONS

17. Plaintiff did not make a demand on the Priatek Board 2 to bring suit asserting the claims set forth herein because pre-suit demand would have been futile. The facts alleged in the Derivative Complaint show that, at a minimum, reasonable doubt exists as to whether a majority of the board was disinterested and independent, or whether the LIEN AGREEMENT was the product of a valid exercise of business judgment.

18. Priatek Board 2 presently consists of five members, including Defendants Greg Karsch, Scott Matthews, Mike Brazerol, Bruce Kamm, and Gary Clarin.

19. Priatek Board 2 should not be considered independent board members. Moreover, all board members undeniably have personal and material financial interests aligned with individuals and in companies that misappropriated Priatek assets and technology in conflict with the interest of Priatek members.

## INTRODUCTION

The Big Scheme – Priatek's minority investors, key employees, board members conspire to hollow-out Priatek and transfer its assets into two separate companies (SKUX and I2W). The first group of bad actors ("Group 1") (Group 1 consists of Bobby Tinsley, Jim Sampey, Kenneth

Douglas, Bob Zaccardo, and Bob Quintana) extorts Priatek for control of a Priatek blockchain technology sub-entity.  When Priatek disagrees, Group 1 absconds with Priatek's technology and engineers and forms a new company – SKUX.  A second group of bad actors ("Group 2") (Group 2 consists of Brian Quimby, John Colby, Vijay Patel, and Krishna Nallamshetty) commits to an investigation from an independent firm so they can pursue litigation against Group 1. Yet, shortly after, Group 2 begins its collusion with Group 1.  The two groups colluded to stall the independent investigation and proceed to launch operations in New York City without the Managing Member's' authorization.   Group 2 ignores a member proxy vote to remove the tainted board members. Instead Group 2, both figuratively and literally, locks-out the Managing Member from Priatek and takes control of Priatek operations.  Group 2 then executes a lien agreement with Priatek assets as collateral but without the Managing Member's knowledge.  Group 2 (with additional members: Hoshi Tamboli, Linda Swenson, and John Glasscock ) are in the process of forcing the Managing Member to sign a new operating agreement; when it determines that it is more profitable to execute on the fraudulent lien and abscond with the company's assets than it is to take operational control of Priatek.  To that end, they burn through $1.2M in cash.  Furthermore, to drive Priatek into more debt and try to force a bankruptcy, Group 2 attest that they have an investment firm to recapitalize Priatek if the Managing Member voluntarily leaves Priatek.  The investment firm was a hoax. Months later, the board members from Group 2 resign and file a UCC to effectively steal the remaining assets of Priatek.  Priatek is left with nothing but debt, and both groups of defendants try to come together to recreate Priatek and it's blockchain company. These two groups and other members (Glasscock, Hoshi Tamboli, and Linda Swenson) conspired to destroy Priatek when it was valued at $54 Million and was on the cusp of major success.

## INITIAL OPERATING AGREEMENT ("OPERATING AGREEMENT")

20.    Priatek's Operating Agreement with an effective date of June 2, 2014. (Exhibit E3)

21.    Parties to the Operating Agreement were Priatek Executives, LLC (the "Managing Member") and Priatek Company Members.

## AMENDED OPERATING AGREEMENT

22.    Priatek's Amended Operating Agreement with an effective date of December 12, 2019. (Exhibit E4)

23.    Parties to the Amended Operating Agreement are Members and Managers (the "Board").

## PRIATEK COMMITTEE INVESTOR DEBRIEF REPORT
USURPING OF MANAGING MEMBER POWER, COMMITTEE FRAUD,
TORTIOUS INTERFERENCE AND IP THEFT (Exhibit E1)

24.    Priatek is an LLC and governed by an Operating Agreement that enumerates the terms and authority granted under it.

25.    Under the Priatek Operating Agreement the Managing Member's (Milind Bharvirkar) authority is clear and supersedes the authority of all others, Board of Directors included.

26.    In April of 2019, Managing Member appoints three (3) members (Mike Brazerol, Todd Lary, and Marc Gutherie) to a special committee to investigate the events that occurred at Priatek from around July 2018 to March 2019.

27.    August 23, 2019, a special committee debrief report was released to the members of Priatek. Sections 140-147 are direct excerpts from the report (names have been inserted).

28.    The trajectory of the events that have been unfolding are directly pointing towards Priatek's investor interests being severely degraded or eliminated by the redirection of Priatek's

Intellectual Property, its patents and its previous investments, towards the outside interests of former key Priatek personnel.

29.     In short, Priatek is being disassembled with the apparent intent to reconstitute its capabilities under the business ventures formed by Priatek personnel. This reconstitution directly threatens the financial interest of all investors.

30.     A week before the Board meeting to vote on the crypto (digital currency that the blockchain company creates) allocation disbursement, a major disagreement with a key member of the development team (Bobby Tinsley) surfaced about how the financial consideration and control of the effort would be divided amongst the team (Jim Sampey, Kenneth Douglas, and Bob Zaccardo) with Priatek. This member also demanded that his role to be promoted to Executive Vice President and for him to be noted as co-founder of Priatek.

31.     Three members of the VendXOR team (referring to Jim Sampey, Ken Douglas, Bob Quintana) and two Priatek board members (referring to Bobby Tinsley and Bob Zaccardo), also demanded a significantly larger percentage of the VendXOR assets, as well as direct control of the VendXOR business itself, essentially removing VendXOR from the control of Priatek LLC. The demands also included Board of Directors seats of this business.

32.     After the VendXOR team's demands were turned down, several members of the VendXOR team not only quit, they formed a new company they incorporated as SKUX, they also recruited Priatek's lead software technologist, Moshe Joshua. The representation of SKUX has remarkable similarities to the capabilities that Priatek had developed through its investment to the tune of approximately $1 million. (Exhibit 6 and 7)

33.     On March 14, 2019, Brian Quimby on behalf of I2W investors, initiated a Florida UCC1 filing.  Then, he filed a Delaware UCC1. Under the UCC1 filings I2W identifies that it has collateral rights to Priatek's IP.  (Exhibit E5)

34.     There are two primary areas leveling accusations and causing the distress to Priatek's Intellectual Property Rights: 1. I2W 2. SKUX. Both organizations feature former Priatek key members and stakeholders.

### CURRENT BOARD LETTER TO PRIATEK MEMBERS (SEPTEMBER 3, 2021) VERIFYING IP THEFT, FALSE ALLEGATIONS, AND FRAUD. (EXHIBIT E2)

35.     A new board is elected and takes office in January 2020 that consists of Greg Karch, Scott Matthews, Gary Clarin, Bruce Kamm, and Mike Brazerol.

36.     The new board commits to submitting a Special Litigation Report, filing corporate taxes, and recovering the patent on a letter sent on May 12, 2020, but never delivers on their promises. (Exhibit E9)

37.     On June 15, 2021, 37 members sent a letter with several questions and requested the Special Litigation Report from the board. They cited the following issues: conflicts of interest, non-performance, non-protection of company assets, non-communication, lack of a plan, and missed opportunities. This group of members asked for the board's resignation. The board responded with a letter that ignores the questions by the members, refuses to step down, and at the same time, tells the members that they can't help the company. While they will not deliver a SLC, the board sends a letter to the members on September 3, 2021. (Exhibit E8) Sections 155-163 are direct excerpts from this letter (names have been inserted).

38. August 2018, several key Priatek personnel and two of its Board Directors (referring to Jim Sampey, Ken Douglas, Bobby Tinsley, and Bob Zaccardo,) demanded increased financial consideration and operating authority, including equity ownership and control over Priatek's

blockchain business initiative, VendXOR. The demands were issued along with threats to report Priatek to SEC authorities for alleged securities violations. (Exhibit E2)

39.     September 2018- A former Director, (referring to Jim Sampey) issued a written communication under the auspicious of representing the "majority of Board of Directors stating willful wrongdoing by Milind Bharvirkar, as the manager of Priatek Executives, LLC, the managing member of Priatek (the "Managing Member"). The allegations continue to lack verifiable proof and subsequent requests by the Board ("by actually two different boards") for verifiable, actionable evidence of the accusations continue to go unanswered by the accusers as of the date of this communication.

40.     September 2018- Key Priatek personnel and two Directors (referring to Jim Sampey, Ken Douglas, Bobby Tinsley, and Bob Zaccardo) resigned from Priatek after their demands are not met with respect to the blockchain business initiative. This same group of former Priatek personnel organized a new business initiative under a new business name called SKUX. Effectively, this group left Priatek to start a similar business after Priatek's financial investment of more than $500,000 in VendXOR.

