**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NEAL ENGWALL, DEAN TREW,**
**CHRISTIE SIKORA, CAROL BRIAM,**
**ROBERT SMITH, JERRY LIVERS,**
**MARSHA WOODS, FRANK RUDD,**
**GREG BUNN, EARL SCHUBE,**
**JACQUES BRIAM, REMY BRIAM,**              CASE NO. 8:22-cv-00638
**WILLIAM CELLI, ALTON FAIRCLOTH,**
**FRED HERAVI, SURESH IDNANI,**
**DAVID MOATS, RICH VOLDRICH,**
**MARK STEBLIN, ED HEALY,**
**ARVIND SHRESTHA, JOSH KENT,**
**MARK SCHULZE, RON RICHARDSON,**
**CHRISTOPHER LAFAY, ROBERT MILTON,**
**STEVE MIRAGLIA,**
**STEVE BLAUER,**
**MATTHEW DONIGHER,**
**THAHIRIH DONIGER,**
**KIM ELLIS,**
**WAYNE ENGLISH,**
**ROBERT GRIFFIN,**
**NANCY CUMMINGS, and**
**MARJORIE DAHLBERG, et al.; all individuals,**
**Derivatively on Behalf of PRIATEK, LLC,**

                    *Plaintiffs*,
        **v.**

**BOBBY TINSLEY, an individual, BRIAN**
**QUIMBY, an individual, SKUXCHANGE, LLC,**
**I2W TAMPA BAY, LLC, iTOUCH ORLANDO, LLC,**
**DREAMDAZE TECHNOLOGY, INC., et al.,**

                    *Defendants*,
        **and,**

**PRIATEK, LLC, a Delaware Limited Liability Company,**

                    *Nominal Defendant.*
_____/

<u>**VERIFIED AMENDED DERIVATIVE COMPLAINT**</u>
<u>**AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs, on behalf of Priatek, LLC ("Priatek), bring the following Verified Amended Derivative Complaint (the "Complaint") against certain members of the Priatek Executive Team ("Priatek Executives"); corporate defendants SKUXCHANGE, LLC (SKUX), I2W Tampa Bay, LLC ("I2W"), iTouch Orlando, LLC ("iTouch"), Dreamdaze Technology, Inc. ("Dreamdaze"), and individual defendants associated with the corporate defendants, and states as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 18 U.S.C. § 1964 (federal question). The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 18 U.S.C.A. § 1964(c), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

2.      Supplemental jurisdiction for state law claims is conferred by 28 U.S.C. §1367, as the Plaintiff's state and federal claims arise out of a common nucleus of operative facts, as more fully set forth below.

3.      Pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. §1965, venue is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<u>**PARTIES**</u>

**PLAINTIFFS**

4.      Plaintiffs are, and at all relevant times have been, holders of membership units of Priatek.  Plaintiffs will continue to hold Priatek membership units through the resolution of this action.  Plaintiffs became members under the original Operating Agreement for Priatek, LLC.  A subsequent, Amended Operating Agreement, was entered into between the Priatek

Members/Investors and the Board of Managers.  Plaintiffs will continue to hold member interests through the resolution of this action.  Plaintiffs, all individuals, are Neal Engwall, Dean Trew, Christie Sikora, Carol Briam, Robert Smith, Jerry Livers, Marsha Woods, Frank Rudd, Greg Bunn, Earl Schube, Jacques Briam, Remy Briam, William Celli, Alton Faircloth, Fred Heravi, Suresh Idnani, David Moats, Rich Voldrich, Mark Steblin, Ed Healy, Arvind Shrestha, Josh Kent, Mark Schulze, Ron Richardson, Christopher Lafay, Robert Milton, John King, Steve Miraglia, Steve Blauer, Matthew Doniger, Thahirih Doniger, Kim Ellis, Wayne English, Robert Griffen, Nancy Cummings, Majorie Dahlberg.

**NOMINAL DEFENDANT**

5.      Nominal Defendant Priatek, LLC ("Priatek") is a Delaware limited liability company headquartered in Saint Petersburg, Florida.

**DEFENDANTS**

6.      Priatek Executive Team – <u>as individual defendants</u> ("Priatek Executive Team")

    (a)      Jeremy Ramos, Vice President of Engineering and Co-Founder of Priatek and also equity ownership interest in I2W

    (b)      John Colby, COO/CFO of Priatek and Co-Founder until August of 2018 - He was converted to solely COO.

    (c)      Bobby Tinsley- originally VP of Sales of Priatek; he received a lateral move to VP of Innovation with Blockchain

    (d)      Bob Zaccardo- VP of Business Development of Priatek

    (e)      Jim Buckley- Director of Marketing of Priatek

    (f)      Richard Waters – consultant for Priatek

7.     SKUXCHANGE, LLC ("SKUX") – a Florida limited liability company, along with individual defendants:

(a)     Jim Sampey- Co- Founder and CEO of SKUX.

(b)     Kenneth Douglas- Co-Founder and EVP of SKUX.

(c)     Bobby Tinsley- Co-Founder and EVP of SKUX.

(d)     Bob Zaccardo- Co-Founder and EVP of SKUX.

(e)     Bob Quintana- former advisor for Priatek/VendXOR. Currently advisor for SKUX

(f)     David Chidekel- former legal advisor of Priatek's blockchain.

(g)     Moshe Joshua- Former head of blockchain technology for Priatek. Currently Chief Technology Officer of SKUX

(h)     Jon Najarian- former advisor for Priatek/VendXOR. Currently advisor for SKUX

(i)     Richard Waters – fundraiser for SKUX

8.     I2W, a Florida limited liability company, along with individual defendants:

(a)     Brian Quimby- Principal owner of I2W which owned Priatek kiosks

(b)     Jeremy Ramos- Partial owner of I2W which owned Priatek kiosks

9.     iTOUCH, a Florida limited liability company, along with individual defendants:

(a)     Scott Matthews- Current Priatek Board member and CEO of iTouch

10.     Dreamdaze Technology, Inc., a New *York* corporation, with its principal place of business located at 300 Westwood Road, Woodmere, New York 11598, along with individual defendant:

(a) Moshe Joshua- owner of Dreamdaze Technology, Inc.

## DERIVATIVE ALLEGATIONS

11.     Plaintiffs bring this action derivatively in the right and for the benefit of Priatek to redress the breaches of fiduciary duty, tortious interference, and other violations of law by Defendants as alleged herein.

12.     Plaintiffs have owned shares of Priatek membership units continuously during the period of the misconduct described herein and continue to hold membership units of Priatek.

13.     Plaintiffs will adequately and fairly represent the interests of Priatek and its members in enforcing and prosecuting Priatek's rights.

## DEMAND FUTILITY ALLEGATIONS

14.     Plaintiff did not make a demand on the Priatek Board 2 to bring suit asserting the claims set forth herein because pre-suit demand would have been futile.  The facts alleged in the Derivative Complaint show that, at a minimum, reasonable doubt exists as to whether a majority of the board was disinterested and independent, or whether financial transactions were the product of a valid exercise of business judgment.

15.     Priatek Board presently consists of five members, including Defendants Greg Karsch, Scott Matthews, Mike Brazerol, Bruce Kamm, and Gary Clarin, who were complicit in the illegal acts of the Defendants.

16.     Priatek Board should not be considered independent board members. Moreover, all board members undeniably have personal and material financial interests aligned with individuals and in companies that misappropriated Priatek assets and technology in conflict with the interest of Priatek members.

## INTRODUCTION

17.    <u>The Big Scheme</u> – Priatek's minority investors, key employees, board members conspire to hollow-out Priatek and transfer its assets into two separate companies (SKUX and I2W).  The first group of bad actors ("Group 1") (Group 1 consists of Bobby Tinsley, Jim Sampey, Kenneth Douglas, Bob Zaccardo, Bob Quintana, Richard Waters, and attorney David Chidekel) team with a minority group of investors (Hoshi Tamboli, Linda Swenson, John Glasscock, Matt and John Diaz, and Mark and Maria Hall) to extort Priatek (by driving investors to ask for rescissions based on false allegations) for control of a Priatek blockchain technology sub-entity called VendXOR.  When Priatek disagrees, Group 1 absconds with Priatek's technology, business plan and engineering partner (Dream Daze Technologies) to form a new company – SKUX. A second group of bad actors ("Group 2") (Group 2 consists of Brian Quimby, John Colby, Vijay Patel, and Krishna Nallamshetty) commits to an investigation from an independent firm so they can pursue litigation against Group 1. Yet, shortly after, Group 2 begins its collusion with Group 1.  The two groups colluded to drop the independent investigation of SKUX and proceed to launch operations in New York City without the Managing Member's' authorization.  It is well known that launching in New York without proper funds would put Priatek in peril. Group 2 ignores a member proxy vote to remove the tainted board members that are attempting to drive Priatek into bankruptcy. Instead Group 2 with Jeremy Ramos, both figuratively and literally, locks-out the Managing Member from Priatek and takes control of Priatek operations.  Group 2 then executes a lien agreement with Priatek assets as collateral (technology, patent, copyrights, software, kiosks, etc) but without the Managing Member's knowledge.  Group 2 (with additional minority members: Hoshi Tamboli, Linda Swenson, and John Glasscock) are in the process of forcing the Managing Member to sign a new operating agreement; when it determines that it is more profitable to execute on the fraudulent lien and abscond with the company's assets than it is to take operational control

of Priatek. To that end, they burn through $1.2M in cash (to this day, this capital cannot be traced). Furthermore, to drive Priatek into more debt and try to force a bankruptcy, Group 2 attest that they have an investment firm to recapitalize Priatek if the Managing Member voluntarily leaves Priatek. The investment firm was a hoax. The director of marketing, Jim Buckley, created the investment firm on the same day that the Managing Member was offered the deal. Months later, the board members from Group 2 resign, abandon the machines in New York, and file a UCC to effectively steal the remaining assets of Priatek. The board's resignation letter blames the state of the company on the Managing Member and states that SKUX is innocent. This confuses members as to what really happened. Priatek is left with nothing but debt, and both groups of defendants try to come together to recreate Priatek and its blockchain company. These two groups and with minority investors (Glasscock, Hoshi Tamboli, Linda Swenson, and Dipak Shah) conspired to destroy Priatek when it was valued at $55 Million and was on the cusp of major success.

## INITIAL OPERATING AGREEMENT ("OPERATING AGREEMENT")

18.     Priatek's Operating Agreement with an effective date of June 2, 2014. (Exhibit 3)

19.     Parties to the Operating Agreement were Priatek Executives, LLC (the "Managing Member") and Priatek Company Members.

## AMENDED OPERATING AGREEMENT

20.     Priatek's Amended Operating Agreement with an effective date of December 12, 2019. (Exhibit 4)

21.     Parties to the Amended Operating Agreement are Members and Managers (the "Board").

### PRIATEK COMMITTEE INVESTOR DEBRIEF REPORT
#### (submitted to Priatek Members on August 23, 2019)
#### USURPING OF MANAGING MEMBER POWER, COMMITTEE FRAUD,
#### TORTIOUS INTERFERENCE AND IP THEFT (Exhibit 1)

22.     The report states, "Priatek is an LLC and governed by an Operating Agreement that enumerates the terms and authority granted under it."

23.     The report states, "Under the Priatek Operating Agreement the Managing Member's (Milind Bharvirkar) authority is clear and supersedes the authority of all others, Board of Directors included."