41.     October 2018- Priatek proceeded with the New York launch in opposition to the direction of the Managing Member.

42.     October 2018- A Director, select members and other key Priatek personnel launched a campaign to remove and terminate the Managing Member from Priatek's operations. (Referring to Brian Quimby, John Colby, Jeremy Ramos, Vijay Patel, Hoshi Tamboli, Linda Swenson, John Glasscock, and Krishna Nallemshetty).  The Managing Member, Milind, was locked out and stripped from having access to Priatek's systems, accounts, and office. He was effectively barred from performing his duties as the Managing Member.

43.    Also in October 2018, after removing the Managing Member, the remaining Priatek officers, management and Board Directors (referring to Brian Quimby, John Colby, Jeremy Ramos, Vijay Patel, Hoshi Tamboli, Linda Swenson, John Glasscock, Krishna Nallamshetty). proceeded to execute an equipment lease agreement between Priatek and I2W, a company owned and operated by one of the then current Directors (Brian Quimby and Jeremy Ramos). There is no evidence that such a relationship was properly approved by the company. In addition, the lease agreement materially modified a prior agreement between Priatek and I2W by incorporating modified language in an attempt to encumber Priatek's intellectual property as collateral to the equipment lease financing.  Subsequent attempts to have Priatek's intellectual property transferred per the agreement were thwarted by Priatek.

44.    March 2019- A former Director (referring to Brian Quimby) filed a UCC1 Financing Statement, attempting to evidence a lien on Priatek's Kiosks assets and its Patent, stemming from the prior mentioned agreement that appears to have been modified in October 2018 without proper company authorization.

45.    May 2019- A Priatek member, John Glasscock, issued a demand to Mr. Bharvirkar to make payment of $1 million into Priatek.

46.    July 2019- A former Director (referring to Brian Quimby) filed with the USPTO for an assignment of Priatek's Patent to I2W. He attempts to support the Patent transfer based on the terms of the fraudulent equipment lease agreement.

### FURTHER FACTUAL ALLEGATIONS OF SCHEME TO DEFRAUD PRIATEK AND CONSPIRACY

47.    In July of 2018, Jeremy Ramos (VP of Engineering) was approached by Bobby Tinsley (VP of Sales). In his testimony (EXHIBIT E11), Jeremy explains that Bobby Tinsley was covertly campaigning to be President of Priatek's new blockchain company called VendXOR, and

"other people were supporting him". Anthony Nguyen (Director of VendXOR) was approached by Bob Zaccardo (VP of Business Development) to join their team because they wanted a "larger share of the cryptocurrency project." (Exhibit E15)

48.     In July of 2018, Bobby Tinsley, Bob Zaccardo, Jim Sampey, and Kenneth Douglas were actively raising capital for Priatek and its blockchain company, yet they were also planning on stealing it.

49.     Bobby Tinsley promotes himself to Executive Vice President and Co-Founder of Priatek without discussing or authorization from the Managing Member. Michael Howard SVP of Operations and Human Resources instructs Bobby not to use those titles. (Exhibit E10)

50.     On September 7, 2018, Bobby Tinsley started an argument with the Managing Member about the governance of the blockchain company. The Managing Member is confused and promises Bobby Tinsley that he will look into his request with Brian Quimby. Bobby does not calm down and threatens the Managing Member by saying, "wait until you see what I do to you." (Exhibit E11)

51.     A group of board members and investors, Vijay Patel, Jim Sampey, Brian Quimby, Ken Douglas, Krishna Nallamshetty, David Chidekel, Bobby Tinsley and Bob Quintana, John and Matt Diaz, met on the weekend of September 8 and 9 of 2018 to remove the Managing Member. In an email on September 12, 2018, Vijay Patel states, "Now that we have accomplished initial goal, it's time to start preparing for final agenda. Let's start collecting all the facts about irregularities, misconducts and violations (including SEC) ASAP. (Exhibit E14)

**USURP THE MANAGING MEMBER TO DEFRAUD PRIATEK,
EXTORTION, AND TORTIOUS INTERFERENCE**

52.     On September 10, 2018 Jim Sampey ("a board of director") and David Chidekel ("legal advisor for Priatek"), representing the board of directors of Priatek, wrote a letter accusing

the Managing Member of not complying with SEC law with VendXOR and for "using the corporate account as my piggy bank". Copied on the email with the accusations are Bobby Tinsley, Kenneth Douglas (board of director), and Bob Quintana (advisor), Brian Quimby, Krishna Nallamshetty. (Exhibit E12)

53.     Note that these accusations were levied an evening before a board meeting to vote on the allocation of the tokens.

54.     On September 11th, another letter was sent to the Managing Member by Jim Sampey and David Chidekel ordering the Managing Member not to attend the Boston Token Fest (Blockchain convention) to announce the launch of VendXOR.  (Exhibit E13)

55.     Bobby Tinsley calls the Boston Token Fest and cancels the Managing Member's attendance and appearance to speak with Jon Nigerian of CNBC on stage.

56.     This is a clear example of tortious interference and their actions to stop the Managing Member from launching VendXOR continues. The board shuts off his company credit card. (Exhibit 16)

57.     On September 11, 2018, the Managing Member's attorney, Jack Kiefner, asked for specifics to broad allegations, and instructed the board that the company cannot launch in NYC given the situation. He also tells the board to stop disseminating the allegations to people outside of the board. (Exhibit E16)

58.     "We note that copies of the "Corporate Resolution" mentioned above were disseminated by members of the Board to outside parties. …it is blatantly clear that said allegations have been published to individuals outside of Priatek who potentially have the ability to affect the cryptocurrency efforts of the Company and its future capital raising activities."

59.    "If followed and considering the unsubstantiated allegations upon which these instructions are purportedly given, the Board will materially impact the ability of the Company to operate and, indeed, survive, let alone realize its potential successes."

60.    On September 13, 2018, Jack Kiefner wrote another letter on behalf of the Managing Member to the board. (Exhibit E17)

61.    "The Managing Member, given current disputes and controversies, cannot complete the "launch" in New York on or about October 1, 2018 without knowing that there are enough cash reserves and an ability to continue raising funds in order to meet necessary financial commitments."

62.    "We believe that the so-called Board of Directors is exceeding its powers and authority and is usurping, without written delegation, the authority which lies at the equity owner level over the Managing Member."

63.    "It should finally be noticed that the corporate governance for the crypto foundation is being supervised by Brian Quimby and was approved by legal counsel to the Company."

64.    Our legal, Umera Ali, states there are No SEC laws being broken.

65.    On September 17, 2018, Board members (Brian Quimby, John Colby, Vijay Patel (delayed signature), and Krishna Nallamshetty) sign a resolution to retract allegations. (Exhibit E18)

66.    The resolution states, "After reasonable search and inquiry, allegations made in a Corporate Resolution and in subsequent letters executed and sent by Jim Sampey purportedly on behalf of the Board of Directors, which may have been published to third parties without authorization, are withdrawn, ab initio, as though they were never issued."

67.     On September 15, 2018,  Bobby Tinsley resigned. Two directors (Jim Sampey and Ken Douglas) resigned on September 19, 2018, and Bob Zaccardo resigned after the token fest. (Exhibit E19 and 20)

68.     Later, the Managing Member finds an email chain from September 8th and 9th proving that the entire board was scheming to fire the Managing Member. (Exhibit E14)

## EXTORTION FOR CONTROL OF VendXOR AND TORTIOUS INTERFERENCE

69.     Bobby Tinsley persuades members to email rescission of their investments in Priatek.

70.     On September 21, 2018, John and Matt Diaz (Priatek members) requested $159,500 back. Bobby Tinsley is copied. (Exhibit E21)

71.     On September 29, 2018, Maria and Mark Hall, Brenda Camarinos, George Camarinos, Jeanne Camarinos, Amar Talati, and Peter Glickman collectively asked for $142,000 to be returned. Bobby Tinsley is copied. (Exhibit E22)

72.     On October 19, 2018, Bob Quintana requested by email for $54,000 back. (Exhibit E23)

73.     On October 22, 2018, Marc Blumenthal and Brent Fisher asked for $56,000 back. (Exhibit E24)

74.     Bobby Tinsley continues demands for control of VendXOR or more rescissions will come in. (Exhibit E25);

75.     Investors such as John Glasscock, Hoshi Tamboli, and Linda Swenson are demanding that Bharvirkar step down as President based on Bobby Tinsley's false allegations. (Exhibit E28)