24.     In April of 2019, Managing Member appoints three (3) members (Mike Brazerol, Todd Lary, and Marc Gutherie) to a special committee to investigate the events that occurred at Priatek from around July 2018 to March 2019.

25.     August 23, 2019, a special committee debrief report was released to the members of Priatek. Paragraphs 26-36 are direct excerpts from the report (names have been inserted).

26.     The report states, "The trajectory of the events that have been unfolding are directly pointing towards Priatek's investor interests being severely degraded or eliminated by the redirection of Priatek's Intellectual Property, its patents and its previous investments, towards the outside interests of former key Priatek personnel".

27.     The report continues, "In short, Priatek is being disassembled with the apparent intent to reconstitute its capabilities under the business ventures formed by Priatek personnel. This reconstitution directly threatens the financial interest of all investors".

28.     The report continues, "A week before the Board meeting to vote on the crypto (digital currency that the blockchain company creates) allocation disbursement, a major disagreement with a key member of the development team (Bobby Tinsley) surfaced about how the financial consideration and control of the effort would be divided amongst the team (Jim Sampey, Kenneth Douglas, Bob Quintana and Bob Zaccardo) with Priatek. This member also

demanded that his role be promoted to Executive Vice President and for him to be noted as co-founder of Priatek."

29.     The report continues, "Three members of the VendXOR team (referring to Jim Sampey, Ken Douglas, Bob Quintana) and two Priatek board members (referring to Bobby Tinsley and Bob Zaccardo), also demanded a significantly larger percentage of the VendXOR assets, as well as direct control of the VendXOR business itself, essentially removing VendXOR from the control of Priatek LLC. The demands also included Board of Directors seats of this business".

30.   The report states, "Several former VendXOR team members have levied threats via accusations against Milind and Priatek's management. We have not found any information substantiating the accusations made by the former VendXOR development team. They have not provided any evidence or basis for their claims, just the threat to go to authorities if their demands are not met. Requests issued to the former Priatek VendXOR team requesting them to support their claims, have remained unanswered."

31.     The report continues, "After the VendXOR team's demands were turned down, several members of the VendXOR team not only quit, they formed a new company they incorporated as SKUX, they also recruited Priatek's lead software technologist, Moshe Joshua (Dreamdaze Technology, Inc). The representation of SKUX has remarkable similarities to the capabilities that Priatek had developed through its investment to the tune of approximately $1 million". (Exhibit 6 and 7)

32.   The report continues, "Shortly thereafter, many of Priatek's investors began receiving solicitation calls from Richard Waters introducing Priatek's investors to this new company and the investment futures they were selling."

33.    The report states, "Priatek Board Members, irrespective of not having authority under Priatek's Operating Agreement, took over the operational control of the company. A communication to investors informing you of this was sent on September 25, 2018."

34.    The report continues, "On March 14, 2019, Brian Quimby on behalf of I2W investors, initiated a Florida UCC1 filing.  Then, he filed a Delaware UCC1. Under the UCC1 filings I2W identifies that it has collateral rights to Priatek's IP".  (Exhibit 5)

35.    The report continues, "The investor committee has made repeated requests to Brian asking for I2W to disclose the basis for the terms it states it has under the credit agreement. Our requests have not been answered. Milind is adamant that Priatek did not accept unique and unusual lease terms with I2W."

36. The report concludes, "There are two primary areas leveling accusations and causing the distress to Priatek's Intellectual Property Rights: 1. I2W 2. SKUX. Both organizations feature former Priatek key members and stakeholders".

**BOARD 2 LETTER TO PRIATEK MEMBERS**
**(submitted to Priatek Members on SEPTEMBER 3, 2021)**
**VERIFYING IP THEFT, FALSE ALLEGATIONS, AND FRAUD. (Exhibit 2)**

37.    A new board is elected and takes office in January 2020 that consists of attorney Greg Karch, Scott Matthews, Gary Clarin, Bruce Kamm, and Mike Brazerol.

38.    The new board commits to submitting a Special Litigation Report, filing corporate taxes, and recovering the patent on a letter sent on May 12, 2020, but never delivers on their promises. (Exhibit 9)

39.    On June 15, 2021, 37 members sent a letter with several questions and requested the Special Litigation Report from the board. The members cited additional issues with the board including: conflicts of interest, non-performance, non-protection of company assets, non-

communication, lack of a plan, and missed opportunities. This group of members asked for the board's resignation. The board responded with a letter that ignores the questions by the members, refuses to step down, and at the same time, tells the members that they can't help the company. While the board will not deliver a SLC, the board sent another letter to the members on September 3, 2021. (Exhibit 8) Paragraphs 40-46 are direct excerpts from this letter (names have been inserted).

40. The letter states, "August 2018, **s**everal key Priatek personnel and two of its Board Directors (referring to Jim Sampey, Ken Douglas, Bobby Tinsley, and Bob Zaccardo,) demanded increased financial consideration and operating authority, including equity ownership and control over Priatek's blockchain business initiative, VendXOR. The demands were issued along with threats to report Priatek to SEC authorities for alleged securities violations." (Exhibit 2)

41. The letter continues, "September 2018- A former Director, (referring to Jim Sampey) issued a written communication under the auspicious of representing the "majority of Board of Directors stating willful wrongdoing by Milind Bharvirkar, as the manager of Priatek Executives, LLC, the managing member of Priatek (the "Managing Member"). The allegations continue to lack verifiable proof and subsequent requests by the Board ("by actually two different boards") for verifiable, actionable evidence of the accusations continue to go unanswered by the accusers as of the date of this communication."

42. The letter continues, "September 2018- Key Priatek personnel and two Directors (referring to Jim Sampey, Ken Douglas, Bobby Tinsley, and Bob Zaccardo) resigned from Priatek after their demands are not met with respect to the blockchain business initiative. This same group of former Priatek personnel organized a new business initiative under a new business name called

SKUX. Effectively, this group left Priatek to start a similar business after Priatek's financial investment of more than $500,000 in VendXOR."

43.     The letter continues, "October 2018- Priatek proceeded with the New York launch in opposition to the direction of the Managing Member."

44.     The letter continues, "October 2018- A Director, select members and other key Priatek personnel launched a campaign to remove and terminate the Managing Member from Priatek's operations.  (Referring to Brian Quimby, John Colby, Jeremy Ramos, Vijay Patel, Hoshi Tamboli, Linda Swenson, John Glasscock, and Krishna Nallemshetty).  The Managing Member, Milind, was locked out and stripped from having access to Priatek's systems, accounts, and office. He was effectively barred from performing his duties as the Managing Member."

45.     The letter continues, "Also in October 2018, after removing the Managing Member, the remaining Priatek officers, management and Board Directors (referring to Brian Quimby, John Colby, Jeremy Ramos, Vijay Patel, Hoshi Tamboli, Linda Swenson, John Glasscock, Krishna Nallamshetty). proceeded to execute an equipment lease agreement between Priatek and I2W, a company owned and operated by one of the then current Directors (Brian Quimby and Jeremy Ramos). There is no evidence that such a relationship was properly approved by the company. In addition, the lease agreement materially modified a prior agreement between Priatek and I2W by incorporating modified language in an attempt to encumber Priatek's intellectual property as collateral to the equipment lease financing.  Subsequent attempts to have Priatek's intellectual property transferred per the agreement were thwarted by Priatek."

46.     The letter continues, "March 2019- A former Director (referring to Brian Quimby) filed a UCC1 Financing Statement, attempting to evidence a lien on Priatek's Kiosks assets and

its Patent, stemming from the prior mentioned agreement that appears to have been modified in October 2018 without proper company authorization. "

47. The letter continues, "May 2019- A Priatek member, John Glasscock, issued a demand to Mr. Bharvirkar to make payment of $1 million into Priatek."

46. The letter continues, "July 2019- A former Director (referring to Brian Quimby) filed with the USPTO for an assignment of Priatek's Patent to I2W. He attempts to support the Patent transfer based on the terms of the fraudulent equipment lease agreement."

## FURTHER FACTUAL ALLEGATIONS OF SCHEME
## TO DEFRAUD PRIATEK AND CONSPIRACY

48.  On March 15, 2018, Dreamdaze owner Moshe Joshua signed a service agreement with Priatek to build blockchain technology for a new wholly owned subsidiary of Priatek named VendXOR. The agreement states that Dreamdaze is deemed "works for hire" and Dreamdaze hereby irrevocably transfers and assigns to the Client (Priatek) all worldwide right, title and interest in the Works, including without limitation all copyright rights thereto, all other intellectual property rights therein. The agreement further states in the Confidentiality clause that neither the consultant (Dreamdaze) nor its owners, officers, directors, employees, or independent contractors will use the same for its or their own private benefit or directly or indirectly for the benefit of others. In the Non-Solicitation clause it states, Each Party agrees that the infringed Party will be entitled to equitable relief, including, without limitation, temporary and permanent injunctions and specific performance, in the event of any breach or potential breach of this Section 8, in addition to any other remedies available to the Party at law. (Exhibit 53)

49. In July of 2018, Jeremy Ramos (VP of Engineering) was approached by Bobby Tinsley (VP of Sales). In his testimony (EXHIBIT 11), Jeremy explains that Bobby Tinsley was covertly campaigning to be President of Priatek's new blockchain company called VendXOR, and "other

people were supporting him". Jeremy Ramos continues to state, "It appears that Bobby was working towards his goal of taking over as president of the crypto project since at least July 20th when he disclosed it to me."

50. Anthony Nguyen (Director of VendXOR) in a written testimony states that he was approached by Bob Zaccardo (VP of Business Development) to join their ("SKUx") team because they wanted a "larger share of the cryptocurrency project." Anthony further states, "From my opinion, SKUx is VendXOR. My conclusion: If it weren't for the unsubstantiated allegations from Bobby and the following campaign initiated against Milind, Priatek would have been able to launch VendXOR's token-sale and continue in2win's launch in NYC. I am also 100% certain, SKUx is the unofficial continuation of VendXOR and that the project must seek another distribution channel to replace in2win as an adoption vehicle." (Exhibit 15)

51. In July of 2018, Bobby Tinsley, Bob Zaccardo, Jim Sampey, and Kenneth Douglas were actively raising capital for Priatek and its blockchain company, yet they were also planning on stealing it.

52. Bobby Tinsley promotes himself to Executive Vice President and Co-Founder of Priatek without discussion or authorization from the Managing Member. Michael Howard SVP of Operations and Human Resources instructs Bobby not to use those titles. (Exhibit 10)

53. On September 6, 2018, Bobby Tinsley started an argument with the Managing Member about the governance of the blockchain company. The Managing Member is confused and promises Bobby Tinsley that he will look into his request with Brian Quimby. Bobby does not calm down and threatens the Managing Member by saying, "wait until you see what I do to you." (Exhibit 11)

54.     On September 6, 2018, Bob Zaccardo (Priatek Executive) wrote to Bobby Tinsley, "Paul (VendXOR advisor) says Kenny's (Kenneth Douglas, Priatek Board Member) token agreement is total bullshit. These guys are trying to screw all of us. Not good."

55.     On September 9, 2018, a group of board members and investors: Vijay Patel, Jim Sampey, Brian Quimby, Ken Douglas, Krishna Nallamshetty, attorney David Chidekel, Bobby Tinsley, Bob Quintana, John and Matt Diaz, held a meeting to remove the Managing Member. At the partial BOD Meeting a formal motion is made, and vote taken, to approve the removal of MB (Exhibit 61).