76.     Richard Waters, a Priatek contractor, sends texts: "The pressure is mounting. Are you praying? Are you hearing from the Lord? You are in a storm…..Rescissions are coming and they will keep coming."; "Milind please ask your legal counsel how they can help you fund your company after all the 2018 investors rescind." "If you don't make the right decision in the next 24 hours, and sign the revised MOU, our company is going up in flames."  "But you apparently believe in your righteous indignation and refuse to meet current demands."  "If your actions cause the company to fail, which is about to happen, you could face incarceration." (Exhibit E29)

**INTELLECTUAL PROPERTY THEFT OF VendXOR**

77.     Jim Sampey, Kenneth Douglas, Bobby Tinsley, Bob Zaccardo, and David Chidekel create SKUX.

78.     SKUX is a blockchain-based enterprise solution for coupons and offers, providing a single source of truth for Brands, Retailers, Media, and Service Providers, while unlocking lost value across the trillion-dollar coupon and loyalty industry. (Exhibit E7)

79.     VendXOR owned and created by Priatek was also a blockchain company for coupons and offers. (Exhibit E6)

80.     Moshe Joshua (technologist and programmer) terminates his relationship with Priatek after being paid hundreds of thousands of dollars of money to build the blockchain company for Priatek. Moshe Joshua never delivers any software code for his work.

81.     After demands by Bobby Tinsley and Richard Waters are not met, Jim Sampey, Kenneth Douglas, Bobby Tinsley, Bob Zaccardo, and David Chidekel recruit Moshe Joshua to start a new company doing the same exact thing as Priatek's company, VendXOR. Moshe Joshua uses the same software that Priatek paid for to start SKUX  (see same team in Exhibit 6 "VendXOR team" and Exhibit 7 "SKUX team").

**MANAGING MEMBER IS TRICKED, LOCKED OUT OF OFFICE, EXTORTION, AND BOARD LAUNCHES IN NYC AGAINST MANAGING MEMBER'S INSTRUCTIONS**

82.     Attorney Umera Ali states, "I don't think you can have a situation where you are being held hostage by individuals on how to run your business." (Exhibit E30)

83.     Attorney Umera Ali recommends that the board hire an independent investigator (Cendrowski firm of Chicago) to investigate two particular matters.  An investigation that can be finished within two weeks.

84.     Part 1 of the investigation is to interview investors and executive staff of any complaints about Managing Member and investigate those allegations.

85.     Part 2 of the investigation into the actions and motives of the two directors and two executives that resigned, Robert Tinsley, Kenny Douglas, Jim Sampey, and/or other potential adverse parties (David Chidekel, Bob Quintana, Moshe Joshua, Bob Zaccardo) with respect to:(i) theft, conversion, or commercial exploitation of, or conspiracy to steal, convert, or commercially exploit, all or some elements of Priatek's intellectual property, technology, products, trade secrets, proprietary information, confidential information, business plan, plans, hardware, software, processes, specifications, designs, applications, methods, procedures, data, vendor relationships, supply-chain relationships, with respect to the blockchain component or planned blockchain component of Priatek's business, or any other aspect of the business of Priatek; (ii) violations of any or all applicable obligations of confidentiality, non-disclosure, non-circumvention, and good faith and fair dealing with respect to Priatek's operations, property, and/or investors; (iii) defamation, tortious interference, and/or other causes of action."  (Exhibit E31)

86.     As verified by the board in their resignation letter, Attorney Umera Ali (SEC attorney for Priatek) recommends that the Managing Member steps down as President and work

from home for two weeks until the investigation clears the Managing Member – while retaining the position of Managing Member.  (Exhibit E32).

87.     The Board, John Colby, Brian Quimby, Vijay Patel, and Krishna Nallamshetty, launch kiosks in NYC against the instructions of the Managing Member. (Exhibit E32).

88.     Brian Quimby and John Colby are aware of the fact that the company does not have enough money to launch in NYC. (Exhibit E33)

89.     Rich McIntyre, an attorney for Hoshi Tamboli, informs the Managing Member that Brian Quimby and John Colby are inquiring about bankruptcy plans for Priatek.  At the time, Priatek had $1.2M in the bank with manageable debt.  There was no reason for bankruptcy plans (Exhibit E28).

90.     Managing Member is threatened by members Hoshi Tamboli, Linda Swenson, Richard Waters, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock and others that if he returns to the office that he will be sued. (Exhibit 28)

91.     On October 25, 2018, with proper authority according to the operating agreement, Managing Member appoints Allen Clary (executive of Tampa Bay Wave incubator) to be interim President of Priatek. (Exhibit 34)

92.     Hoshi Tamboli, Linda Swenson, John Glasscock, Brian Quimby, and John Colby refuse to allow Allen Clary in the office. (Exhibit 35)

93.     The investigation continues to be stalled by John Colby and Brian Quimby to keep the Managing Member out of the office.

**PROXY VOTE IS IGNORED, MANAGING MEMBER CONTINUES
TO BE LOCKED OUT, AND SPOLIATION OF EVIDENCE**

94.     In the first week of October 2018, the Managing Member conducted a member vote to remove Brian Quimby and John Colby from the board.

95.     Simultaneously John Colby solicits a new operating agreement to the members.

96.     While John Colby submission of a new operating agreement does not pass, the board members vote for the removal of John Colby and Brian Quimby passes on October 25, 2018. (Exhibit 37).

97.     On October 26, 2018, the Managing Member terminated John Colby from his executive position at Priatek.  (Exhibit 38)

98.     In response to the proxy vote and termination of John Colby, Hoshi, Swenson, and Glasscock instructed John Colby and Brian Quimby to lock the Managing Member out of the office, ignore the proxy vote, and Colby's termination by the Managing Member. The same week, the Managing Member discovers that John Colby was appointed President by someone, but no one is willing to say who. (Exhibit E40)

99.     The Managing Member's email and access to the google drive is shut off by Jeremy Ramos.

100.     Without access to the google drive, the Managing Member cannot access board minutes, financial records, expense reports, non-competes, contracts, NDAs, board and advisory agreements, and lien agreements.  Agreements with Moshe Joshua's company,  board of directors, executives, and advisory agreements that include non-competes with Jim Sampey, Kenneth Douglas, Bobby Tinsley, Bob Zaccardo, Bob Quintana, Jon Najarian, Brian Quimby, John Colby, and other members and executives are missing.

101.     To this day, (even after the resignation of the board and a formal request for these items), these records have never been returned to the Managing Member. (Exhibit E39)

102.    The Managing Member salary was also terminated on October 26, 2018.

103.    This takeover of the office is a clear violation of the operating agreement. The Managing Member has authority over the board and the executive team.

104.    The operating agreement states that no member can act as if they are the Managing Member. There is a clear admission of this in the board's resignation letter. (Exhibit E32)

105.    Umera Ali informs the Managing Member that he needs to verify each member that voted by producing their signed operating agreement. The signed operating agreement (paper copies) were locked in the accounting office and the keys were changed to prevent the Managing Member from getting in. (Exhibit E40)

106.    It is clear at this point to the Managing Member that the investigation was a trick to get the Managing Member to leave the office. Once out of the office, certain members, directors, and executives are working together to defraud the company.

107.    The claim of needing the signed operating agreement from every member was unwarranted under the terms of the operating agreement.

108.    When the Managing Member asked Umera Ali for help, she said she represents the board not the Managing Member. (Exhibit E40)

109.    On November 5, 2018, Jeremy Ramos states, "As I understand it the Proxy vote to remove John and Brian from the board has been rejected or revoked by a majority of investors. Copied on the email is board members: Brian Quimby, John Colby, Vijay Patel, Krishna Nallamshetty and investors: Hoshi Tamboli Steve Grunbach, Dipak Shah, Sareet Majumdar, John Glasscock, Gary Clarin, and attorney Umera Ali. (Exhibit E35)

110.    The proxy vote was passed by 63.47%. The proxy vote was not rejected by the majority of investors. It was rejected by a small group of investors that were supporters of Brian Quimby and John Colby. Those members are copied on the email sent by Jeremy Ramos.

111.    The Managing Member has Priatek's corporate attorney (Battaglia, Ross, Dicus & McQuaid) verify the results of the proxy vote. On November 21, 2018, the law firm verified the vote to remove John Colby and Brian Quimby passed by 63.47%. (Exhibit E37)

112.    Attorney Rich McIntyre writes in an email that the verification of the proxy vote by the law firm further validates the vote to remove John Colby and Brian Quimby.