**USURP THE MANAGING MEMBER TO DEFRAUD PRIATEK, EXTORTION, AND TORTIOUS INTERFERENCE**

56.     On September 10, 2018, Jim Sampey ("a board of director") and attorney David Chidekel ("legal advisor for Priatek"), representing the board of directors of Priatek, wrote a letter accusing the Managing Member of not complying with SEC law with VendXOR and for "using the corporate account as my piggy bank". Copied on the email with the accusations are Bobby Tinsley, Kenneth Douglas (board of director), and Bob Quintana (advisor), Brian Quimby, Krishna Nallamshetty. (Exhibit 12)

57.     Note that these accusations were levied an evening before a board meeting to vote on the allocation of the tokens. Also note that this group made allegations against the Managing Member without having evidence (Exhibit 14).

58.     On September 11th, another letter was sent to the Managing Member by Jim Sampey and attorney David Chidekel on behalf of the board which ordered the Managing Member not to attend the Boston Token Fest (Blockchain convention) and engage in the following activities: (i) conducting any interviews with Jon Najarian or other on-air pundits or analysts, (ii) mentioning verbally or in writing anything whatsoever related to the company's proposed ICO or

other capital raising activities, and (iii) disseminating verbally or in writing to the press, conference participants or anyone else, any written materials related to any ICO, cryptocurrency or similar capital raising activities of the company, including the so-called "White Paper". (Exhibit 13) Note this is a false allegation because the company was not conducting an ICO in the United States.

59.     Bobby Tinsley calls the Boston Token Fest and cancels the Managing Member's attendance and appearance to speak with Jon Nigerian of CNBC on stage.

60.     This is a clear example of tortious interference and their actions to stop the Managing Member from launching VendXOR and raising capital for Priatek. The board shuts off the Managing Member's company credit card. Later the Managing Member also discovers that the same group is stalling on the investment paperwork called a SAFT to prevent the company from raising capital in Europe (Exhibit 16).

61.     On September 11, 2018, the Managing Member's attorney, Jack Kiefner, asked the Priatek board for specifics to their broad allegations, and instructed the board that the company cannot launch in NYC given the situation. He also tells the board to stop disseminating the allegations to people outside of the board. (Exhibit 16)

62.     Kiefner's letter states, "We note that copies of the "Corporate Resolution" mentioned above were disseminated by members of the Board to outside parties. …it is blatantly clear that said allegations have been published to individuals outside of Priatek who potentially have the ability to affect the cryptocurrency efforts of the Company and its future capital raising activities."

63.     Kiefner continues, "If followed and considering the unsubstantiated allegations upon which these instructions are purportedly given, the Board will materially impact the ability of the Company to operate and, indeed, survive, let alone realize its potential successes."

Furthermore Kiefner states, "It appears patently obvious that for whatever reason, with Priatek appearing to be on the verge of expansion and material successes, there has become an internal "wrestling" for power that is in all respects inconsistent for the best interests of Priatek, including its Officers, Directors, Unitholders, contractors and sub-contractors and the like.

64.    On September 13, 2018, Jack Kiefner wrote another letter on behalf of the Managing Member to the board. (Exhibit 17)

65.    Kiefner states, "The Managing Member, given current disputes and controversies, cannot complete the "launch" in New York on or about October 1, 2018 without knowing that there are enough cash reserves and an ability to continue raising funds in order to meet necessary financial commitments."

66.    Kiefner continues, "We believe that the so-called Board of Directors is exceeding its powers and authority and is usurping, without written delegation, the authority which lies at the equity owner level over the Managing Member."

67.    Kiefner continues, "It should finally be noticed that the corporate governance for the crypto foundation is being supervised by Brian Quimby and was approved by legal counsel to the Company."

68.    On September 11, 2018, Priatek's SEC attorney, Umera Ali, stated, "there has not been any breach of SEC regulations or other government laws."

69.    On September 11, 2018, Hoshi Tamboli (Priatek advisor and member) immediately tried to get the Managing Member to give up governance control. Hoshi advises the Managing Member, "Agree to more oversight and an outside COO. Stay calm. If it means sharing responsibility and some control on day to day operations and having some oversight that is predefined so be it."

70.    On September 11, 2018. Milind forwards an email from SEC attorney (Umera Ali) to Hoshi Tamboli. Hoshi replies to Milind, "Glad Umera has said nothing is wrong." Hoshi states he is well aware that Priatek's SEC attorney found no wrongdoing by the Managing Member.

71.    On September 12, 2018, John Colby wrote an email to attorney Jack Kiefner. Colby states, "Attorney David Chidekel is a member of our crypto advisory board. He was personally brought in and has a personal contract to provide advice on legal and other issues regarding the blockchain project. He has never raised to management any issues regarding potential SEC violations regarding any efforts that are alleged in the board note. It appears that he has brought his firm Michelman and Robinson to work on behalf of the board while he is still retained as an advisor to the company. It appears that he is working with unclean hands. Tell me what else you need to prepare a note putting him on notice of our intent to file a complaint to the bar council." (Exhibit 54)

72.    On September 14, 2018, Jeremy Ramos texted Milind Bharvirkar, "It seems Bob Quintana (Priatek advisor) played a BIG role in this." Jeremy is referring to Bob Quintana's role in  the false allegations and the attempt to usurp the Managing Member. (Exhibit 62)

73.    On September 15, 2018, Bobby Tinsley resigned. Two directors (Jim Sampey and Ken Douglas) resigned on September 19, 2018, and Bob Zaccardo resigned after the token fest. (Exhibits 19, 20 and 55)

74.    On September 17, 2018, Board members (Brian Quimby, John Colby, Vijay Patel, and Krishna Nallamshetty) signed a resolution to retract allegations against the Managing Member. (Exhibit 18)

75.    The resolution states, "After reasonable search and inquiry, allegations made in a Corporate Resolution and in subsequent letters executed and sent by Jim Sampey purportedly on

behalf of the Board of Directors, which may have been published to third parties without authorization, are withdrawn, ab initio, as though they were never issued." (Exhibit 18)

76.     Later, the Managing Member finds an email chain dated September 12th (Vijay Patel, Krishna Nallamshetty, Kenneth Douglas, attorney David Chidekel, Bobby Tinlsey, Bob Quintana, Jim Sampey) that the board, legal advisor, and Bobby Tinlsey forwarded allegations to the Managing Member without having any evidence. Vijay Patel states, "Now that we have accomplished the initial goal, it's time to start preparing for the final agenda. Let's start collecting all the facts about irregularities, misconducts and violations (including SEC) ASAP." (Exhibit 14)

**EXTORTION FOR CONTROL OF VendXOR AND TORTIOUS INTERFERENCE**

77.     Almost immediately after his resignation, Bobby Tinsley (with Richard Water) threatened Milind and the Priatek board that they will lead Priatek members to ask for rescission of their investments based on their false allegations unless Priatek gives them control of VendXOR.

78.     On September 21, 2018, in an effort to resolve the matter peacefully, the Priatek board signed a MOU that offered Bobby Tinlsey and his group (Jim Sampey, Kenneth Douglas, Bob Quintana, and Bob Zaccardo) two board seats on VendXOR. (Exhibit 56)

79.     On September 21, 2018, John and Matt Diaz (Priatek members) requested their investment of $159,500 back. Bobby Tinsley is copied on the email. The letter states, "Given the recent information that has come to our attention, Bobby's resignation from Priatek and the firing of 2 promeninent board members that were pertinent to the success of the block chain project, we request our recent investment of ($159,500.00) to be refunded immediately. (Exhibit 21) Note that John and Matt Diaz were involved in the September 9, 2018 meeting that voted on the improper and unauthorized removal of Milind Bharvirkar as Managing Member.

80.     On September 21, 2018, Bobby Tinsley rejected the board's proposal and he forwards a revised MOU or "demand letter" for the control of VendXOR. In response, John Colby (COO) stated, "They want control of the board, control of the IP, control of the business practices and they have changed to a foundation." (Exhibit 25) Attorney Umera Ali stated, "I don't think you can have a situation where you are being held hostage by individuals on how to run your business." (Exhibit 30)

81.     On September 22, 2018, Brian Quimby texted Milind, "investors that have a beef were involved in creating that "revised" MOU. Bobby said there were like 15 people debating that MOU." (Exhibit 63)

82.     A minority group of Priatek investors have teamed up with Bobby Tinsley, Bob Zaccardo, Kenneth Douglas, Bob Quintana, and Jim Sampey with the objective of taking control of VendXOR. At this time, the minority group of investors includes Hoshi Tamboli, Vijay Patel, Linda Swenson, John Glasscock, Mark and Maria Hall, and John and Matt Diaz. Yet, this group grows over time.

83.     On September 21, 2018, Hoshi Tamboli threatened Milind to sign the revised MOU to give Bobby and his group VendXOR, "What you do today is going to determine whether you kill your company, wipe the investors and the employees, potentially go to jail and possibly lose your wife and kids. Back down." (Exhibit 64)

84.     On September 22, 2018, Brian Quimby texted Milind, "You and Bobby are probably going to have to get on the phone, cause I don't know what else to do if you're still trying to hold onto this vendxor thing. It's going to blow up, one dug in investor and there's no way Priatek raises any money and the longer this stews the more pissed off people are getting. Linda (Swenson) was

ready to fire off with her group yesterday. Bobby said Gary Clarin talked to Richard Waters again and he's no longer in your camp." (Exhibit 63)

85.     On September 24, 2018, Jeremy Ramos texted Milind, "Don't sign the MOU. It's immoral. They are criminals and should go to jail."  In the next two weeks, Jeremy Ramos will begin aiding this group with their theft. (Exhibit 65)

85.     On September 24, 2018, Hoshi Tamboli advised Milind to give the crypto company to Bobby and his group, "And you have collected the best dream team for crypto already. There is so much wealth right there with the team you have collected And you are fine not running the crypto part of the company. They are ready to give Priatek money and working capital and the coins for the Priatek board to allocate fairly. Let Umera and the attorney on the other side (Chidekel) draft the MOU." (Exhibit 65)

86.     On September 29, 2018, Maria and Mark Hall, Brenda Camarinos, George Camarinos, Jeanne Camarinos, Amar Talati, and Peter Glickman collectively asked for $142,000 to be returned. Bobby Tinsley is copied on the email. The email states, "Bobby is no longer with the company. In addition, they told her that people were saying you were not handling our investment/funds appropriately. This is obviously very concerning to us and our family. Not to mention, the blockchain aspect of this investment was a crucial and critical part of why we invested."  (Exhibit 22)

87.     On October 9, 2018    Hoshi Tamboli texted Milind, "Yes you have 51 percent of the voting stock but that is a loadstone around your neck because of this company fails or implodes right now it will be squarely on your shoulders and I am telling you all the shareholders- every single one is going to come after you not underestimating the trouble you will have with the SEC and lawsuits and all sorts of liability." (Exhibit 67)

88.     By October, Hoshi and the other minority investors were threatening to sue Milind if he returned to the office or did not give the governance control of the company to his group. This strategy prevents Milind from saving VendXOR by taking legal action against SKUx.