113.    After the verification from legal counsel, the investors (Tamboli, Swenson, and Glasscock) still refuse to allow the Managing Member back to the office. (Exhibit E34, E43, and E44)

114.    While the proxy vote to remove the board members Brian Quimby and John Colby was successful, another vote advanced by these minority investors to pass "their" amended operating agreement was unsuccessful.

115.  The minority investors, representing approximately 25% of all members, refused to acknowledge the winning results and proceeded to lock out the Managing Member.

## COVER UP OF INVESTIGATION AND CONSPIRACY

116.    The investigation conducted by the Cendrowski Firm according to Randy Wilson ("the investigator") continues to be stalled by John Colby and Brian Quimby. (Exhibit E42)

117.    This investigation is never released until over a year later (late 2019 or early 2020).

118.    According to Rich McIntyre, he recommended it would be best not to be completed. Yet, the Managing Member insisted on it being completed.

119.    Gary Clarin writes an email to Linda Swenson, "Linda where is the report? I heard from Milind today and there is nothing in the report. That came from Rich. Milind is clean except for maybe some expense reports. This is over. We need to get Milind back and working. Get rid of John and Brian and stop the BS. The smoke screen is over. We have spent 10 weeks and a million dollars trying to force-out our guy who did nothing wrong." (Exhibit E43)

120.    On September 21, 2018, Umera Ali, the corporate security attorney states, "There has been no breach of SEC regulations as both your equity issuances were done under SEC regulations- one under Reg D, the other under Reg S." (Exhibit E30)

121.    On November 11, 2018, Umera Ali in regards to the investigation by Cendrowski states, "a number of allegations were raised against Milind in his personal capacity. However, there was no evidence provided in relation to these allegations." Yet, John Colby and Brian Quimby do not accept this answer and continue to press allegations against Milind. (Exhibit E41)

122.    On November 11, 2018, Umera stated the following about the investigation of SKUX: [One of the issues that was going to be considered in the investigation was whether there was a conspiracy by Bobby and others while they were working at Priatek. It has been difficult to independently verify this issue as the investigators have not been able to get access to the email inboxes of all the relevant individuals and key employees of the company. This is not because the company has not agreed to provide access to the inboxes but because investigators wanted to get forensic evidentiary experts to copy the inboxes before accessing any information. This process allows us to submit the emails as evidence in court (in case of proceedings). The failure to do this would make the emails inadmissible. We appreciate that there are cost concerns in relation to this process, and therefore, this cannot be done at the stage] (Exhibit E41)

123.    In essence, the board with the support of Umera Ali dropped the investigation of Bobby Tinsley, Bob Zaccardo, Jim Sampey, Kenneth Douglas, and Moshe Joshua for IP theft, extortion, tortious interference, defamation, breach of fiduciary responsibility because they can't forensically capture emails. (Exhibit E41)

124.    There were many other options to consider if the board wanted to finish an investigation such as deposing all the board members. The investigator for Cendrowski, Randy Wilson, said that John Colby and the board refused to finish the investigation. (Exhibit E42)

### EXTORTION AND TORTIOUS INTERFERENCE

125.    A group of members, directors, and an attorney (Hoshi Tamboli, Linda Swenson, Gary Clarin, Frank Helstab, John Colby, Brian Quimby, Vijay Patel, and Attorney Rich McIntyre) hold various meetings and start a chain email. (Exhibit E43)

126.    The chain email states from Hoshi Tamboli, "we keep the investigation findings and roll it into the complaint and arbitration etc. John Colby and Brian Quimby work on your operating agreement draft and employment agreement." (Exhibit E43)

127.    Hoshi Tamboli was threatening the Managing Member with a lawsuit if the Managing Member didn't agree to his terms for several months (between September and December of 2018).

128.    On December 4, 2018, "Brian, John, and Vijay" are simply operating in the capacity of the board members who have a fiduciary responsibility and have pointed out some serious issues." stated Brian Quimby. (Exhibit E43)

129.   Umera Ali gave an update regarding the investigation on November 11, 2018 that there was no evidence of wrongdoing to the board, yet Brian Quimby continues his allegations in order to prevent the Managing Member from returning to the office.

130.    These individuals, and members, are lynching the Managing Member but have no interest in pursuing SKUX for IP theft, extortion, and tortious interference.

131.    There is collusion between Bobby Tinsley, Brian Quimby, John Colby, Linda Swenson, and Hoshi Tamboli. Bobby and Brian persuade Linda and Hoshi to keep the Managing Member from returning, so they can steal the IP from Priatek and VendXOR.

132.    This group of members tells the Managing Member that he cannot return until he agrees to dissolve the Managing Member position and sign a new operating agreement which would give them control of the company. (Exhibit E34, E43, and E44)

133.    This group is also superseding its authority by negotiating the Managing Member's salary, employment agreement, and reimbursement for legal expenses. (Exhibit E43 and E44)

134.    This email chain shows that members are interfering and working with Brian Quimby and John Colby to prevent the Managing Member from returning. If the Managing Member returns, then he could discover and report the ongoing fraudulent activity.

135.    Brian Quimby states that he has evidence of "serious issues" against the Managing Member. Brian Quimby has been spreading false allegations to members that included: (a) Managing Member took a $200k vacation with his wife to Europe with company funds; (b) Managing Member bought $65k worth of furniture for his home with company funds; (c) Managing Member spent $10k worth of clothes for his wife.  (Exhibit E42 and E32)

136.    Brian Quimby's allegations are baseless and the accusations are lies to discredit the Managing Member. Quimby's attacks on the Managing Member distract members from his scheme to defraud the company.

137.     Brian Quimby wrote an email to the Managing Member a month earlier saying, "I love you man", and Brian Quimby signed the resolution that the board found no wrongdoing by the Managing Member. (Exhibits E45 and E18)

138.     The negotiations for a new operating agreement are being done under extreme threats by these "hostile" members.

### JOHN COLBY AND BRIAN QUIMBY CONSPIRE TO COMMIT FRAUD AND EXTORTION BY INVENTING A FICTITIOUS INVESTMENT FIRM (RATH CAPITAL PARTNERS)

139.     On December 13, 2018 on the eve of the Managing Member signing the operating agreement that would allow him to return to Priatek, if he gave board control to Hoshi Tamboli, Linda Swenson, and Rich McIntyre. Rich McIntyre and Gary Clarin call Milind Bharvirkar and offer him a buyout.

140.     Rich McIntyre claimed that Brian Quimby and John Colby had an investment firm that was willing to buyout Milind Bharvirkar's equity for $2.7M. Their proposal was Milind would get $875,000 and the remaining $1.825M would go to Priatek. In other words, the Managing Member is giving 2/3 of his investment back to Priatek.

141.     Milind consulted several members and reluctantly agreed to accept the offer for the sake of the other Priatek members.

142.     A unit transfer agreement was executed on December 21, 2018, and the money was supposed to be transferred within 7 days. (Exhibit E46)

143.     The buyout agreement also stated in section 4.3- Prior to the execution of this Agreement, Company or certain parties related to Company initiated an investigation into the conduct of the Founder (the "Investigation"). Investigation has not provided evidence of any wrongdoing by the Founder.

144.    While weeks pass without the emergence of an investment firm to buyout the Managing Member, in February of 2019, John Colby calls the Managing Member and informs him that the investment firm renegotiated the deal. The investment firm is suggesting that Milind only receive 50% down and 50% in 6 months (unsecured). The Managing Member says he will think about it.

145.    On February 6, 2019, John Colby extorted the Managing Member into signing the addendum. Colby states in the email (Exhibit E47): "For the sake of clarity we wanted to ensure you understand what happens should the deal not be consummated by Wed night" – (a) Investors, creditors and partners will be notified of the company's insolvency which will bring on a slew of lawsuits from Zumwalt, Schweizer, attorneys, landlords, malls, and others; (b) SEC- fraud, misrepresentation and willful misconduct- should the SEC classify you as a "Bad Actor" you will be barred from raising capital OR holding any senior position with a company who wishes to raise capital in the United States for life; (c) Former employees, investors and other familiar with the history of the company will no longer be restricted or asked to refrain from contact with the media; all of the dirty laundry at Priatek that has led to your current situation will become public record with multiple independent sources. When your name is Googled those articles will be the top search results permanently; (d) We're sorry to put things in this light, but it is your final hour. If this deal expires on Wed night, there is no more money, no more runway; this will become your life and everyone involved loses.