89.     On October 19, 2018, Bob Quintana requested by email for $54,000 back. Quintana states, "In light of the developments at Priatek over the last 4-6 weeks, and since no agreements of any kind were ever signed, both Mr. Marinaro and I request that a full refund of the $54,000.00 be issued by 5pm EDT on Monday, October 22, 2018. Please know that this is strictly a business decision based on the issues that have arisen over the last month-plus." (Exhibit 23)

90.     On October 22, 2018, Marc Blumenthal and Brent Fisher asked for $56,000 back. Their attorney, Sheryl Hunter, states, "I fully expect that Priatek's board and its officers are well-aware that there are serious issues with the offerings of securities that the company has engaged in." (Exhibit 24)

91.     Bobby Tinsley continues to spread his false allegations to drive more rescissions.

92.     On September 16, 2019, Brian Quimby wrote an email to the Special Committee, in which he states, "Milind formally resigned as CEO to board on 9/24/18 after pressure from investors, including Hoshi, Richard Waters, Linda Swenson, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock, and others. (Exhibit 28)

93.     On September 23, 2018, Richard Waters sent this text to Milind: "Rescissions are coming and they will keep coming. By Monday it will be an avalanche of rescissions and you can stop it today. The pressure is mounting. Are you praying? Are you hearing from the Lord? You are in a storm…..Your path is one of utter destruction."; "Milind please ask your legal counsel how they can help you fund your company after all the 2018 investors rescind." "If you don't make the right decision in the next 24 hours, and sign the revised MOU, our company is going up in

flames." "But you apparently believe in your righteous indignation and refuse to meet current demands." "If your actions cause the company to fail, which is about to happen, you could face incarceration." (Exhibit 68)

## INTELLECTUAL PROPERTY THEFT OF VendXOR

94.     On October 1, 2018, after demands by Bobby Tinsley and others were not met, Gary Clarin (Priatek member) texted Milind, "Been told Bobby is done and moving on to start a new Crypto company. What the hell is going on?" (Exhibit 69)

95.     On October 15, 2018, Jim Sampey (with Kenneth Douglas, Bobby Tinsley, Bob Zaccardo, and David Chidekel) created SKUX, a Florida corporation. (Exhibits 57 and 70)

96.     From the SKUX White paper- SKUX is a blockchain-based enterprise solution poised to disrupt a trillion-dollar industry in the issuance and redemption of coupons, offers, and loyalty (Exhibit 7)

97.     From the VendXOR white paper- VendXOR owned by Priatek is a blockchain based enterprise solution that is changing the way vendors issue and manage coupons, offers, and loyalty. (Exhibit 6)

98.     Blockchain experts, David Steen and Anthony Nguyen, are the primary authors of the VendXOR white paper with input from Moshe Joshua, Jeremy Ramos and Milind Bharvirkar. David Steen and Anthony Nguyen agree that VendXOR and SKUX are the same business opportunity. (Exhibit 15)

99.     In October of 2018, Moshe Joshua (owner of Dreamdaze) terminated his relationship with Priatek after being paid hundreds of thousands of dollars of money to build the blockchain technology for Priatek.

100.     Milind Bharvirkar asked Jeremy Ramos if Moshe Joshua delivered any software code for his work. Jeremy Ramos said no and furthermore does not care. As VP of Engineering, Jeremy Ramos was responsible for protecting and storing the software code. Later, it is discovered that Jeremy Ramos is working with Bobby and SKUX.  Just two weeks prior, Jeremy Ramos texted Milind not to sign the revised MOU from Bobby and group, that it was immoral, and these "criminals" should go to jail.

101.     In October of 2018, SKUX recruited Moshe Joshua as Chief Technical Officer to create the same technology and business opportunity as Priatek's company, VendXOR. Moshe Joshua uses the same software that Priatek paid for to start SKUX (see Moshe Joshua on "VendXOR team" (Exhibit 6) and Moshue Joshua on the SKUX team (Exhibit 7).

## MANAGING MEMBER IS TRICKED, LOCKED OUT OF OFFICE, EXTORTION, AND BOARD LAUNCHES IN NYC AGAINST MANAGING MEMBER'S INSTRUCTIONS

102.     On September 21, 2018, Attorney Umera Ali stated in an email to Milind Bharvirkar and John Colby, "I don't think you can have a situation where you are being held hostage by individuals on how to run your business." (Exhibit 30)

103.     On September 21, 2018, Attorney Umera Ali recommended that the board hire an independent investigator to investigate two particular matters.  An investigation that can be finished within two weeks.

104.     On September 23, 2018, John Colby wrote an email with his opinion of two investigative firms: Cendrowski (Morrie Elstien and Randy Wilson) and Larry Kolb.

105.     Part 1 of the investigation is to interview investors and executive staff about any complaints of the Managing Member and investigate those allegations. (Exhibit 31)

106.     Part 2 of the investigation into the actions and motives of the two directors and two executives that resigned, Robert Tinsley, Kenny Douglas, Jim Sampey, and/or other potential

adverse parties (David Chidekel, Bob Quintana, Moshe Joshua, Bob Zaccardo) with respect to:(i) theft, conversion, or commercial exploitation of, or conspiracy to steal, convert, or commercially exploit, all or some elements of Priatek's intellectual property, technology, products, trade secrets, proprietary information, confidential information, business plan, plans, hardware, software, processes, specifications, designs, applications, methods, procedures, data, vendor relationships, supply-chain relationships, with respect to the blockchain component or planned blockchain component of Priatek's business, or any other aspect of the business of Priatek; (ii) violations of any or all applicable obligations of confidentiality, non-disclosure, non-circumvention, and good faith and fair dealing with respect to Priatek's operations, property, and/or investors; (iii) defamation, tortious interference, and/or other causes of action."  (Exhibit 31)

107.    On September 24, 2018, Attorney Umera Ali (SEC attorney for Priatek) recommended that Milind step down as President and work from home for two weeks until the investigation clears him – yet Milind still retains the position of Managing Member.

108.    On September 25, 2018, since the investigation did not start, Milind returned to the office to pick up some items. John Colby immediately yells and curses at Milind to leave the office. Milind was confused as to why Colby was so rude. Until this point, John Colby was amicable and assisting Milind.

109.    On October 4, 2018, As stated in the Board letter dated March 20, 2019, the executive team launched the kiosks in NYC against Milind, Managing Member, wishes. (Exhibit 32). Yet, the board consisting of John Colby, Brian Quimby, Vijay Patel, and Krishna Nallamshetty also authorized the launch of these kiosks against Milind's wishes as well.

110.    In the same letter by the Board dated March 20, 2019, the board also stated, "Milind resigned as President of the Company; however, he did not resign as Managing Member or

Chairman of the Board. Under the current operating agreement, the Managing Member has complete authority over the company's operations and the current Board cannot overrule or remove him." (Exhibit 32)

111.    Brian Quimby and John Colby are aware of the fact that the company does not have enough money to launch in NYC. In an email from Quimby to Milind on June 14, 2018, Quimby states, "If we pull the trigger on 4.0 ("software") and other ramped up budgets before money comes in and it either doesn't come in or it takes longer, we will not be able to launch in NY. (Exhibit 33)

112.    Rich McIntyre, an attorney for Hoshi Tamboli, informs the Managing Member that Brian Quimby and John Colby are inquiring about bankruptcy plans for Priatek.  At the time, Priatek had $1.2M in the bank with manageable debt. According to Brian Quimby, there was a burn rate of $150k a month. There was no reason for bankruptcy plans (Exhibit 28).

113.    The Managing Member is extremely concerned that Colby, Quimby, Vijay Patel, Krishna, and other members are working together to run the company out of money to force a bankruptcy. Milind also believes that the investigation is being stalled to keep him from returning to the office.

114.   On October 9, 2018, the Managing Member continues to be threatened by members Hoshi Tamboli, Linda Swenson, Richard Waters, John Glasscock and others that if he returns to the office that he will be sued. Hoshi states in a text, "I have got calls from more than 2 people in the company in distress about recent issues with you and the executive team. The executive team almost resigned this evening. At this time, 1. all 4 of them 2. most of the other employees and 3. all the investors and 4. the crypto group are all on one side and you are alone on one side. You sent a letter to all the investors saying that you stepped back from the day to day management but you

are not letting them do their job with authority. They alone should have authority to fire someone. Yes. you have 51 percent of the voting stock but that is a loadstone around your neck because of this company fails or implodes right now it will be squarely on your shoulders and I am telling you all the shareholders- every single one is going to come after you not underestimating the trouble you will have with the SEC and the lawsuits and all sorts of liability." (Exhibit 28) (Exhibit 67)

115.   On October 25, 2018, with authority according to the operating agreement, Managing Member appoints Allen Clary (executive of Tampa Bay Wave incubator) to be interim President of Priatek. (Exhibit 34)

116.   Yet, Hoshi Tamboli, Linda Swenson, John Glasscock, Brian Quimby, Vijay Patel, Jeremy Ramos, Krishna N. and John Colby refuse to allow Allen Clary in the office. (Exhibit 35)

117.   The investigation continues to be stalled by John Colby and Brian Quimby to keep the Managing Member out of the office. (Exhibit 42) (add exhibit)

### PROXY VOTE IS IGNORED, MANAGING MEMBER CONTINUES TO BE LOCKED OUT, AND SPOLIATION OF EVIDENCE

118.   In response to hearing that Quimby and Colby had plans to run Priatek into bankruptcy, the Managing Member conducted a member vote to remove Brian Quimby and John Colby from the board in early October of 2018.

119.   Simultaneously John Colby solicits a new operating agreement to the members in an effort to remove Milind as Managing Member. (Exhibit 58)

120.   While John Colby submission of a new operating agreement does not pass, the board members vote for the removal of John Colby and Brian Quimby and appoint Gary Clarin and Av Utukuri to the board passed on October 25, 2018. (Exhibit 37).

121.   On October 26, 2018, the Managing Member terminated John Colby from his executive position at Priatek.  (Exhibit 38)

122.    In response to the proxy vote and termination of John Colby, Hoshi, Swenson, Krishna, Vijay, and Glasscock instructed John Colby, Jeremy Ramos, and Brian Quimby to lock the Managing Member out of the office, ignore the proxy vote, and disregard Colby's termination by the Managing Member. The same week, the Managing Member discovers that John Colby was appointed President by someone, but no one is willing to say who. (Exhibit 40)

123.    The Managing Member's email and access to the google drive is shut off by Jeremy Ramos. (Exhibit 28)

124.    Without access to the google drive, the Managing Member cannot access board minutes, financial records, expense reports, non-competes, contracts, NDAs, board and advisory agreements, and lien agreements.  Board of directors, executives, and advisory agreements that include non-competes with Jim Sampey, Kenneth Douglas, Bobby Tinsley, Bob Zaccardo, Bob Quintana, Jon Najarian, Brian Quimby, John Colby, and other members and executives are missing.

125.    On April 18, 2019, attorney Kiefner formally requests the former officers, directors, employees, and principals of Priatek to return all corporate property, documentation, accounting files, liens, contracts, technology, investigation reports, leases, promissory notes, kiosks, office equipment, etc. to be returned to the Managing Member.  To this day, (even after the resignation of the board and a formal request for these items), these records have never been returned to the Managing Member. (Exhibit 39)

126.    The Managing Member salary was also terminated on October 26, 2018.

127.    This takeover of the office is a clear violation of the operating agreement. The Managing Member has authority over the board and the executive team.  (Exhibit 3)

128.    The operating agreement states that no member can act as if they are the Managing Member. There is a clear admission by the board that they violated the operating agreement by usurping the Managing Member in their letter on March 20, 2019. (Exhibit 32)

129.    Umera Ali informs the Managing Member that he needs to verify each member that voted by producing their signed operating agreement. The signed operating agreement (paper copies) were locked in the accounting office and the keys were changed to prevent the Managing Member from getting in. (Exhibit 40)

130.    It is clear at this point to the Managing Member that the investigation was a trick to get the Managing Member to leave the office. Once out of the office, certain members, directors, and executives are working together to defraud the company.