146.    Under threats of extortion from John Colby, the Managing Member concedes for the benefit of the members and signs the addendum to the buyout offer on February 7, 2019. (Exhibit E48)

147.     John Colby calls the Managing Member in March of 2019 and tells him the investment firm fell through, while the Managing Member met all his requirements.

148.     After the deal falls through, the Managing Member learns that the investment firm was called Rath Capital Partners.

149.     Rath Capital Partners was founded on December 13, 2018. The same day the buyout offer was made to the Managing Member.

150.     Rath Capital Partners was founded by Jim Buckley, the director of marketing at Priatek.

151.     Jim Buckley was close friends with Jim Sampey and Bobby Tinsley. Jim Sampey hired Jim Buckley at Val Pak and also hired him at Priatek.

152.     Jim Buckley was not independently wealthy, and he has never been in the investment business.

153.     Jim Buckley stated to Todd Lary from the special committee by email: "Our team assessed Priatek as a potential investment late last year and made the decision not to move forward with investing or being involved in that business in any way going forward." (Exhibit E49)

154.     Rath Capital Partners is no longer in business.

155.     Frank Helstab, a Priatek member, told the Managing Member that Rath Capital Partners was a hoax and had never done an investment deal.

156.     Rath Capital Partners was a hoax to prevent the Managing Member from returning, uncovering the fraud that was going on, and running up more debt for Priatek.

### MARCH 20, 2019 RESIGNATION LETTER BY BOARD FRAMES MANAGING MEMBER AS THE FALL PERSON FOR THE CONDITION OF PRIATEK

157.     The Managing Member was locked out of the office as a response to the proxy vote being passed and the minority of investors rejecting the results.

158.   John Colby notifies the Managing Member that the deal with Rath Capital Partners fell through.

160.   The Board sends a resignation letter to the Priatek members and blames the condition of Priatek on the Managing Member. (Exhibit E32)

161.   Letter states in part that [this letter has been composed by the resigning Board members and former employees and contractors].

162.   The letter was written under direction of the minority investors in the company, including John Glasscock, Vijay Patel, Hoshi Tamboli, and Linda Swenson.

163.   The letter further states, "The executive team also made the decision to deploy kiosks into the NY malls against Milind's wishes."

164.   These kiosks result in being abandoned in NYC. The decision to launch in NY results in depleting the capital reserves of the company and losing all the kiosks shipped in NY. The cumulative loss is over $2 Million to the company. Yet, that doesn't include the amount of debt that John Colby and Brian Quimby accumulate and expend cash reserves in the amount of $1.2 million.

165.   The letter also states, "Milind resigned as President of the Company, however, he did not resign as Managing Member or Chairman of the Board. Under the current operating agreement, the Managing Member has complete authority over the company's operations and the current Board cannot overrule or remove him."

166. The letter also states, "In early December, a credible investor approached certain individuals in the company with an offer to pay Milind off and invest in the company going forward without him." As noted herein, the "credible investor" was not credible at all. The investor

was a newly formed company by the director of marketing of Priatek, Jim Buckley. It was a hoax to run the company into more debt.

167.   Still yet the letter exalts SKUX and minimizes fraud and intellectual property theft conducted by conspirators composed of SKUX and Priatek members, board members, employees, and consultants.

168.   In part, Bobby Tinsley demanded control of VendXOR. He led numerous investors to ask for rescissions unless the board gave him control of our blockchain company.

169.   Priatek invested $ 1 Million dollars in the development of VendXOR- blockchain for coupons and offers.

170.   Bobby Tinsley, Bob Zaccardo, Jim Sampey, Kenneth Douglas, Bob Quintana, and Moshe Joshua signed non competes and NDAs. They stole the Intellectual Property of Priatek (VendXOR) and started the exact same company (SKUX) across the street from Priatek.

171.   The corporate attorney Umera, Brian Quimby, John Colby, Vijay Patel, Hoshi Tamboli, Linda Swenson, and John Glasscock refused to complete the investigation on SKUX and its members in order to break the parts of Priatek and steal them with two different parties.

**FRAUDULENT LIEN AGREEMENT RESULTS IN AN ILLEGAL UCC FILING AND FRAUDULENT PATENT TRANSFER TO START A SEPARATE COMPANY**

172.   On March 14, 2019 (6 days prior to the resignation letter) a UCC filing was initiated I2W Tampa Bay, LLC owned by Brian Quimby. (Exhibit 5)

173.   The UCC statement covers collateral representing physical Priatek kiosks units and associated intellectual property.

174.   Brian Quimby, John Colby, and Vijay Patel do not disclose the UCC filing in their resignation letter 6 days later on March 20, 2019. To add, the Managing Member had no

knowledge of this new lien agreement or modified old lien agreement. Furthermore, the board did not have the authority to execute this lien agreement without the Managing Member. (Exhibit E32)

175.    Upon further inquiry by Mike Brazerol, the Managing Member discovers that the lien agreement that I2W (which collateralized kiosks only) was modified in October of 2018 to include all the assets, source code, kiosks, patents, and copyrights/trademarks of Priatek. (Exhibit E1 and E2)

176.    Significantly October of 2018 was the month that the lien agreement was modified, and it was also the month that (a) The board launched in NYC without the authorization by the Managing Member. The board knew that the company did not have enough funds to launch in NY; (b) October of 2018 was the month that the proxy vote terminated John Colby and Brian Quimby from the board, and they ignored it; (c) Rich McIntyre told the Managing Member that Brian Quimby and John Colby were inquiring about a bankruptcy, yet there was $1.2M in the bank with manageable debt; (d) It was also the month that the Managing Member was locked out of the office and his google drive access was terminated- which leads to the destruction of key contracts and non-competes.

## SEPTEMBER 3, 2021 LETTER WITH FINDINGS OF CURRENT BOARD

The Managing Member, the Special Committee and the current board of Priatek believes that Directors and members (referring to Brian Quimby, John Colby, Vijay Patel, Hoshi Tamboli, Linda Swenson, and John Glasscock) were conspiring to lock out the Managing Member and run Priatek into bankruptcy, so they can take the assets of the company and start a new company with a fraudulent lien agreement.   But this was only to buy time to let the clock run against Milind and Priatek would be taken into bankruptcy.  (Exhibit E3)

177.     On July 30, 2019, Brian Quimby files for transfer of Priatek's patent and I2W takes possession of the patent when Priatek was not insolvent, and without judicial approval.

178.     After filing a complaint, the United States Patent and Trademark Office declares that Brian Quimby illegally transferred the patent.

179.     On September 6, 2019, the Managing Member filed a Final Demand Notice to Brian Quimby to return the assets and patent of Priatek but Brian Quimby refused to cooperate. (Exhibit E27)

## CONSPIRACY

180.     On June 15, 2019, Brian Quimby wrote a letter to Mike Brazerol and the Special Committee where Brian Quimby states, "I have the express support or proxy from other Priatek investors representing roughly $12 million." (Exhibit E50)

181.     While the Managing Member had the support of 63.4% of investors, as reflected in the proxy vote to remove Quimby and Colby, the investors that did not vote for removal of the two board members but supported Quimby included John Glasscock, Frank Helstab, Hoshi Tamboli, Vijay Patel, Linda Swenson, and Steve Grunebach.

182.     Brian Quimby and John Colby to date have refused to provide the Managing Member, Special Committee or current board with the revised lien agreement.

183.     The June 15, 2019 letter from Quimby, a former board member, states, "Neither I nor I2W nor any other Priatek investor have any obligation whatsoever to engage with or be responsible to you, your group or Priatek; Priatek has an obligation to us. We certainly will not engage with the wild conjecture, false and meritless accusations, deranged conspiracy theories, destructive behavior or deceptive and delusional optimism espoused, published and circulated by your group." (Exhibit E50)

184.     Implying his loyalties lie with certain investors, Brian Quimby states in an email to Mike Brazerol and the special committee that he cannot save every Priatek investor but he can save some.

185.     On September 22, 2019, an email from Brian Quimby and Linda Swenson to Scott Matthews (on current board of directors), states that Free Play (Quimby transferred all the assets of I2W to Free Play) consist of these key players: Steve Grunebach, Sareet Majumdar, Frank Helstab/John Moshegan, Bruce Kamm, Hoshi Tamboli, Dipak Shah, Vijay Patel, and John Glasscock. (Exhibit E51)

186.     These are the same Priatek members and board members that ran Priatek into the ground.

187.     These are also the same individuals who supported Brian Quimby and John Colby when the proxy vote was ignored, the Managing Member was locked out, and the fraudulent lien agreement was executed.