131.    The claim of needing the signed operating agreement from every member was unwarranted under the terms of the operating agreement.

132.    When the Managing Member asked Umera Ali for help, she said she represents the board not the Managing Member. (Exhibit 40)

133.    On November 5, 2018, Jeremy Ramos states, "As I understand it the Proxy vote to remove John and Brian from the board has been rejected or revoked by a majority of investors. Copied on the email is board members: Brian Quimby, John Colby, Vijay Patel, Krishna Nallamshetty and investors: Hoshi Tamboli Steve Grunbach, Dipak Shah, Sareet Majumdar, John Glasscock, Gary Clarin, and attorney Umera Ali. (Exhibit 35)

134.    The proxy vote was passed by 63.47%. The proxy vote was not rejected by the majority of investors. It was rejected by the minority group of investors that were supporters of Brian Quimby and John Colby. Those members are copied on the email sent by Jeremy Ramos.

135.    The Managing Member has Priatek's corporate attorney (Battaglia, Ross, Dicus & McQuaid) verify the results of the proxy vote. On November 21, 2018, the law firm verified the vote to remove John Colby and Brian Quimby passed by 63.47%. (Exhibit 37)

136.    Attorney Rich McIntyre writes in an email that the verification of the proxy vote by the law firm further validates the vote to remove John Colby and Brian Quimby. (Exhibit 43)

137.    After the verification from legal counsel, the investors (Tamboli, Swenson, and Glasscock) still refuse to allow the Managing Member back to the office. (Exhibits 34, 43, and 44)

138.    While the proxy vote to remove the board members Brian Quimby and John Colby was successful, another vote advanced by these minority investors to pass "their" amended operating agreement was unsuccessful.

139.  The minority investors, representing approximately 25% of all members, refused to acknowledge the winning results and proceeded to lock out the Managing Member.

## COVER UP OF INVESTIGATION AND CONSPIRACY

140.    The investigation conducted by the Cendrowski Firm according to Randy Wilson ("the investigator") continues to be stalled by John Colby and Brian Quimby. (Exhibit 42)

141.    This investigation is never released until over a year later (late 2019 or early 2020).

142.    According to Rich McIntyre (Hoshi Tamboli's attorney) he recommended it would be best not to be completed. Yet, the Managing Member insisted on it being completed.

143.    Gary Clarin pleaded in an email to Linda Swenson, "Linda where is the report? I heard from Milind today and there is nothing in the report. That came from Rich (McIntyre). Milind is clean except for maybe some expense reports. This is over. We need to get Milind back and working. Get rid of John and Brian and stop the BS. The smoke screen is over. We have spent 10 weeks and a million dollars trying to force-out our guy who did nothing wrong." (Exhibit 43)

144.    On September 21, 2018, Umera Ali, the corporate security attorney states, "There has been no breach of SEC regulations as both your equity issuances were done under SEC regulations- one under Reg D, the other under Reg S." (Exhibit 30)

145.    On November 11, 2018, Umera Ali in regards to the investigation by Cendrowski states, "a number of allegations were raised against Milind in his personal capacity. However, there was no evidence provided in relation to these allegations." Yet, John Colby and Brian Quimby do not accept this answer and continue to press allegations against Milind. (Exhibit 41)

146.    On November 11, 2018, Umera stated the following about the investigation of SKUX: [One of the issues that was going to be considered in the investigation was whether there was a conspiracy by Bobby and others while they were working at Priatek. It has been difficult to independently verify this issue as the investigators have not been able to get access to the email inboxes of all the relevant individuals and key employees of the company. This is not because the company has not agreed to provide access to the inboxes but because investigators wanted to get forensic evidentiary experts to copy the inboxes before accessing any information. This process allows us to submit the emails as evidence in court (in case of proceedings). The failure to do this would make the emails inadmissible. We appreciate that there are cost concerns in relation to this process, and therefore, this cannot be done at the stage] (Exhibit 41)

147.    In essence, the board with the support of Umera Ali dropped the investigation of Bobby Tinsley, Bob Zaccardo, Jim Sampey, Kenneth Douglas, and Moshe Joshua (Dreamdaze) for IP theft, extortion, tortious interference, defamation, breach of fiduciary responsibility because they can't forensically capture emails. (Exhibit 41)

148.    There were many other options to consider if the board wanted to finish an investigation such as deposing all the board members. The investigator for Cendrowski, Randy Wilson, said that John Colby and the board refused to finish the investigation. (Exhibit 42)

## **EXTORTION AND TORTIOUS INTERFERENCE**

149.    A group of members, directors, and an attorney (Hoshi Tamboli, Linda Swenson, Gary Clarin, Frank Helstab, John Colby, Brian Quimby, Vijay Patel, and Attorney Rich McIntyre) hold various meetings and start a chain email. (Exhibit 43)

150.    The chain email states from Hoshi Tamboli, "we keep the investigation findings and roll it into the complaint and arbitration etc. John Colby and Brian Quimby work on your operating agreement draft and employment agreement." (Exhibit 43)

151.    Hoshi Tamboli was threatening the Managing Member with a lawsuit if the Managing Member didn't agree to his terms for several months (between September and December of 2018). Yet, these members are fully aware that the investigation has found no wrongdoing by the Managing Member.

152.    On December 4, 2018, Brian Quimby states, "Brian, John, and Vijay" are simply operating in the capacity of the board members who have a fiduciary responsibility and have pointed out some serious issues."  All three of these board members signed a resolution finding no wrongdoing by the Managing Member. (Exhibit 43)

153.  Umera Ali gave an update regarding the investigation on November 11, 2018 (Brian Quimby was copied on this email) that there was no evidence of wrongdoing to the board, yet Brian Quimby continues his allegations in order to prevent the Managing Member from returning to the office. (Exhibit 41)

154.    There is collusion between Bobby Tinsley's SKUX group, board 1 (consisting of Brian Quimby, John Colby, Vijay Patel and Krishna) and the minority members that include Linda Swenson, Hoshi Tamboli, John Glasscock, and others). Bobby Tinsley, Brian Quimby, Jeremy Ramos, and John Colby are working with the minority group of members to keep the Managing Member from returning, so they can steal the IP from Priatek and VendXOR.

155.    These individuals, and members, are lynching the Managing Member but have no interest in pursuing SKUX for IP theft, extortion, and tortious interference. The Managing Member discovered much later that the minority investors assisted Bobby Tinsley's group in stealing VendXOR. By keeping the Managing Member out of the office, the Managing Member cannot pursue legal action against Bobby Tinsley's group, SKUX.

156.    This group of members told the Managing Member that he cannot return until he agrees to dissolve the Managing Member position and sign a new operating agreement which would give them control of the company. (Exhibits 34, 43, and 44)

157.    This group was also superseding its authority by negotiating the Managing Member's salary, employment agreement, and reimbursement for legal expenses. (Exhibits 43 and 44)

158.    This email chain shows that members are interfering and working with Brian Quimby and John Colby to prevent the Managing Member from returning. If the Managing Member returns, then he could discover and report the ongoing fraudulent activity.

159.    Brian Quimby states that he has evidence of "serious issues" against the Managing Member. Brian Quimby has been spreading false allegations to members that included: (a) Managing Member took a $200k vacation with his wife to Europe with company funds; (b)

Managing Member bought $65k worth of furniture for his home with company funds; (c) Managing Member spent $10k worth of clothes for his wife. (Exhibits 42 and 32)

160.    Brian Quimby's allegations are baseless and the accusations are lies to discredit the Managing Member. Quimby's attacks on the Managing Member distract members from his scheme to defraud the company.

161.    Brian Quimby wrote an email to the Managing Member a month earlier saying, "I love you man", and Brian Quimby signed the resolution that the board found no wrongdoing by the Managing Member. (Exhibits 45 and 18)

162.    The negotiations for a new operating agreement are being done under extreme threats by these "hostile" members.

## JOHN COLBY AND BRIAN QUIMBY CONSPIRE TO COMMIT FRAUD AND EXTORTION BY INVENTING A FICTITIOUS INVESTMENT FIRM (RATH CAPITAL PARTNERS)

163.    On December 13, 2018, on the eve of the Managing Member signing a new operating agreement that would allow him to return to Priatek, if he gave board control to Hoshi Tamboli, Linda Swenson, and Rich McIntyre. Rich McIntyre and Gary Clarin call Milind Bharvirkar and offer him a buyout.

164.    Rich McIntyre claimed that Brian Quimby and John Colby had an investment firm that was willing to buyout Milind Bharvirkar's equity for $2.7M. Their proposal was Milind would get $875,000 and the remaining $1.825M would go to Priatek. In other words, the Managing Member is giving 2/3 of his investment back to Priatek.

165.    Milind consulted several members and reluctantly agreed to accept the offer for the sake of the other Priatek members.

166.    A unit transfer agreement was executed on December 21, 2018, and the money was supposed to be transferred within 7 days. (Exhibit 46)

167.    The buyout agreement also stated in section 4.3- Prior to the execution of this Agreement, Company or certain parties related to Company initiated an investigation into the conduct of the Founder (the "Investigation"). Investigation has not provided evidence of any wrongdoing by the Founder.

168.    While weeks pass without the emergence of an investment firm to buyout the Managing Member, in February of 2019, John Colby calls the Managing Member and informs him that the investment firm renegotiated the deal. The investment firm is suggesting that Milind only receive 50% down and 50% in 6 months (unsecured). The Managing Member says he will think about it.

169.    On February 6, 2019, John Colby extorted the Managing Member into signing the addendum. Colby states, "For the sake of clarity we wanted to ensure you understand what happens should the deal not be consummated by Wed night" – (a) Investors, creditors and partners will be notified of the company's insolvency which will bring on a slew of lawsuits from Zumwalt, Schweizer, attorneys, landlords, malls, and others; (b) SEC- fraud, misrepresentation and willful misconduct- should the SEC classify you as a "Bad Actor" you will be barred from raising capital OR holding any senior position with a company who wishes to raise capital in the United States for life; (c) Former employees, investors and other familiar with the history of the company will no longer be restricted or asked to refrain from contact with the media; all of the dirty laundry at Priatek that has led to your current situation will become public record with multiple independent sources. When your name is Googled those articles will be the top search results permanently; (d) We're sorry to put things in this light, but it is your final hour. If this deal expires on Wed night,

there is no more money, no more runway; this will become your life and everyone involved loses. (Exhibit 47)

170.    Under threats of extortion from John Colby, the Managing Member concedes for the benefit of the members and signs the addendum to the buyout offer on February 7, 2019. (Exhibit 48)

171.    John Colby calls the Managing Member in March of 2019 and tells him the investment firm fell through, while the Managing Member met all his requirements.

172.    After the deal falls through, the Managing Member learns that the investment firm was called Rath Capital Partners.

173.    Rath Capital Partners was founded on December 13, 2018. The same day the buyout offer was made to the Managing Member.