188.     On September 29, 2019, Brian Quimby wrote an email to Scott Matthews and states, "Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up." (Exhibit E52)

189.     This email details that Bobby Tinsley, Jeremy Ramos, Vijay Patel, and Frank Helstab were assisting Brian Quimby and Linda Swenson to raise capital for I2W.

190.     Additionally, Jeremy Ramos is a key player because he is the engineer that has possession of the software to run Priatek's kiosks.

191.     In May of 2019, the Managing Member calls John Colby and asks how he and others can do this, John Colby replies that all of them are politically connected. No matter what

the Managing Member does, they have a counter move. They have more money to fight the Managing Member in court, and he has no chance.

## EXTORTION, FALSE ALLEGATIONS, AND COMPLAINT BY JOHN GLASSCOCK

192.    Jeremy Ramos called the Managing Member in April of 2019 and informed him if he doesn't run Priatek into bankruptcy John Glasscock and Brian Quimby will sue him.

193.    Misappropriation of assets by Defendants, including Brian Quimby also reflects Defendants' goal to drive Priatek into bankruptcy.

194.    John Glasscock delivers a complaint to the Managing Member on May 21, 2019 with false allegations to pressure the Managing Member to put Priatek into bankruptcy.

195.    John Glasscock's complaint is based on information and collaboration with Brian Quimby and John Colby.

196.    Quimby and Colby have confessed to the current board of their inappropriate actions against Priatek and the Managing Member.

197.    The prior board composed of Quimby, Colby and Vijay Patel were asked to produce all financial documentations, contracts, expense reports, lien agreements, board and advisory agreements, QuickBooks statements of the $1.2M over the previous 6 months which is unaccounted for, etc. No documents were ever provided to the Managing Member, yet Quimby and Colby gave the financial documents to Glasscock for his complaint. (Exhibit E39)

198.    Documents were also destroyed so the Defendants could present their version of events.

199.    Reports have been written by the special committee and the current board of directors that I2W and SKUX have stolen millions of dollars of IP from Priatek, yet John Glasscock is not interested in their investigation or lawsuit. The total loss of the investors is $16

Million, yet the value of Priatek was $54 Million at the time of the usurping of the Managing Member in September 2018. (Exhibit E1 and E2)

200.    In a sworn deposition, John Glasscock claims to not know who is I2W or Free Play. This is hard to believe since he was on the board for two years, and Brian Quimby is helping him with his claims against Milind.

201.    Yet, on September 22, 2019, in an email from Brian Quimby and Linda Swenson to Scott Matthews (on current board of directors), it states that Free Play (Quimby transferred all the assets of I2W to Free Play) consist of key players including John Glasscock. (Exhibit 51)

202.    John Glasscock has invested $4M in Priatek. Yet, he did not vote for the new board to try to save the company.

203.    John Glasscock refuses to acknowledge the validity of the current board and refused to be interviewed by the board and the former special committee of members.

204.    Glasscock is interested in pursuing the Managing Member for misappropriation of funds but is perplexingly indifferent about IP Theft of all the company's assets and technology or trying to save Priatek.

205.    Glasscock claims to have an expert witness, a CPA firm to analyze Priatek's financial data and any impropriety on the part of the Managing Member.

206.    However, the CPA firm is not a domain expert in games, prize promotions, or technology revolving around Priatek's business.

207.    The CPA firm did not interview the Managing Member about spending or business expenses.

208.    The CPA firm took direction solely from John Colby and Brian Quimby to generate its biased report.

209.    The current board has provided a written statement that John Colby and Brian Quimby created a fraudulent lien agreement.

210.    The CPA report was engaged by Brian Quimby and John Colby even though they had an opportunity to finish an investigation with the Cendrowski firm in October of 2018. The Cendrowski firm did not find any wrongdoings by the Managing Member, so Colby and Quimby did not finish the investigation. Instead, Colby and Quimby collaborated with Glasscock to file suit against the Managing Member.

211.    The claims against the former Managing Member such as lack of board meetings, financial reports, compensation reviews are all false. John Glasscock, John Colby, Brian Quimby, and Jeremy Ramos have confiscated and concealed board minutes, financial records, votes on plans, expense reports, compensation reviews, non-competes, advisory and board agreements, lien agreements to make false allegations of the Managing Member. The Former Managing Member will be able to prove that these documents existed before they were destroyed by this group.

212.    The current board states in its latest letter that Glasscock's complaint is preventing the board from doing a deal with the former Managing Member and it is therefore preventing them from saving the company.

213.    The lawsuit was initiated by Glasscock to prevent Priatek members from supporting the Managing Member to save Priatek.

214.    The lawsuit contains baseless allegations that are blatant lies.  John Glasscock served on the board of directors for two years (2016-2018) but never presented even a single written complaint as a board member.

215.    Nevertheless, Glasscock now falsely claims that there were very few board meetings when on the contrary there were many board meetings and constant communication.

216.    Glasscock claims that there were no financial reports presented to him but instead financial statements were presented to the board and Glasscock at every meeting.

217.    Glasscock claims that the Managing Member recklessly manufactured 275 kiosks but instead Glasscock persuaded the Managing Member to build 200 or more kiosks, and in Glasscock's own words…"it is low risk".

218.    Glasscock played a major role in the sabotage of Priatek.

219.    Quimby confessed in an email to the board on Sept 16, 2019 that the Managing Member was pressured by Glasscock to step down as President.

220.    According to the board members, Glasscock has threatened the current board with litigation if the board releases a SLC report.

221.    Quimby claims to have the support of members that collectively invested $12 Million. It is obvious that Glasscock is part of this group because Glasscock invested $4 Million.

## THE CURRENT BOARD CONSPIRES WITH BRIAN QUIMBY

222.    On June 15, 2021, 36 members signed a letter requesting the current board resignation for non-performance, non-protection of company assets, unreported conflicts of interest, missed opportunities, non-communication, and a lack of a plan. (Exhibit E8)

223.    This 15-page letter details a breach of fiduciary duties that include the non-production of a special litigation report promised, in a May 12, 2020 letter, by the board to the members.

224.    Four board members (Karch, Brazerol, Clarin, and Kamm) interviewed Colby and Quimby and stated that there were confessions to the fraud.

225.    The board had dozens of emails, documents, bank statements, and contracts to complete a report, but never did. Every document and more in this complaint was given to the board.

226.    The board has not performed basic corporate tasks: (a) No annual meeting as required by the Priatek operating agreement; (b) Taxes were not filed; (c) Corporate filings were not met; (d) No bank account was opened; (e) No website was created

227.    The Managing member inquiries about the SLC report are met with hostility by board members.  Scott Matthews said, "Walk away from Priatek. The company is dead. I can't tell you why but walk away."  Gary Clarin said, "We are not going to complete the SLC because you are asking for it."  Mike Brazerol said, "I'm going to write a book on how you can be right but still fail. This is one of those situations."  Greg Karch said, "You don't need the SLC to clear your name."

228.    When Milind inquires about the board intervening in the derivative complaint initiated by Glasscock, Brazerol says the board doesn't believe it is their business to intervene.

229.    It is further evident that the board is collaborating with Quimby and Glasscock since Priatek machines are being used in commerce at a car museum called Dezerland on International Drive in Orlando; Priatek machines with iTouch Orlando software on them; Priatek member Matt Doniger finds Priatek kiosks with iTouch Orlando software on kiosks in the SeaWorld Doubletree hotel.

230.    Scott Matthews of the current board owns a company called iTouch Orlando. It provides kiosks for hotels in the Orlando area.

231.    Scott Matthews made a deal with Brian Quimby to repurpose Priatek's kiosks and launch them in Orlando with his software.

232.    The member letter also reflects that the iTouch Orlando website contains a copyright notice by I2W Tampa Bay, which is owned by Brian Quimby.

233.    In addition, iTouch's Orlando's LLC Articles of Organization show that the company's Registered Agent is DLT Law Group, which is the law firm of Priatek's Board Member Gregory M. Karch.

234.    Furthermore, Priatek members have discovered that Brian Quimby has invested in Scott Matthew's company, iTouch Orlando.

235.    The member letter states, "one thing is clear: At least two Priatek Board Members appear to have conflicts of interest, and the Board has not shared this information with Priatek investors…..Moreover, the Board and its Special Litigation Committee were responsible for investigating issues involving former Board member Brian Quimby."

236.    Quimby acquired Priatek's patent in 2019 for his company, I2W Tampa Bay. (The US Patent Office later agreed with a Priatek objection to the patent reassignment and said that Priatek could retrieve its patent if it paid the renewal fee.)"