174.    Rath Capital Partners was founded by Jim Buckley, the director of marketing at Priatek.

175.    Jim Buckley was close friends with Jim Sampey and Bobby Tinsley. Jim Sampey hired Jim Buckley at Val Pak and also hired him at Priatek. On November 5, 2018, Milind wanted to layoff Jim Buckley because he was friends with Jim Sampey and Bobby Tinsley. Yet, his instructions were ignored. (Exhibit 35)

176.    Jim Buckley was not independently wealthy, and he has never been in the investment business.

177.    Jim Buckley stated to Todd Lary from the special committee by email: "Our team assessed Priatek as a potential investment late last year and made the decision not to move forward with investing or being involved in that business in any way going forward." (Exhibit 49)

178.    Rath Capital Partners is no longer in business.

179.    Frank Helstab, a Priatek member, told the Managing Member that Rath Capital Partners was a hoax and had never done an investment deal.

180.    Rath Capital Partners was a hoax to prevent the Managing Member from returning, uncovering the fraud that was going on, and for Quimby and Colby to continue running up more debt for Priatek.

181.    The Managing Member discovered that Brian Quimby ("Mark Brian Quimby") confessed to FINRA violations and perjury under oath while working for Allstate Insurance. (Exhibit 59)

## MARCH 20, 2019 RESIGNATION LETTER BY BOARD FRAMES MANAGING MEMBER AS THE FALL PERSON FOR THE CONDITION OF PRIATEK

182.    The Managing Member was locked out of the office as a response to the proxy vote being passed and the minority of investors rejecting the results.

183.    John Colby notifies the Managing Member that the deal with Rath Capital Partners fell through.

184.    On March 20, 2019, the Board sent a resignation letter to the Priatek members and blamed the condition of Priatek on the Managing Member. (Exhibit 32)

185.    The Board Letter states, "this letter has been composed by the resigning Board members and former employees and contractors, however, it echo's the sentiments of not just the Board, but the employees, contractors and the largest investors in the company, collectively representing well over $10 million invested capital." (Exhibit 32)

186.    The $10 million dollars of investors includes John Glasscock, Vijay Patel, Hoshi Tamboli, Frank Helstab, and Linda Swenson.

187.    The letter further admits, "The executive team also made the decision to deploy kiosks into the NY malls against Milind's wishes."  (Exhibit 32)

188.    These kiosks result in being abandoned in NYC. The decision to launch in NY results in depleting the capital reserves of the company and losing all the kiosks shipped in NY. The cumulative loss is over $2 Million to the company. Yet, that doesn't include the amount of debt that John Colby and Brian Quimby accumulate and expend cash reserves in the amount of $1.2 million. To this day, Colby and Quimby refuse to give documentation to how the $1.2M was spent.

189.    The letter also stated, "Milind resigned as President of the Company, however, he did not resign as Managing Member or Chairman of the Board. Under the current operating agreement, the Managing Member has complete authority over the company's operations and the current Board cannot overrule or remove him."  (Exhibit 32)

190.    The letter also stated, "In early December, a credible investor approached certain individuals in the company with an offer to pay Milind off and invest in the company going forward without him."  As noted herein, the "credible investor" was not credible at all. The investor was a newly formed company by the director of marketing of Priatek, Jim Buckley. It was a hoax to run the company into more debt. (Exhibit 32)

191.    Still yet the letter exalts SKUX and dismisses the fraud and intellectual property theft conducted by conspirators composed of SKUX and Priatek members, board members, employees, and consultants. (Exhibit 32)

192.    In part, Bobby Tinsley demanded control of VendXOR. He led numerous investors to ask for rescissions unless the board gave him control of our blockchain company.

193.    Priatek invested $ 1 Million dollars in the development of VendXOR- blockchain for coupons and offers.

194.    Bobby Tinsley, Bob Zaccardo, Jim Sampey, Kenneth Douglas, Bob Quintana, and Moshe Joshua signed non competes and NDAs. Dreamdaze (Moshe Joshua's company) signed a work for hire contract that clearly states Priatek owned the work and worldwide rights to the technology. They stole the Intellectual Property of Priatek (VendXOR) and started the exact same company (SKUX) across the street from Priatek.

195.    The corporate attorney Umera, Brian Quimby, John Colby, Vijay Patel, Hoshi Tamboli, Linda Swenson, and John Glasscock refused to complete the investigation on SKUX and its members in order to break the parts of Priatek and steal them with two different parties.

## FRAUDULENT LIEN AGREEMENT RESULTS IN AN ILLEGAL UCC FILING AND FRAUDULENT PATENT TRANSFER TO START A SEPARATE COMPANY

196.    On March 14, 2019 (6 days prior to the resignation letter) a UCC filing was initiated I2W Tampa Bay, LLC owned by Brian Quimby. (Exhibit 5)

197.    The UCC statement covers collateral representing physical Priatek kiosks units and associated intellectual property.

198.    Brian Quimby, John Colby, and Vijay Patel do not disclose the UCC filing in their resignation letter 6 days later on March 20, 2019. To add, the Managing Member had no knowledge of this new lien agreement or modified old lien agreement. Furthermore, the board did not have the authority to execute this lien agreement without the Managing Member. (Exhibit 32)

199.    Upon further inquiry by Mike Brazerol, the Managing Member discovers that the lien agreement that I2W (which collateralized kiosks only) was modified in October of 2018 to include all the assets, source code, kiosks, patents, and copyrights/trademarks of Priatek. (Exhibits 1, 2, and 5)

200.    Significantly October of 2018 was the month that the lien agreement was modified, and it was also the month that (a) The board launched in NYC without the authorization by the

Managing Member. The board knew that the company did not have enough funds to launch in NY; (b) October of 2018 was the month that the proxy vote terminated John Colby and Brian Quimby from the board, and they ignored it; (c) Rich McIntyre told the Managing Member that Brian Quimby and John Colby were inquiring about a bankruptcy, yet there was $1.2M in the bank with manageable debt; (d) it was the month that Jim Sampey, Bobby Tinsley, Kenneth Douglas, and Bob Zaccardo and Moshe Joshua start SKUX; and  (e) it was also the month that the Managing Member was locked out of the office and his google drive access was terminated- which leads to the destruction of key contracts and non-competes.

### SEPTEMBER 3, 2021 LETTER WITH FINDINGS OF CURRENT BOARD

201.    The Managing Member, the Special Committee and the current board of Priatek believes that Directors and members (referring to Brian Quimby, John Colby, Vijay Patel, Hoshi Tamboli, Linda Swenson, and John Glasscock) were conspiring to lock out the Managing Member and run Priatek into bankruptcy, so they can take the assets of the company and start a new company with a fraudulent lien agreement.   But this was only to buy time to let the clock run against Milind and Priatek would be taken into bankruptcy.

202.    On July 30, 2019, Brian Quimby files for transfer of Priatek's patent and I2W takes possession of the patent when Priatek was not insolvent, and without judicial approval. (Exhibit 60)

203.    After filing a complaint, the United States Patent and Trademark Office declares that Brian Quimby improperly and illegally transferred the patent.

204.    On September 6, 2019, the Managing Member filed a Final Demand Notice to Brian Quimby to return the assets and patent of Priatek but Brian Quimby refused to cooperate. (Exhibit 27)

**CONSPIRACY**

205.     On June 15, 2019, Brian Quimby wrote a letter to Mike Brazerol and the Special Committee where Brian Quimby states, "I have the express support or proxy from other Priatek investors representing roughly $12 million." (Exhibit 50)

206.     While the Managing Member had the support of 63.4% of investors, as reflected in the proxy vote to remove Quimby and Colby, the investors that did not vote for removal of the two board members but supported Quimby included John Glasscock, Frank Helstab, Hoshi Tamboli, Vijay Patel, Linda Swenson, Steve Grunebach, and others.

207.     Brian Quimby and John Colby to date have refused to provide the Managing Member, the Special Committee, and the current board with the revised lien agreement.

208.     The June 15, 2019 letter from Quimby, a former board member, states, "Neither I nor I2W nor any other Priatek investor have any obligation whatsoever to engage with or be responsible to you, your group or Priatek; Priatek has an obligation to us. We certainly will not engage with the wild conjecture, false and meritless accusations, deranged conspiracy theories, destructive behavior or deceptive and delusional optimism espoused, published and circulated by your group." (Exhibit 50)

209.     Implying his loyalties lie with certain investors, Brian Quimby stated in an email to Mike Brazerol and the special committee that he cannot save every Priatek investor but he can save some.

210.     On September 22, 2019, an email from Brian Quimby and Linda Swenson to Scott Matthews (on current board of directors), states that Free Play Media (Quimby transferred all the assets of I2W to Free Play Media) consist of these key players: Steve Grunebach, Sareet

Majumdar, Frank Helstab/John Moshegan, Bruce Kamm, Hoshi Tamboli, Dipak Shah, Vijay Patel, and John Glasscock. (Exhibit 51)

211.    These are the same Priatek members and board members that usurped the Managing Member, took control of Priatek, and ran Priatek into the ground.

212.    These are also the same individuals ($12 million of investors) who supported Brian Quimby and John Colby when the proxy vote was ignored, the Managing Member was locked out, and the fraudulent lien agreement was executed.

213.    On September 29, 2019, Brian Quimby wrote an email to Scott Matthews and stated, "Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up." (Exhibit 52)

214.    This email details that Bobby Tinsley, Jeremy Ramos, Vijay Patel, and Frank Helstab were assisting Brian Quimby and Linda Swenson to raise capital for I2W.

215.    Additionally, Jeremy Ramos is a key player because he is the engineer that has possession of the software to run Priatek's kiosks.

216.    In May of 2019, the Managing Member called John Colby and asked how he and others can do this.  John Colby replied that his investor group is politically connected. No matter what the Managing Member does, they have a counter move. They have more money to fight the Managing Member in court, and he has no chance.

**EXTORTION, FALSE ALLEGATIONS, AND COMPLAINT BY JOHN GLASSCOCK**

217.    Jeremy Ramos called the Managing Member in April of 2019 and informed him if he doesn't run Priatek into bankruptcy John Glasscock and Brian Quimby will sue him.

218.    Misappropriation of assets by Defendants, including Brian Quimby also reflects Defendants' goal to drive Priatek into bankruptcy.

219.    John Glasscock delivers a complaint to the Managing Member on May 21, 2019 with false allegations to pressure the Managing Member to put Priatek into bankruptcy.

220.    John Glasscock's complaint is based on information and collaboration with Brian Quimby and John Colby.

221.    Quimby and Colby have confessed to the current board of their inappropriate actions against Priatek and the Managing Member.

222.    The prior board composed of Quimby, Colby and Vijay Patel were asked to produce all financial documentations, contracts, expense reports, lien agreements, board and advisory agreements, QuickBooks statements of the $1.2M over the previous 6 months which is unaccounted for, etc. No documents were ever provided to the Managing Member, yet Quimby and Colby provided certain financial documents to Glasscock for his complaint. (Exhibit 39)

223.    Documents were also destroyed so the Defendants could present their version of events such as non-competes and expense reports.

224.    Reports have been written by the special committee and the current board of directors that I2W and SKUX have stolen millions of dollars of IP from Priatek, yet John Glasscock is not interested in their investigation or lawsuit. The total loss of the investors is $16 Million, yet the value of Priatek was $55 Million at the time of the usurping of the Managing Member in September 2018. (Exhibits 1 and 2)

225.    In a sworn deposition, John Glasscock claims to not know who is I2W or Free Play. This is hard to believe since he was on the board for two years, and Brian Quimby is helping him with his claims against Milind.