237.    There are questions in the letter from the members to the board that remain unanswered to this day: (a) "How can the Board protect Priatek assets and defend Priatek investors' interest if two of its members have significant conflicts of interest?; (b) "How can the Board examine issues involving Brian Quimby (as part of the Board's Special Litigation Committee) when certain Members are affiliated with a company that is linked to Brian Quimby's company, I2W Tampa Bay?"; (c) "To what extent are current and past Priatek Board members profiting from the assets of Priatek?"; (d) "Why has the Board not disclosed to investors these conflicts of interest?"

238.    It is evident that at least two board members and perhaps more are profiting from the distressed state of Priatek. These board member(s) would benefit from Priatek going bankrupt.

239.    A month after the member letter, the board released a letter stating that Bharvirkar released confidential information. It insinuates that there was a plan to help Priatek, yet no plan to date is ever released to the members. It also states that the board refuses to step down as requested by the members.

240.    September 3, 2021, the current board writes a letter stating, Priatek is insolvent, and they have exhausted every way to save it. There is no explanation of the deal in the previous letter. They do mention that they would release a SLC report upon request. Several members have requested the SLC report and to date it has not been released to anyone.

241.    It is obvious to the members that the board is in breach of their duties, complicit in the misappropriation of Priatek IP and kiosk, and are covering up the crimes of the former board, Quimby, Colby, I2W and the SKUX group by not releasing a SLC report.

242.    While the current board has done everything to drive Priatek into bankruptcy, the former Managing Member and Founder has continued to try to save Priatek for the last two years.

243.    The former Managing Member: (a) Recovered Kiosks, empty office; (b) Created a Special Committee of Members to write a report; (c) Participated in the efforts to elect a New Board; (d) Created a plan to save Priatek; (e) Cooperated with the Current Board and Special Committee; (f) Produced dozens of (perhaps over a hundred) emails, contracts and other evidence for the board and the special committee; (g) Helped in filing complaints with the state and the patent office; (h) Wrote Demand letters to Quimby for assets to be recovered; (i) Got Bank Statements and delivered them to the board; (j) Offered a licensing agreement that would provide Priatek members a royalty for ten years and a buyout arrangement; (k) In the agreement, Replay

Esports would provide $50k upfront to help with expenses to reinstate the patent, file taxes, state filings, and the SLC report; (k) The licensing agreement was signed by Brazerol, but the board requested 250 units. The former Managing Member, Milind, believes that if he forfeited 250 units that the board would have the swing votes to run the company into bankruptcy. So the former Managing Member did not sign the agreement under those conditions.

## COUNT I
## DERIVATIVE CLAIM FOR A DECLARATORY JUDGMENT

244.    Plaintiffs reallege each allegation above, as though fully set forth herein.

245.    Plaintiffs brings this Count I derivatively on behalf of Priatek and directly against Defendants Priatek Board 2.

246.    Plaintiffs requests removal of the current board via an election of the board since the current board has perpetual control and has breached its contract and its fiduciary duties to Priatek.

247.    A new board would have its interest aligned with Priatek's majority investors to secure its patents before the patents become non-proprietary.

## COUNT II – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
## (RICO) ACT – SECTION 1962(a)

### DERIVATIVE ACTION against BOARD 1, BOARD 2, MINORITY MEMBERS, PRIATEX EXECUTIVE TEAM, I2W, SKUX, iTOUCH

248.    Plaintiffs reallege each allegation above, as though fully set forth herein.

249.    Plaintiffs bring this Count II derivatively on behalf of Priatek against each Defendant individually, and also the corporate entities as separate defendants.

250.    In particular, Bobby Tinsley, Brian Quimby, I2W, SKUX, iTOUCH along with associated individuals and the separate formal entities, also constituted an association-in-fact enterprises which are all enterprises engaged in and whose activities affect interstate commerce.

251.    The Defendant(s) used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.  Specifically, Defendants through extortion converted Priatek assets for personal gain and also used the assets as a springboard for other entities.

252.    The Defendants' racketeering activity constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

253.    As direct and proximate result of the Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in its business and property in that Priatek is on the brink of bankruptcy.

### COUNT III – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT –  SECTION 1962(b)

**DERIVATIVE ACTION against BOARD 1, BOARD 2, MINORITY MEMBERS, PRIATEX EXECUTIVE TEAM, I2W, SKUX, iTOUCH**

254.    Plaintiffs realleges each allegation above, as though fully set forth herein.

255.    Plaintiffs brings this Count III derivatively on behalf of Priatek against each Defendant individually, and also the corporate entities as separate defendants.

256.    Priatek is an enterprise engaged in and whose activities affect interstate commerce.

257.    John Glasscock, Brian Quimby, in particular, along with the other Defendant(s) acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity.  Specifically, Defendants through extortion converted Priatek assets for personal gain and also used the assets as a springboard for other entities while usurping power.

258.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

259.    The Defendant(s) have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

260.    As direct and proximate result of these Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in its business and property in that Priatek is on the brink of bankruptcy.

**COUNT IV – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT –  SECTION 1962(c)**

**DERIVATIVE ACTION against BOARD 1, BOARD 2, MINORITY MEMBERS, PRIATEX EXECUTIVE TEAM, I2W, SKUX, iTOUCH**

261.    Plaintiffs realleges each allegation above, as though fully set forth herein.

262    Plaintiffs brings this Count IV derivatively on behalf of Priatek against each Defendant individually, along with individuals now associated with other entities besides Priatek.

263.    Priatek is an enterprise engaged in and whose activities affect interstate commerce. The Defendant(s) are employed by or associated with Priatek, where they took some part in directing Priatek's business affairs.

264.    The Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically, Defendants through extortion converted Priatek assets for personal gain and also used the assets as a springboard for other entities while usurping power.

265.    Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts of usurpation of company power via extortion to drive Priatek to the brink of bankruptcy so that their nefarious acts would go undetected.

266.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

267.    The Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

268.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and property in that the company assets have been fraudulently converted and the company is on the brink of bankruptcy.

**COUNT V – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT –  SECTION 1962(d): RICO CONSPIRACY**

**DERIVATIVE ACTION against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, PRIATEX EXECUTIVE TEAM, I2W, SKUX, iTOUCH**

269.    Plaintiffs reallege each allegation above, as though fully set forth herein.

270.    Plaintiffs bring this Count V derivatively on behalf of Priatek.

271. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c).  Specifically, defendant conspired to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)); or (3) conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c).

272. The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

273. As direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Defendants agreed to participate in an endeavor to take control of Priatek by the extortion of the Managing Member and founder and misappropriating company assets.

## COUNT VI – BREACH OF FIDUCIARY DUTIES (INCLUDING CARE AND LOYALTY)

### DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, PRIATEX EXECUTIVE TEAM

274. Plaintiff realleges each allegation above, as though fully set forth herein.

275. Plaintiff brings this Count VI derivatively on behalf of Priatek against Defendants.

276. Defendants owed fiduciary duties of care and loyalty to the Company and its members and have breached their fiduciary duties.

277. Defendants had a fiduciary duty to manage the entity in its interest and in the interests of its members – not in their own self-interest.

280.     Defendants fraudulently transferred Priatek assets to separate entities personally owned and controlled by them.

281.     Minority investors and the Board exercised actual control where they channeled the company into a particular outcome.

282.     Minority Members stonewalled investigations in order to bankrupt Priatek and facilitate the misappropriation of assets.

283.     Minority members exploited their contract right to block and control financing decisions in bad faith to enable them to misappropriate Company assets at the expense of the interests of the Company and majority-members.

284.     The Board acted at the direction of the minority-members.

285.     Defendants caused the corporation to effect transactions that benefited the fiduciaries at the expense of the harmed members.

286.     Usurped power in breach of fiduciary duty.

287..    Defendants allowed fraudulent schemes to be perpetuated.

288.     As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

**COUNT VII – DERIVATIVE CLAIM**
**CONSPIRACY (THROUGH ABUSE OF ECONOMIC POWER)**

**DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2,**
**MINORITY MEMBERS, EXECUTIVE TEAM, I2W, SKUX**

289.     Plaintiff realleges each allegation above, as though fully set forth herein.

290.     Plaintiff brings this Count VII derivatively on behalf of Priatek and directly against Defendants Priatek Board 1, Board 2, and Priatek Minority Members, I2W, SKUX.