226.    Yet, on September 22, 2019, in an email from Brian Quimby and Linda Swenson to Scott Matthews (on current board of directors), it states that Free Play (Quimby transferred all the assets of I2W to Free Play) consist of key players including John Glasscock. (Exhibit 51)

227.    John Glasscock has invested $4M in Priatek. Yet, he did not vote for the new board to try to save the company.

228.    John Glasscock refuses to acknowledge the validity of the current board and refused to be interviewed by the board and the former special committee of members.

229.    Glasscock is interested in pursuing the Managing Member for misappropriation of funds but is perplexingly indifferent about IP Theft of all the company's assets and technology or trying to save Priatek.

230.    Glasscock claims to have an expert witness, a CPA firm, to analyze Priatek's financial data and any impropriety on the part of the Managing Member.

231.    However, the CPA firm is not a domain expert in games, prize promotions, or technology revolving around Priatek's business.

232.    The CPA firm did not interview the Managing Member about spending or business expenses.

233.    The CPA firm took direction solely from John Colby and Brian Quimby to generate its biased report.

234.    The current board has provided a written statement that John Colby and Brian Quimby created a fraudulent lien agreement.

235.    The CPA report was engaged by Brian Quimby and John Colby even though they had an opportunity to finish an investigation with the Cendrowski firm in October of 2018. The Cendrowski firm did not find any wrongdoings by the Managing Member, so Colby and Quimby

did not finish the investigation. Instead, Colby and Quimby collaborated with Glasscock to file suit against the Managing Member.

236.    The claims against the former Managing Member state there was a lack of board meetings, financial reports, compensation reviews are all false. John Glasscock, John Colby, Brian Quimby, and Jeremy Ramos have confiscated and concealed board minutes, financial records, votes on plans, expense reports, compensation reviews, non-competes, advisory and board agreements, lien agreements to make false allegations of the Managing Member. The Former Managing Member will be able to prove that these documents existed before they were destroyed by this group.

237.    The current board stated in its latest letter that Glasscock's complaint is preventing the board from doing a deal with the former Managing Member and it is therefore preventing them from saving the company.

238.    The lawsuit was initiated by Glasscock to prevent Priatek members from supporting the Managing Member to save Priatek.

239.    The lawsuit contains baseless allegations that are blatant lies.  John Glasscock served on the board of directors for two years (2016-2018) but never presented even a single written complaint as a board member.

240.    Nevertheless, Glasscock now falsely claims that there were very few board meetings when on the contrary there were many board meetings and constant communication.

241.    Glasscock claims that there were no financial reports presented to him but instead financial statements were presented to the board and Glasscock at every meeting.

242.    Glasscock claims that the Managing Member recklessly manufactured 275 kiosks but instead Glasscock persuaded the Managing Member to build 200 or more kiosks, and in Glasscock's own words…"it is low risk".

243.    Glasscock played a major role in the sabotage of Priatek.

244.    Quimby confessed in an email to the special committee on Sept 16, 2019 that the Managing Member was pressured by Glasscock to step down as President.

245.    According to the board members, Glasscock has threatened the current board with litigation if the board releases a SLC report.

246.    Quimby claims to have the support of members that collectively invested $12 Million. It is obvious that Glasscock is part of this group because Glasscock invested $4 Million.

## THE CURRENT BOARD CONSPIRES WITH BRIAN QUIMBY

247.    On June 15, 2021, 36 members signed a letter requesting the current board resignation for non-performance, non-protection of company assets, unreported conflicts of interest, missed opportunities, non-communication, and a lack of a plan. (Exhibit 8)

248.    This 15-page letter details a breach of fiduciary duties that include the non-production of a special litigation report promised, in a May 12, 2020 letter, by the board to the members.

249.    Four board members (Karch, Brazerol, Clarin, and Kamm) interviewed Colby and Quimby and stated that there were confessions to the fraud.

250.    The board had dozens of emails, documents, bank statements, and contracts to complete a report, but never did. Every document and more in this complaint was given to the board.

251.    The board has not performed basic corporate tasks: (a) No annual meeting as required by the Priatek operating agreement; (b) Taxes were not filed; (c) Corporate filings were not met; (d) No bank account was opened; (e) No website was created

252.    The Managing member inquiries about the SLC report are met with hostility by board members.  Scott Matthews said, "Walk away from Priatek. The company is dead. I can't tell you why but walk away."  Gary Clarin said, "We are not going to complete the SLC because you are asking for it."  Mike Brazerol said, "I'm going to write a book on how you can be right but still fail. This is one of those situations."  Greg Karch said, "You don't need the SLC to clear your name."

253.    When Milind inquires about the board intervening in the derivative complaint initiated by Glasscock, Brazerol states the board doesn't believe it is their business to intervene.

254.    It is further evident that the board is collaborating with Quimby and Glasscock since Priatek machines are being used in commerce at a car museum called Dezerland on International Drive in Orlando; Priatek machines with iTouch Orlando software on them; Priatek member Matt Doniger finds Priatek kiosks with iTouch Orlando software on kiosks in the SeaWorld Doubletree hotel.

255.    Scott Matthews of the current board owns a company called iTouch Orlando. It provides kiosks for hotels in the Orlando area.

256.    Scott Matthews made a deal with Brian Quimby to repurpose Priatek's kiosks and launch them in Orlando with his software.

257.    The member letter also reflects that the iTouch Orlando website contains a copyright notice by I2W Tampa Bay, which is owned by Brian Quimby.

258.    In addition, iTouch's Orlando's LLC Articles of Organization show that the company's Registered Agent is DLT Law Group, which is the law firm of Priatek's Board Member Gregory M. Karch.

259.    Furthermore, Priatek members have discovered that Brian Quimby and Linda Swenson have invested in Scott Matthew's company, iTouch Orlando.

260.    The member letter stated, "one thing is clear: At least two Priatek Board Members appear to have conflicts of interest, and the Board has not shared this information with Priatek investors…..Moreover, the Board and its Special Litigation Committee were responsible for investigating issues involving former Board member Brian Quimby."

261.    Quimby acquired Priatek's patent in 2019 for his company, I2W Tampa Bay. (The US Patent Office later agreed with a Priatek objection to the patent reassignment and said that Priatek could retrieve its patent if it paid the renewal fee.)"

262.    There are questions in the letter from the members to the board that remain unanswered to this day: (a) "How can the Board protect Priatek assets and defend Priatek investors' interest if two of its members have significant conflicts of interest?; (b) "How can the Board examine issues involving Brian Quimby (as part of the Board's Special Litigation Committee) when certain Members are affiliated with a company that is linked to Brian Quimby's company, I2W Tampa Bay?"; (c) "To what extent are current and past Priatek Board members profiting from the assets of Priatek?"; (d) "Why has the Board not disclosed to investors these conflicts of interest?"

263.    It is evident that at least two board members and perhaps more are profiting from the distressed state of Priatek. These board member(s) would benefit from Priatek going bankrupt.

264.    A month after the member letter, the board released a letter stating that Bharvirkar released confidential information. It insinuates that there was a plan to help Priatek, yet no plan to date is ever released to the members. It also states that the board refuses to step down as requested by the members.

265.    September 3, 2021, the current board wrote a letter stating, Priatek is insolvent, and they have exhausted every way to save it. There is no explanation of the deal in the previous letter. They do mention that they would release a SLC report upon request. Several members have requested the SLC report and to date it has not been released to anyone.

266.    It is obvious to the members that the board is in breach of their duties, complicit in the misappropriation of Priatek IP and kiosk, and are covering up the crimes of the former board, Quimby, Colby, I2W and the SKUX group by not releasing a SLC report.

267.    While the current board has done everything to drive Priatek into bankruptcy, the former Managing Member and Founder has continued to try to save Priatek for the last two years.

268.    The former Managing Member: (a) Recovered Kiosks, empty office; (b) Created a Special Committee of Members to write a report; (c) Participated in the efforts to elect a New Board; (d) Created a plan to save Priatek; (e) Cooperated with the Current Board and Special Committee; (f) Produced dozens of (perhaps over a hundred) emails, contracts and other evidence for the board and the special committee; (g) Helped in filing complaints with the state and the patent office; (h) Wrote Demand letters to Quimby for assets to be recovered; (i) Got Bank Statements and delivered them to the board; (j) Offered a licensing agreement that would provide Priatek members a royalty for ten years and a buyout arrangement; (k) In the agreement, Replay Esports would provide $50k upfront to help with expenses to reinstate the patent, file taxes, state filings, and the SLC report; (k) The licensing agreement was signed by Brazerol, but the board

requested 250 units. The former Managing Member, Milind, believes that if he forfeited 250 units that the board would have the swing votes to run the company into bankruptcy. So the former Managing Member did not sign the agreement under those conditions.

### PRELIMINARY INJUNCTION – SKUX' CONVERSION OF CORPORATE ASSETS

269.    As a direct and proximate result of Defendant SKUX' conduct, Plaintiff has suffered, and will continue to suffer, significant irreparable harm, as well as incalculable economic injury and loss.

270.    Indeed, the ongoing nature of SKUX' unlawful actions necessitate judicial intervention in the form of an injunction to enjoin defendants from using converted corporate assets belonging to Priatek.  Injunctive relief will further prevent economic loss that Plaintiff would have to devote resources to detect if the intellectual property has been introduced into the stream of commerce.

271.    In light of the significant financial losses incurred by virtue of Defendants' actions (which are incalculable at this time), Plaintiff is entitled to all remedies available under law and equity, including, but not limited to compensatory damages, punitive damages, statutory damages, costs of suit, and attorney's fees in an amount to be proved, as well as any other remedies the court deems appropriate.

272.    By virtue of the foregoing, Plaintiff has demonstrated a likelihood of success on the merits of a claim for injunctive relief against Defendants and that a balancing of the equities favors the issuance of such an injunction against Defendants.  At this time, Plaintiff has no adequate remedy at law.  Furthermore, the present economic loss to Plaintiff, which is unascertainable at this time, and future economic loss, which is presently incalculable, present a significant risk to Plaintiff and its business activities.

## COUNT I
## DERIVATIVE CLAIM FOR A DECLARATORY JUDGMENT

273.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

274.    Plaintiffs bring this Count I derivatively on behalf of Priatek for declaratory relief.

275.    Plaintiffs request removal of the current board via an election of the board since the current board has perpetual control and has breached its contract and its fiduciary duties to Priatek.

276.    A new board would have its interest aligned with Priatek's majority investors to secure its patents before the patents become non-proprietary.

## COUNT II
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## (RICO) – SECTION 1962(a)

**DERIVATIVE ACTION against PRIATEK EXECUTIVE TEAM, I2W, SKUX, iTOUCH, DREAMDAZE**

277.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

278.    Plaintiffs bring this Count II derivatively on behalf of Priatek against each Defendant individually, and also the corporate entities as separate defendants.

279.    In particular, Bobby Tinsley, Brian Quimby, I2W, SKUX, iTOUCH, Dreamdaze, along with associated individuals and the separate formal entities, also constituted an association-in-fact enterprises which are all enterprises engaged in and whose activities affect interstate commerce.

280.    The Defendant(s) used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.   Specifically, Defendants through extortion

converted Priatek assets for personal gain and also used the assets as a springboard for other entities.