291.    These Defendants are parties to a civil conspiracy that entered into an agreement where Priatek board members, minority investors extorted Priatek's Managing Member in the process of misappropriating company assets and attempted to put the company into bankruptcy.

292.    Defendants were aware of the other Defendants' fiduciary duties to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members.

293.    Glasscock in particular manipulated and controlled the Boards and the Priatek Minority investors.

294.    Minority Members and the Boards exercised actual control where they channeled the company into a particular outcome.

295.    In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of the Company and Plaintiffs.

296.    Each one of these Defendants engaged in separate overt acts, in agreement amongst each other, causing damages to Priatek as alleged herein.

## COUNT VIII – CONSPIRACY (BREACH OF FIDUCIARY DUTIES)

### DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, EXECUTIVE TEAM, I2W, SKUX

297.    Plaintiff realleges each allegation above, as though fully set forth herein.

298.    Plaintiff brings this Count VIII derivatively on behalf of Priatek and directly against Defendants Priatek Board 1, Board 2, and Priatek Minority Members, I2W.

299.    These Defendants are parties to a civil conspiracy that entered into an agreement where Priatek board members, minority investors breached fiduciary duties, including duties of care and loyalty, owed to Priatek to misappropriate company assets and drive the company into bankruptcy.

300.   Defendants were aware of the Priatek Board 1, Board 2, and Executive Team, minority investors' fiduciary duties to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members.

301.   In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of the Company and Plaintiffs.

302.   Each one of these Defendants engaged in separate overt acts, in agreement amongst each other, causing damages to Priatek as alleged herein.

## COUNT IX – AIDING AND ABETTING (BREACH OF FIDUCIARY DUTIES)

### DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, PRIATEK EXECUTIVE TEAM, I2W, SKUX

303.   Plaintiff realleges each allegation above, as though fully set forth herein.

304.   Plaintiff brings this Count IX derivatively on behalf of Priatek against Defendants.

305.   These Defendants knowingly aided and abetted each other where Priatek board members, minority investors, executive team, breached fiduciary duties owed to Priatek to misappropriate company assets and drive the company into bankruptcy.

306.   Defendants were aware of the fiduciary duties owed to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members.

307.   In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of the Company and Plaintiffs.

308.   Each one of these Defendants provided substantial assistance and/or encouragement to each other, causing damages to Priatek as alleged herein.

309.   In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of the Company and Plaintiff.

## COUNT X – BREACH OF CONTRACT

**DERIVATIVE CLAIM against PRIATEK BOARD 2**

310.   Plaintiff realleges each allegation above, as though fully set forth herein.

311.   Plaintiff brings this Count X derivatively on behalf of Priatek against Defendants Priatek Board 2.

312.   Priatek Amended Operating Agreement 2 with an effective date of December 12, 2019.

313.   Parties to the Amended Operating Agreement are Members and Managers (the "Board").

314.   The Board of Managers breached its contract with Member Investors.

315.   The Board did not comply with tax filing requirements, did not hold annual meetings, and failed to perform governance tasks.

316.   The Board did not fulfill its obligations and as a result, Priatek members were damaged in an amount to be proven at trial.

## COUNT XI – FRAUDULENT CONVERSION OF CORPORATE ASSETS

**DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, PRIATEK EXECUTIVE TEAM, SKUX, I2W, iTOUCH**

317.   Plaintiff realleges each allegation above, as though fully set forth herein.

318.   Plaintiff brings this Count XI derivatively on behalf of Priatek.

319.   Each individual and corporate defendant, converted Priatek assets for their separate gain.

320.   The conduct of each individual and corporate defendant was willful and malicious.

321.   As a direct and proximate result of the fraudulent conversion of corporate assets, Priatek has sustained damages, as alleged herein.

## COUNT XII – CONSPIRACY
## (FRAUDULENT CONVERSION OF CORPORATE ASSETS)

### DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, PRIATEK EXECUTIVE TEAM, SKUX, I2W, iTOUCH

322.    Plaintiffs reallege each allegation above, as though fully set forth herein.

323.    Plaintiffs bring this Count XII derivatively on behalf of Priatek against Defendants.

324.    Each individual and corporate defendant conspired in agreement to convert

Priatek assets for their separate gain.

325.    The conduct of each individual and corporate defendant was willful and malicious.

326.    As a direct and proximate result of the fraudulent conversion of corporate assets,

Priatek has sustained damages, as alleged herein.

## COUNT XIII – AIDING AND ABETTING
## (FRAUDULENT CONVERSION OF CORPORATE ASSETS)

### DERIVATIVE CLAIM against PRIATEK BOARD 1, PRIATEK BOARD 2, MINORITY MEMBERS, PRIATEK EXECUTIVE TEAM, SKUX, I2W, iTOUCH

327.    Plaintiff realleges each allegation above, as though fully set forth herein.

328.    Plaintiff brings this Count XIII derivatively on behalf of Priatek against

Defendants.

329.    Each individual and corporate defendant performed substantially to convert

Priatek assets for their separate gain.

330.    The conduct of each individual and corporate defendant was willful and malicious.

331.    As a direct and proximate result of the fraudulent conversion of corporate assets,

Priatek has sustained damages, as alleged herein.

## COUNT XIIII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

### DERIVATIVE CLAIM against SKUX, I2W, iTOUCH, PRIATEK EXECUTIVE TEAM

332.     Plaintiff realleges each allegation above, as though fully set forth herein.

333.     Plaintiff brings this Count XIIII derivatively on behalf of Priatek against Defendants.

334.     Defendants interfered with the business relationship between Priatek Member Investors and Managing Member under Operating Agreement 1.

335.     Defendants also interfered with the business relationship between Priatek Member Investors and Priatek Board 2 under Operating Agreement 2.

335.     In particular, Defendant Bobby Tinsley, acting in his individual capacity, acting outside the scope of his corporate authority and for his personal benefit, led the charge for the misappropriation of assets and technology, thereby interfering with Priatek's agreement with the Managing Member, and also interfering with the agreement between Priatek Member Investors and Priatek Board 2.

336.     Likewise, the other Defendants, also interfered with the business relationships of both operating agreements to injure Priatek.

## COUNT XV – CONSPIRACY
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP)

**DERIVATIVE CLAIM against SKUX, I2W, iTOUCH, PRIATEK EXECUTIVE TEAM**

337.     Plaintiffs realleges each allegation above, as though fully set forth herein.

338.     Plaintiffs bring this Count XV derivatively on behalf of Priatek against Defendants.

339.     Each individual and corporate defendant conspired in agreement to interfere with Plaintiffs' business relationships.

340.     The conduct of each individual and corporate defendant was willful and malicious.

341.    As a direct and proximate result of the tortious interference, Priatek has sustained damages, as alleged herein.

## COUNT XVI – AIDING AND ABETTING
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP)

**DERIVATIVE CLAIM against SKUX, I2W, iTOUCH, PRIATEK EXECUTIVE TEAM**

342.    Plaintiffs reallege each allegation above, as though fully set forth herein.

343.    Plaintiffs bring this Count XVI derivatively on behalf of Priatek against Defendants.

344.    Each individual and corporate defendant performed substantially to interfere with Plaintiff's business relationships for their separate gain.

345.    The conduct of each individual and corporate defendant was willful and malicious.

346.    As a direct and proximate result of the tortious interference, Priatek has sustained damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment as follows:

a)    For an order deeming this action to be a proper derivative action and Plaintiffs to be proper and adequate derivative plaintiffs;

b)    For an order awarding judgment in an amount to be determined at trial, punitive damages, and prejudgment interest, together with costs of suit and reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper.

c)    For an order awarding judgment against the Defendant(s) for Plaintiffs RICO claims in an amount to be determined at trial, including actual damages, treble damages and attorney's fees, and equitable relief to prevent and restrain RICO violations.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action.

Respectfully submitted on this 2nd day of January, 2022,

*/s/ Derek P. Usman*
Derek P. Usman
Florida Bar No. 0120303
Email:  derek@usmanfirm.com
**The Usman Law Firm, P.A.**
505 E Jackson Street
Suite 305
Tampa, FL 33602
(813) 377-1197 telephone

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of January, 2022, a true and correct copy of the foregoing has been provided electronically through the Court's CM/ECF filing system to all registered recipients.

*/s/ Derek P. Usman*
Derek P. Usman, Esq.
Florida Bar No. 0120303
Email:  derek@usmanfirm.com
The Usman Law Firm, P.A.
505 E Jackson Street
Suite 305
Tampa, FL 33602
(813) 377-1197 telephone
Attorney for Plaintiffs