281.    The Defendants' racketeering activity constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

282.    As direct and proximate result of the Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in its business and property in that Priatek is on the brink of bankruptcy.

## COUNT III
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## RICO – SECTION 1962(c)

### DERIVATIVE ACTION against PRIATEK EXECUTIVE TEAM, I2W, SKUX, iTOUCH, DREAMDAZE

283.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

284.    Plaintiffs bring this Count III derivatively on behalf of Priatek against each Defendant individually, along with individuals now associated with other entities besides Priatek.

285.    Priatek is an enterprise engaged in and whose activities affect interstate commerce. The Defendant(s) are employed by or associated with Priatek, where they took some part in directing Priatek's business affairs.

286.    The Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically, Defendants through extortion converted Priatek assets for personal gain and also used the assets as a springboard for other entities while usurping power.

287.    Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts of usurpation of company power via extortion to drive Priatek to the brink of bankruptcy so that their nefarious acts would go undetected.

288.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

289.    The Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

290.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and property in that the company assets have been fraudulently converted and the company is on the brink of bankruptcy.

**COUNT IV**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(RICO) – SECTION 1962(d): RICO CONSPIRACY**

**DERIVATIVE ACTION against PRIATEK EXECUTIVE TEAM, I2W, SKUX,**
**iTOUCH, DREAMDAZE**

291.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

292.    Plaintiffs bring this Count IV derivatively on behalf of Priatek.

293.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c).  Specifically, defendant conspired to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)); or (3)

conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c).

294.     The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

295.     As direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Defendants agreed to participate in an endeavor to take control of Priatek by the extortion of the Managing Member and founder and misappropriating company assets.

<u>COUNT V</u>
<u>BREACH OF FIDUCIARY DUTIES (INCLUDING CARE AND LOYALTY)</u>

**DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM**

296.     Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

297.     Plaintiffs bring this Count V derivatively on behalf of Priatek against the Priatek Executive Team, as individuals.

298.    Defendants owed fiduciary duties of care and loyalty to the Company and its members and have breached their fiduciary duties.

299.    Defendants had a fiduciary duty to manage the entity in its interest and in the interests of its members – not in their own self-interest.

300.    Defendants fraudulently transferred Priatek assets to separate entities personally owned and controlled by them.

301.    Priatek Executive Team exercised actual control where they channeled the company into a particular outcome.

302.    Priatek Executive Team stonewalled investigations in order to bankrupt Priatek and facilitate the misappropriation of assets.

303.    Priatek Executive Team exploited their positions to block and control financing decisions in bad faith to enable them to misappropriate Company assets at the expense of the interests of the Company and majority-members.

304.    The Priatek Team acted in self-interest.

305.    Defendants caused the corporation to effect transactions that benefited the fiduciaries at the expense of the harmed members.

306.    Usurped power in breach of fiduciary duty.

307.    Defendants allowed fraudulent schemes to be perpetuated.

308.    As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

**COUNT VI – DERIVATIVE CLAIM
CONSPIRACY (THROUGH ABUSE OF ECONOMIC POWER)**

**DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM, I2W, SKUX**

309.     Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

310.     Plaintiffs bring this Count VI derivatively on behalf of Priatek and directly against Defendants Priatek Executive Team, I2W, SKUX – against each Defendant individually, and also the corporate entities as separate defendants.

311.     These Defendants are parties to a civil conspiracy that entered into an agreement where defendants extorted Priatek's Managing Member in the process of misappropriating company assets and attempted to put the company into bankruptcy.

312.     Defendants were aware of the other Defendants' fiduciary duties to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members.

313.     Defendants manipulated and controlled the Boards and the Priatek Minority investors.

314.     Defendants exercised actual control where they channeled the company into a particular outcome.

315.     In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of Priatek.

316.     Each one of these Defendants engaged in separate overt acts, in agreement amongst each other, causing damages to Priatek as alleged herein.

## COUNT VII – CONSPIRACY (BREACH OF FIDUCIARY DUTIES)

### DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM, I2W, SKUX

317.     Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

318.     Plaintiffs bring this Count VII derivatively on behalf of Priatek and directly against Defendants Priatek Executive Team, SKUX, I2W – against each Defendant individually, and also the corporate entities as separate defendants.

319.     These Defendants are parties to a civil conspiracy that entered into an agreement where defendants breached fiduciary duties, including duties of care and loyalty, owed to Priatek to misappropriate company assets and drive the company into bankruptcy.

320.     Defendants were aware of the Priatek Executive Team's fiduciary duties to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members.

321.     In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of Priatek.

322.     Each one of these Defendants engaged in separate overt acts, in agreement amongst each other, causing damages to Priatek as alleged herein.

## COUNT VIII – AIDING AND ABETTING (BREACH OF FIDUCIARY DUTIES)
### DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM, I2W, SKUX

323.     Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

324.     Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendants – against each Defendant individually, and also the corporate entities as separate defendants.

325.     These Defendants knowingly aided and abetted each other where Priatek Executive Team breached fiduciary duties owed to Priatek to misappropriate company assets and drive the company into bankruptcy.

326. Defendants were aware of the fiduciary duties owed to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members.

327. In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of Priatek.

328. Each one of these Defendants provided substantial assistance and/or encouragement to each other, causing damages to Priatek as alleged herein.

329. In concert, Defendants engaged in an orchestrated series of self-interested actions to the detriment of the Company and Plaintiff.

## COUNT IX – FRAUDULENT CONVERSION OF CORPORATE ASSETS

**DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM, SKUX, I2W, iTOUCH**

330. Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

331. Plaintiffs bring this Count IX derivatively on behalf of Priatek – against each Defendant individually, and also the corporate entities as separate defendants.

332. Each individual and corporate defendant, converted Priatek assets for their separate gain.

333. The conduct of each individual and corporate defendant was willful and malicious.

334. As a direct and proximate result of the fraudulent conversion of corporate assets, Priatek has sustained damages, as alleged herein.

## COUNT X – CONSPIRACY
## (FRAUDULENT CONVERSION OF CORPORATE ASSETS)

**DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM, SKUX, I2W, iTOUCH**

335. Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

336.    Plaintiffs bring this Count X derivatively on behalf of Priatek against Defendants – against each Defendant individually, and also the corporate entities as separate defendants.

337.    Each individual and corporate defendant conspired in agreement to convert Priatek assets for their separate gain.

338.    The conduct of each individual and corporate defendant was willful and malicious.

339.    As a direct and proximate result of the fraudulent conversion of corporate assets, Priatek has sustained damages, as alleged herein.

## COUNT XI – AIDING AND ABETTING
## (FRAUDULENT CONVERSION OF CORPORATE ASSETS)

**DERIVATIVE CLAIM against PRIATEK EXECUTIVE TEAM, SKUX, I2W, iTOUCH**

340.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

341.    Plaintiffs bring this Count XI derivatively on behalf of Priatek against Defendants – against each Defendant individually, and also the corporate entities as separate defendants.

342.    Each individual and corporate defendant performed substantially to convert Priatek assets for their separate gain.

343.    The conduct of each individual and corporate defendant was willful and malicious.

344.    As a direct and proximate result of the fraudulent conversion of corporate assets, Priatek has sustained damages, as alleged herein.

## COUNT XII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

**DERIVATIVE CLAIM against SKUX, I2W, iTOUCH, PRIATEK EXECUTIVE TEAM**

345.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

346.    Plaintiffs bring this Count XII derivatively on behalf of Priatek against Defendants – against each Defendant individually, and also the corporate entities as separate defendants.

347.    Defendants interfered with the business relationship between Priatek Member Investors and Managing Member under Operating Agreement 1.

348.    Defendants also interfered with the business relationship between Priatek Member Investors and Priatek Board 2 under Operating Agreement 2.

349.    In particular, Defendant Bobby Tinsley, acting in his individual capacity, acting outside the scope of his corporate authority and for his personal benefit, led the charge for the misappropriation of assets and technology, thereby interfering with Priatek's agreement with the Managing Member, and also interfering with the agreement between Priatek Member Investors and Priatek Board 2.

350.    Likewise, the other Defendants, also interfered with the business relationships of both operating agreements to injure Priatek.

### COUNT XIII – CONSPIRACY
### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP)

**DERIVATIVE CLAIM against SKUX, I2W, iTOUCH, PRIATEK EXECUTIVE TEAM**

351.    Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

352.    Plaintiffs bring this Count XIII derivatively on behalf of Priatek against Defendants – against each Defendant individually, and also the corporate entities as separate defendants.

353.    Each individual and corporate defendant conspired in agreement to interfere with Plaintiffs' business relationships.

354.    The conduct of each individual and corporate defendant was willful and malicious.

355.     As a direct and proximate result of the tortious interference, Priatek has sustained damages, as alleged herein.

## COUNT XIV – AIDING AND ABETTING
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP)

**DERIVATIVE CLAIM against SKUX, I2W, iTOUCH, PRIATEK EXECUTIVE TEAM**

356.     Plaintiffs incorporate the allegations made in Paragraphs 1 through 272 as if stated herein in their entirety.

357.     Plaintiffs bring this Count XIV derivatively on behalf of Priatek against Defendants – against each Defendant individually, and also the corporate entities as separate defendants.

358.     Each individual and corporate defendant performed substantially to interfere with Plaintiff's business relationships for their separate gain.

359.     The conduct of each individual and corporate defendant was willful and malicious.

360.     As a direct and proximate result of the tortious interference, Priatek has sustained damages, as alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment as follows:

a)      For an order deeming this action to be a proper derivative action and Plaintiffs to be proper and adequate derivative plaintiffs;

b)      Preliminary and any other appropriate injunctive relief enjoining Defendant Skux as alleged herein;

c)      Enter judgment according to the declaratory relief sought;

d)      For an order awarding judgment in an amount to be determined at trial, punitive damages, and prejudgment interest, together with costs of suit and reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper;

e)      For an order awarding judgment against the Defendant(s) for Plaintiffs RICO claims in an amount to be determined at trial, including actual damages, treble damages and attorney's fees, and equitable relief to prevent and restrain RICO violations.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action.

Respectfully submitted on this 31st day of March, 2022,

> /s/ *Derek P. Usman*
> Derek P. Usman
> Florida Bar No. 0120303
> Email:  derek@usmanfirm.com
> **The Usman Law Firm, P.A.**
> 505 E Jackson Street
> Suite 305
> Tampa, FL 33602
> (813) 377-1197 telephone

## VERIFICATION

Pursuant to 28 U.S.C. § 1746(2), under penalties of perjury, I verify that I have read the forgoing VERIFIED AMENDED DERIVATIVE COMPLAINT AND DEMAND FOR JURY TRIAL and that the facts stated in it are true and correct.

Executed on March 31, 2022.

/s/ *Dean Trew* *
Dean Trew


\* I hereby certify that I have the signed original of this document that is available for inspection during normal business hours by the Court or a party to this action.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of March, 2022, a true and correct copy of the

foregoing has been provided electronically through the Court's CM/ECF filing system to all

registered recipients.

<u>/s/ <i>Derek P. Usman</i></u>
Derek P. Usman, Esq.
Florida Bar No. 0120303
Email:  <u>derek@usmanfirm.com</u>
**The Usman Law Firm, P.A.**
505 E Jackson Street
Suite 305
Tampa, FL 33602
(813) 377-1197 telephone
Attorney for Plaintiffs
