**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NEAL ENGWALL, DEAN TREW,**
**CHRISTIE SIKORA, CAROL BRIAM,**
**ROBERT SMITH, JERRY LIVERS,**
**MARSHA WOODS, FRANK RUDD,**
**GREG BUNN, EARL SCHUBE,**
**JACQUES BRIAM, REMY BRIAM,**
**WILLIAM CELLI, ALTON FAIRCLOTH,**
**FRED HERAVI, SURESH IDNANI,**
**DAVID MOATS, RICH VOLDRICH,**
**MARK STEBLIN, ED HEALY,**
**ARVIND SHRESTHA, JOSH KENT,**
**MARK SCHULZE, RON RICHARDSON,**
**CHRISTOPHER LAFAY, ROBERT MILTON,**
**STEVE MIRAGLIA,**
**STEVE BLAUER,**
**MATTHEW DONIGHER,**
**THAHIRIH DONIGER,**
**KIM ELLIS,**
**WAYNE ENGLISH,**
**ROBERT GRIFFIN,**
**NANCY CUMMINGS, and**
**MARJORIE DAHLBERG, *et al.*; all individuals,**
**Derivatively on Behalf of PRIATEK, LLC,**

**CASE NO. 8:22-cv-00638**

***Plaintiffs,***

**v.**

**BOBBY TINSLEY, an individual, BRIAN QUIMBY, an individual, SKUXCHANGE, LLC, I2W TAMPA BAY, LLC, iTOUCH ORLANDO, LLC, DREAMDAZE TECHNOLOGY, INC., *et al.*,**

***Defendants,***

**and,**

**PRIATEK, LLC, a Delaware Limited Liability Company,**

***Nominal Defendant.***

_______________________________________________/

**SECOND AMENDED DERIVATIVE COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of Priatek, LLC ("Priatek, LLC"), bring the following Amended Derivative Complaint (the "Complaint") against certain members of the Priatek Executive Team ("Priatek Executives"); corporate defendants SKUXCHANGE, LLC (SKUX, LLC), I2W Tampa Bay, LLC ("I2W, LLC"), iTouch Orlando, LLC ("iTouch, LLC"), Dreamdaze Technology, Inc. ("Dreamdaze, Inc."), and individual defendants associated with the corporate defendants; individuals comprising the "minority investor group", certain Priatek, LLC board members, and states as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 18 U.S.C. § 1964 (federal question). The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 18 U.S.C.A. § 1964(c), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

2. Supplemental jurisdiction for state law claims is conferred by 28 U.S.C. §1367, as the Plaintiff's state and federal claims arise out of a common nucleus of operative facts, as more fully set forth below.

3. Pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. §1965, venue is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**PARTIES**

**PLAINTIFFS**

4. Plaintiffs are, and at all relevant times have been, holders of membership units of Priatek, LLC. Plaintiffs will continue to hold Priatek membership units through the resolution of this action. Plaintiffs became members under the original Operating Agreement for Priatek, LLC. A subsequent, Amended Operating Agreement, was entered into between the Priatek Members/Investors and the Board of Managers. Plaintiffs will continue to hold member interests through the resolution of this action. Plaintiffs, all individuals, include Neal Engwall, Dean Trew, Christie Sikora, Carol Briam, Robert Smith, Jerry Livers, Marsha Woods, Frank Rudd, Greg Bunn, Earl Schube, Jacques Briam, Remy Briam, William Celli, Alton Faircloth, Fred Heravi, Suresh Idnani, David Moats, Rich Voldrich, Mark Steblin, Ed Healy, Arvind Shrestha, Josh Kent, Mark Schulze, Ron Richardson, Christopher Lafay, Robert Milton, John King, Steve Miraglia, Steve Blauer, Matthew Doniger, Thahirih Doniger, Kim Ellis, Wayne English, Robert Griffen, Nancy Cummings, Majorie Dahlberg.

**NOMINAL DEFENDANT**

5. Nominal Defendant Priatek, LLC ("Priatek, LLC") is a Delaware limited liability company headquartered in Saint Petersburg, Florida.

**DEFENDANTS (federal and state claims)**

6. SKUX-ENTERPRISE associates: (individuals) Bobby Tinsley, James Sampey, Richard Waters, Brian Quimby, Hoshi Tamboli, Linda Swenson, John Glasscock, Krishna Nalamshetty, Vijay Patel, Dipak Shah, Jon Najarian, Scott Matthews, David Chidekel, James Buckley, Jeremy Ramos, Moshe Joshua; Dreamdaze Technology, Inc., a

New York corporation, with its principal place of business located at 300 Westwood Road, Woodmere, New York 11598.

7. I2W-ENTERPRISE associates: Brian Quimby, John Colby, Jeremy Ramos, Scott Matthews.

8. Corporate defendants: SKUX, LLC – a Florida limited liability company; I2W, LLC, a Florida limited liability company;

9. Corporate defendant: iTOUCH, LLC, a Florida limited liability company.

10. Additional individual defendants: Bob Zaccardo, Kenneth Douglas, Robert Quintana.

**DERIVATIVE ALLEGATIONS**

11. Plaintiffs bring this action derivatively in the right and for the benefit of Priatek to redress violations of the Racketeer Influenced and Corrupt Organizations Act, breaches of fiduciary duty, tortious interference, and other violations of law by Defendants as alleged herein.

12. Plaintiffs have owned shares of Priatek membership units continuously during the period of the misconduct described herein and continue to hold membership units of Priatek.

13. Plaintiffs will adequately and fairly represent the interests of Priatek and its members in enforcing and prosecuting Priatek's rights.

**DEMAND FUTILITY ALLEGATIONS**

14. Plaintiff did not make a demand on the Priatek Board 2 to bring suit asserting the claims set forth herein because pre-suit demand would have been futile.

The facts alleged in the Derivative Complaint show that a reasonable doubt exists, as of the time the complaint is filed, that Priatek Board 2 could have properly exercised its independent and disinterested business judgment in responding to a demand. (Exhibit 8)

15. Priatek Board presently consists of five members, including Defendant Scott Matthews, who had knowledge of the SKUX-Enterprise and I2W-Enterprise's illegal taking of Priatek assets and technology. (Exhibit 51, 52)

16. With the (second) Priatek board installation, upon the amendment of the Priatek Operating Agreement, the new Board Members begin to exploit their positions and begin to coordinate their conduct with both the I2W-Enterprise and the SKUX-Enterprise. (Exhibit 8, 52)

17. Even prior to the installation of the new board, the I2W-Enterprise and the SKUX-Enterprise (including certain "minority investors"), were entangled in business dealings that involved misappropriated Priatek Kiosk machines. (Exhibit 1, 2)

18. Also, Matthews transacted with I2W, LLC and Quimby to repurpose Priatek Kiosk machines (previously taken from Priatek by Quimby), not only with iTOUCH, LLC software, but also with the digital VendXOR technology. (Exhibit 8)

19. iTOUCH, LLC website contains a copyright notice by I2W, LLC, which is owned by Brian Quimby. (Exhibit 8)

20. The presence of Priatek Kiosk coupon machines, containing iTouch Orlando software, at the car museum "Dezerland", along with the amusement park Seaworld, in Orlando, Florida is further probative of the second Priatek Board's collusion

with Quimby (SKUX-Enterprise, I2W-Enterprise), and the "minority investors. (Exhibit 8)

21. In addition, iTOUCH, LLC's registered agent with the Florida Division of Corporations is DLT Law Group, PA – a law firm operated by Priatek Board Member Gregory Karch. (Exhibit 8)

22. Quimby and Swenson ("minority investor group") have an ownership interest in iTOUCH, LLC. (Exhibit 52)

23. While Matthews was already compromised prior to his appointment to the board, a September 22, 2019 e-mail amongst Quimby, "minority group investor" Swenson, and Matthews documents the transfer of misappropriated Priatek assets from I2W, LLC to Free Play Media Group, LLC. Free Play Media "key players" include its principal Quimby, and other "minority group investors" Hoshi Tamboli, Vijay Patel, and John Glasscock, and yet another compromised Board Member Bruce Kamm. (Exhibit 51)

24. Brazerol's vitriol against the Priatek investors is on display when Brazerol telephones Bharvirkar, "I'm going to write a book on how you can be right but still fail. This is one of those situations."

25. Matthews, also via a telephone conversation, adds: "Walk away from Priatek. The company is dead. I can't tell you why but walk away."

26. On June 15, 2021, 36 Priatek members signed a letter requesting the current board's resignation for non-performance, non-protection of company assets, unreported conflicts of interest, missed opportunities, non-communication, and a lack of a plan. (Exhibit 8)

27. In particular, the member letter requests the production of the Special Litigation Committee Report ("Committee Report") which was offered by the Board in a letter dated May 12, 2020. (Exhibit 9)

28. While the Board, on September 3, 2021, disseminates another letter to Priatek Members, the Committee Report is not provided yet again. (Exhibit 2)

29. Additionally, Priatek Board 2 presently consists of five members, including Defendant Scott Matthews, who were all individually liable, and also complicit in the illegal acts of the Defendants. The Priatek Board 2 faced a substantial likelihood of liability on all or one of the claims brought against the Defendants in their complaint. (Exhibit 8,9)

30. The board members delayed action for years to become liable for knowingly or recklessly allowing the criminal and illegal acts of defendants to continue. (Exhibit 8)

31. Priatek Board should not be considered independent board members. Moreover, all board members undeniably have personal and material financial interests aligned with individuals and in companies that misappropriated Priatek assets and technology in conflict with the interest of Priatek members. (Exhibits 8, 9, 102)

## INTRODUCTION

32. Certain associates of racketeering enterprises – SKUX-Enterprise and I2W-Enterprise are named Defendants, including Priatek LLC's "minority investor group", key employees, board members. By utilizing multiple schemes, the racketeering enterprises first engaged in concerted illegal actions to obtain Priatek property (Vendxor

a *digital* blockchain "project", and physical kiosk-gaming machines). The associate Defendants then transferred Priatek, LLC property into two separate companies (SKUX, LLC and I2W, LLC). To further their overall objectives to obtain Priatek, LLC's property, the Defendants further advanced multiple schemes to conceal their actions by undermining internal investigations; driving Priatek, LLC into bankruptcy by entering into commercial transactions to render Priatek, LLC insolvent; removing Priatek LLC's co-founder Milind Bharvirkar ("Bharvirkar") from his role as President of Priatek, LLC. Still yet, Defendants then schemed to amend Priatek's operating Agreement to eviscerate the authority of Bharvirkar and install a compromised board of directors. (Exhibits 1, 2, 32)

33. The mantra for the SKUX-Enterprise is #MARCHTOBILLION. Defendant Tinsley used #MARCHTOBILLION in his e-mail signature at Priatek, LLC and then this mantra becomes the branding tagline for the SKUX-Enterprise. (Exhibit 103, 104)

34. The racketeering enterprise's actions begin with threats of incarceration, and harm to his spouse and children to the Priatek LLC co-founder and President Bharvirkar. (Exhibit 64, 67)

35. Text messages from SKUX-Enterprise associate Richard Waters include disturbing threats: "Rescissions are coming and they will keep coming. By Monday it will be an avalanche of rescissions and you can stop it today. The pressure is mounting. Are you praying? Are you hearing from the Lord? You are in a storm…..Your path is one of utter destruction."; "Milind please ask your legal counsel how they can help you fund your company after all the 2018 investors rescind." "If you don't make the right decision

in the next 24 hours, and sign the revised MOU, our company is going up in flames." "But you apparently believe in your righteous indignation and refuse to meet current demands." "If your actions cause the company to fail, which is about to happen, you could face incarceration." (Exhibit 68)

36. Text messages from Defendant Tamboli further threaten Bharvirkar. On September 21, 2018: "What you do today is going to determine whether you kill your company, wipe the investors and the employees, potentially go to jail and possibly lose your wife and kids. Back down." (Exhibit 64)

37. Another example of text message from Defendant Tamboli on October 9, 2018 to Bharvirkar states: […you have 51 percent of the voting stock but that is a loadstone around your neck because of this company fails or implodes right now it will be squarely on your shoulders and I am telling you all the shareholders- every single one is going to come after you not underestimating the trouble you will have with the SEC and the lawsuits and all sorts of liability."] (Exhibit 28, 67)

38. The allegations of this civil complaint demonstrate that the Defendants engaged in smash-and-grab looting of Priatek in broad daylight and were caught red-handed. (Exhibit 1, 2)

39. There were separate independent reports by outside third parties which reflect findings of Defendants engaging in illegal and criminal acts. ( Exhibit 1, 2, 42)

40. The findings list evidence gathered from documents and witnesses – evidence which is also incorporated into this civil complaint of crimes committed by the Defendants. (Exhibit 1, 2, 42)

41. Financial expert Larry Kolb presents a proposal, via correspondence dated September 23, 2018, to investigate financial improprieties by Defendants at Priatek. (Exhibit 31)

42. Cendrowski Corporate Advisors, LLC provides a twenty (20) page "draft commentary" dated November 29, 2018 which outlines its forensic investigation findings. (Exhibit 42)

43. Priatek legal counsel were ready to proceed with litigation based upon evidence of substantial illegal actions being orchestrated at Priatek by Defendants, but these investigations were also sabotaged by the RICO criminal enterprises. (Exhibit 30)

44. Letters dated September 11, 2018 and September 13, 2018, from attorney Jack R. Kiefner, Jr. contain evidence consistent with the allegations of the operative complaint. (Exhibit 16 and 17). Then Attorney Kiefner again details ongoing illegal acts by Defendants in a letter Dated April 18, 2019. (Exhibit 39)

45. Attorney Howard Ross from the law firm Battaglia, Ross, Dicus & McQuaid, P.A. further details wrongdoing at Priatek in a letter dated November 21, 2018. (Exhibit 37)

## BACKGROUND FACTUAL ALLEGATIONS

46. Priatek, LLC based in Saint Petersburg, Florida began operations in 2014 to provide retail coupon solutions via physical Priatek Kiosk coupon machines and associated technology (the "Priatek Kiosks"). (Exhibit 106)

47. In early 2018. Priatek commenced the digital VendXOR project ("VendXOR"). The digital application was a blockchain based, crypto currency project for vendors to issue and manage coupons, offers, and loyalty. (Exhibit 6, 78)

48. In 2018, two racketeering enterprises emerged from the ranks of Priatek, LLC – the SKUX-Enterprise and the I2W-Enterprise. While the SKUX-Enterprise desired VendXOR – the emerging digital technology, the I2W-Enterprise wanted Priatek Kiosks – the physical machines to house the digital technology. (Exhibit 1, 2, 26)

49. With disregard to corporate governance procedures, the two criminal enterprises, in concert, engage in multiple schemes to obtain the assets of Priatek – the physical Priatek Kiosks and the digital VendXOR. (Exhibit 1)

50. Then, while openly perpetuating their schemes to abscond with Priatek Kiosks and VendXOR, the I2W-Enterprise and SKUX-Enterprise also scheme to conceal their criminal activities and maintain the taking of Priatek's assets. (Exhibit 26)

51. In the process, of taking VendXOR, the SKUX-Enterprise left Priatek, LLC to form a new separate entity SKUX, LLC ("SKUX") and to transfer and invest the digital VendXOR into to SKUX. (Exhibit 57)

52. The I2W-Enterprise remains behind at Priatek to take the physical Kiosks and utilizes its pre-existing entity I2W Tampa Bay, LLC ("I2W") to transfer and invest the physical Priatek Kiosks into I2W. (Exhibit 5, 60)

53. Contemporaneously, Priatek founder and President Milind Bharvirkar ("Bharvirkar") was present every step of the way as an "eye-witness" to the crimes being committed by the two criminal enterprises. On behalf of Priatek, and fellow Priatek

members, Bharvirkar, perpetually attempts to fend off the criminal attacks by the SKUX-Enterprise and I2W-Enterprise. (Exhibit 26)

54. In concert with the SKUX-Enterprise, the I2W-Enterprise further proceeds to sabotage any effort by Priatek to investigate the criminal wrongdoings and then destroy Priatek as a going concern. (Exhibit 1, 42)

55. The two criminal enterprises further collude with specific Priatek minority investors to advance their schemes to fruition. These minority investors, while smaller in number, account for a proportionally larger capital investment than the majority investors. (Exhibit 50, 63)

56. At the inception of the SKUX-Enterprise on or about July 20, 2018, Brian Quimby ("Quimby") oversaw VendXOR and also Priatek finances and budgets. Quimby was also the principal owner of I2W. (Exhibit 33)

57. As a member of the SKUX-Enterprise, and in conspiracy as a member of the soon to be formed I2W-Enterprise, the SKUX-Enterprise and Quimby extort Priatek's President and Managing Member Milind Bharvirkar ("Bharvirkar") by imputing criminal acts of embezzlement and theft of Priatek assets, along with other federal crimes. Bharvirkar is also the 38-percent owner of Priatek. (Exhibit 1, 2, 25, 52)

58. The extortion is intended for Bharvirkar to resign as Priatek President to enable the two Enterprises to install SKUX-Enterprise associate Jim Sampey as Priatek president – and simultaneously make another SKUX-Enterprise associate Bobby Tinsley president of VendXOR. (Exhibit 14, 61)

59. When Priatek's Managing Member retains legal counsel, the SKUX-Enterprise and Brian Quimby of the soon to be formed I2W-Enterprise momentarily pause their extortionate threats and feign cooperation with investigations of Priatek corporate governance. Nevertheless, in short order the extortion escalates. (Exhibit 18, 45)

60. While the extortion against Priatek prompts Bharvirkar to resign as President, the internal investigations continue. (Exhibit 50)

61. At this point, the "minority investor group", including Hoshi Tamboli, John Glasscock, Linda Swenson, Vijay Patel, Dipak Shah, and Krishna Nalamshetty, reassure the two racketeering enterprises to remain unconcerned with any potential legal repercussions and proceed with the schemes to take Priatek assets and technology. (Exhibit 35)

62. With the I2W Enterprise remaining at Priatek, their members Brian Quimby, John Colby, and Jeremy Ramos utilize their unfettered access and erase Priatek business records – including non-disclosure agreements, non-compete agreements, e-mails, contracts, board minutes, expense reports, and more. (Exhibit 38)

63. These illegal actions of the SKUX-Enterprise and the I2W-Enterprise are a prelude to further criminal acts in violation of federal racketeering statutes and many other state laws that continue to this day. (Exhibit 8)

**PRIATEK ORGANIZATIONAL STRUCTURE**

64. Priatek organizational structure in 2018 (first Board of Directors); Priatek Executive Team; Advisors (investors). (Exhibit 6, 87, 88, 106)

65. Milind Bharvirkar – President until September 24, 2018, Managing Member until December 2019; Priatek equity owner (majority 38-percent owner)

66. John Colby, President (after Bharvirkar's resignation)

67. (first) Board of Directors (* "working" board member)

a. Milind Bharvirkar* (managing member)

b. Brian Quimby* (financial executive after assuming Colby's CFO duties); equity ownership interest in I2W, LLC.

c. James Sampey*

d. Kenneth Douglas*

e. John Colby*

f. Dr. Vijay Patel ("minority investor group")

g. Dr. Krishna Nalamshetty ("minority investor group")

68. Priatek, LLC Board of Directors after SKUX-Enterprise departs Priatek, LLC consists of Colby, Quimby, Patel, Nalamshetty, and Bharvirkar (Managing Member/President).

69. Priatek Executive Team ("Priatek Executive Team")

a. Jeremy Ramos, Vice President of Engineering and Co-Founder of Priatek, LLC (and also equity ownership interest in I2W, LLC)

b. John Colby, COO/CFO of Priatek and co-founder until August of 2018 then converted to solely COO

c. Bobby Tinsley, originally VP of Sales of Priatek; he received a lateral move to VP of Innovation with VendXOR blockchain project

d. Bob Zaccardo, VP of Business Development of Priatek

e. James Buckley, Director of Marketing of Priatek

f. Bob Quintana, Advisory Board Member for Priatek, LLC and VendXOR

g. Kenneth Douglas, Vice President of Strategic Relationships (and "working" board member)

**SKUX-ENTERPRISE and I2W-ENTERPRISE RACKETEERING ENTERPRISES**

70. SKUX-Enterprise (named Defendants)

a. Jim Sampey, co- founder and CEO of SKUX.

b. Bobby Tinsley, co-founder and EVP of SKUX.

c. David Chidekel, former legal advisor for Priatek VendXOR blockchain.

d. Moshe Joshua, Former head of blockchain technology for Priatek. Currently Chief Technology Officer of SKUX; principal owner of Dreamdaze Technology, Inc..

e. Jon Najarian, former advisor for Priatek/VendXOR. Currently advisor for SKUX.

f. Richard Waters, fundraiser for SKUX.

g. Brian Quimby, Priatek (first) board member and I2W equity owner.

h. Jeremy Ramos, former Priatek executive and I2W equity owner.

l. Vijay Patel, (first) board member and minority Priatek investor.

m. John Glasscock, minority Priatek investor.

n. Linda Swenson, minority Priatek investor.

o. Hoshi Tamboli, minority Priatek investor.

p. Krishna Nalamshetty, minority Priatek investor.

q. Dipak Shah, minority Priatek investor

r. Scott Matthews, (second) Board member; owner of iTOUCH, LLC.

s. James Buckley, former marketing director for Priatek, LLC

71. I2W-Enterprise (named Defendants)

a. Brian Quimby

b. Jeremy Ramos

c. John Colby

d. Scott Matthews, (second) Board member; owner of iTOUCH, LLC.

**PRIATEK LLC'S (second) BOARD OF DIRECTORS**

72. Priatek, LLC's (second) Board of Directors: Mike Brazerol, Gregory Karch, Scott Matthews, Bruce Kamm, Gary Clarin. (Exhibit 9)

**ADDITIONAL FACTUAL ALLEGATIONS**

73. Tinsley and the SKUX-Enterprise want control of Priatek – they particularly desire operational control of Priatek's digital VendXOR blockchain crypto-currency project, and its assets and technology and continue on its "#marchtobillions". (Exhibit 11, 25, 30)

74. Along with the "minority investor group", the SKUX-Enterprise also consists of Bobby Tinsley, Bob Zaccardo, Bob Quintana, Kenneth Douglas, Jim Sampey, David Chidekel, Jon Najarian, and Moshe Joshua. These latter individuals are also key

personnel of SKUX, LLC – the reincarnation of Pritaek's project VendXOR. (Exhibit 57, 70, 110)

75. Much after the inception of Priatek, Bobby Tinsley began his employment for Priatek for a time period of 4-5 years. Tinsley's initial position was Vice President of Sales.

76. Tinsley then became Vice President of Innovation (Blockchain) for Priatek.

77. Priatek developed a crypto-currency project named Vendxor.

78. In his role as Vice President of Innovation (Blockchain), Tinsley formed a close association with Defendant Jon Najarian.

79. On July 20, 2018, while Priatek hosted a crypto summit, Tinsley discloses his desire to become president of VendXOR to Priatek personnel. Tinsley further informs Defendant Ramos that Tinsley had the support of others to take over Vendxor and Ramos should also align himself with Tinsley. (Exhibit 11)

80. Other members of SKUX-Enterprise in attendance at the crypto summit included Defendants Bob Zaccardo, Bob Quintana, Kenneth Douglas, Jim Sampey, David Chidekel, Jon Najarian, and Moshe Joshua. (Exhibit 11)

81. Through September 3 – 6, 2018, Tinsley unilaterally asserted himself as EVP (executive vice-president) and co-founder of Priatek. (Exhibit 10)

82. Tinsley is reprimanded for his unauthorized actions by Priatek.

83. On September 6, 2018, Bobby Tinsley started an argument with the Managing Member about the governance of the blockchain project. In particular, Tinsley threatens the Priatek President, "Wait until you see what I do to you." (Exhibit 11).

84. On September 6, 2018, Bob Zaccardo emailed Tinsley: "Paul says Kenny's token agreement is total bullshit. These guys are trying to screw all of us. Not good." The SKUx Enterprise members, Bob Zaccardo, Bobby Tinsley, Kenneth Douglas believed their proposed shares of VendXOR should have been larger. (Exhibit 83)

85. Thereafter, the SKUX-Enterprise commenced a series of schemes to obtain VendXOR apart from Priatek, and formed SKUX, LLC to use the VendXOR blockchain technology. (Exhibit 30)

86. **SCHEME 1 (SKUX-Enterprise's fraudulent misrepresentations to Priatek to usurp power, which sabotages Priatek funding efforts from prospective investor leads. SKUX-Enterprise takes Priatek investor leads for itself.**

87. Initially the SKUX-Enterprise was composed of Bobby Tinsley, Jim Sampey, Kenneth Douglas, Bob Zaccardo, Bob Quintana, David Chidekel, Brian Quimby. (Exhibit 61)

88. The SKUX-Enterprise commences its objective to obtain control of VendXOR by intentionally participating in Scheme 1 to fraudulently remove Priatek's President and in turn sabotages Priatek's funding efforts from prospective investor(s) leads. (Exhibit 14)

89. Mail/wire fraud (18 U.S.C. §§ 1341, 1343). The SKUX-Enterprise used mails and/or wires in furtherance of this particular scheme to defraud Priatek. The SKUX-Enterprise sabotaged Priatek investor leads by making intentional material misrepresentations regarding the impropriety of Priatek President and Managing Member's business decisions. (Exhibit 12, 13, 16, 17)

90. On September 9, 2018, certain SKUX-Enterprise members (and other individuals – Vijay Patel, Jim Sampey, Brian Quimby, Kenneth Douglas, Krishna Nallamshetty, David Chidekel, Bobby Tinsley, Bob Quintana, John and Matt Diaz) held a meeting to remove the Bharvirkar as Priatek President. (Exhibit 61).

91. At this juncture, Patel joins the SKUX-Enterprise by acquiescing to SKUX-Enterprise's plan to remove Bharvirkar as Priatek President. (Exhibit 14)

92. Immediately, on September 9, 2018, Priatek Board resolution prompted the Priatek President to be removed from his duties. (Exhibit 61)

93. Wire fraud. The SKUX-Enterprise, by simple majority, controls the Priatek Board and informs Priatek members of the board resolution via multiple e-mails. (Exhibit 16, 17, 30)

94. The SKUX-Enterprise, with its new associate Patel, unilaterally installed their criminal associates Sampey as President, and Quintana as CEO of Priatek. (Exhibit 61)

95. Wire fraud. September 10, 2018, Tinsley along with SKUX-Enterprise, falsely threatened to report Priatek for federal securities violations to remove Priatek President/Managing member from his duties. (Exhibit 12; email sent by Defendant James Sampey and David Chidekel, and copies Bobby Tinsley, Bob Quintana and the board members Krishna Nallamshetty, Vijay Patel, Brian Quimby, and John Colby.)

96. This September 10, 2018 correspondence reiterates false accusations that the Priatek President/Managing Member is embezzling corporate assets. (Exhibit 12).

97. This letter also falsely accuses the Priatek President of secretly attempting to transfer Priatek assets into outside entities. (Exhibit 12).

98. Mail/wire fraud. Another letter (disseminated via e-mail and USPS) to Priatek's President Managing Member sent via e-mail and certified United States postal mail on September 11, 2018 further echoes fraudulent accusations of wrongdoing by Priatek's President/Managing Member. (Exhibit 13).

99. Both the September 10 and 11, 2018 letters instruct the Priatek President to refrain from attending the Boston Token Fest (Blockchain convention), and to refrain from capital raising agreement activities on behalf of Priatek. (Exhibit 12, 13)

100. These communications reflect misrepresentations made to Priatek and its Board that led to the removal of the Priatek President. (Exhibit 50)

101. The fraudulent allegations further prompted Priatek to halt operations, including shipment of Priatek Kiosks to New York City causing significant economic injury to Priatek. (Exhibit 16, 32, 33)

102. The fraudulent allegations to the Board also prompted Priatek to cease necessary capital raising investors efforts. (Exhibit 33, delineating need for capital infusion). Priatek had previously raised $4.5 million in 2018 alone. Subsequently, Priatek did not raise any additional capital from investors.

103. Priatek and its President was informed on September 11, 2018 by its legal counsel to refrain from communicating with prospective investors. (Exhibit 86, 95)

104. The pause in funding efforts and suspension of the President/Managing Member caused additional injury to Priatek because prospective investors would not

monetarily invest in Priatek, and the Priatek President was prevented from soliciting investments from prospective investors. (Exhibit 17, 50)

105. To further the facilitation of its scheme, the SKUX-Enterprise continues to conspire to malign the Priatek President with additional false allegations to the Board regarding financial and accounting irregularities. (Exhibit 14)

106. A September 17, 2018, Board resolution made findings that the allegations of wrongdoing by Priatek's President were meritless. (Exhibit 18)

107. For example, the fraudulent misrepresentations were questioned by Priatek Managing Member's independent legal counsel on September 13, 2018. (Exhibit 17). No proof of any wrongdoing by Priatek's President is presented to the Board.

108. Additionally, John Colby, a board member, in a September 12, 2018 email, implicates Chidekel as "working with unclean hands" alongside Quintana to advance interests adverse to Priatek. Colby's e-mail further states: "[Chidekel] has never raised any issues regarding potential SEC violations regarding any efforts that are alleged in the board note." (Exhibit 54). Another independent legal counsel, Umera Ali, on September 11, 2018, concludes: "However I note that there has not been any breach of SEC regulations or other government laws or regulations governing the issue of cryptocurrency." (Exhibit 85)

109. **<u>SCHEME 2</u> (OBTAINING VENDXOR) SKUX-Enterprise extorts Priatek President for Priatek to relinquish the digital VendXOR blockchain project to the newly formed SKUX, LLC entity. SKUX-Enterprise also fraudulently induces investor rescissions.**

110. While SKUX-Enterprise's initial Scheme 1 injures Priatek by disrupting its corporate governance and operations, and more significantly halting capital raising efforts, the criminal enterprise does not yet have VendXOR. (Exhibit 31, 42)

111. Nevertheless, due to their initial scheme having minimal success by crippling Priatek capital raising efforts and creating corporate chaos, the SKUX Enterprise begins its next scheme in furtherance of its goal to obtain VendXOR and continue its "#marchtobillions". (Exhibit 103)

112. On September 15, 2018, Tinsley resigned. Two directors (Jim Sampey and Kenneth Douglas) resigned on September 19, 2018, and Bob Zaccardo resigned after the Boston token fest. (Exhibits 19, 20, 55).

113. In September 2018, additional criminal associates that joined the SKUX-Enterprises are Richard Waters, Jon Najarian, Moshe Joshua (and his Dreamdaze, Inc. entity), along with the "minority investor group". (Exhibit 29, 110)

114. The SKUX-Enterprise's recruitment of Dreamdaze, Inc. and Moshe Joshua to facilitate the use of VendXOR assures the "minority investor group" that joining the SKUX-Enterprise will ensure monetary gain for them as SKU-Enterprise associates. (Exhibit 57, 66)

115. The "minority investor group" includes Hoshi Tamboli, John Glasscock, Linda Swenson, Dipak Shah, and Vijay Patel (Patel is a board member and pre-existing SKUX-Enterprise associate.). (Exhibit 50)

116. Overt actions by the "minority investor group" were taken knowingly to assist the operations of the SKUX-Enterprises. For instance, scrutiny of the criminal acts of the SKUX-Enterprise is diverted towards Bharvirkar. (Exhibit 43, 44)

117. Extortion and Conspiracy to Extort (18 U.S.C. § 1951, § 1951(a), and § 836.05, Fla. Stat.). Extortion (along with Conspiracy to Extort) of Bharvirkar, Priatek President and Managing Member, begins by the SKUX-Enterprise using instrumentalities of interstate commerce and the extortion interferes with interstate commerce. The SKUX-Enterprise intends to gain governance control of VendXOR, and the lion's share of its equity. (Exhibit 47, 58)

118. As a SKUX-Enterprise associate, Hoshi Tamboli, commences the extortion of Priatek's President. Through September – December 2018, while having knowledge of independent investigations implicating SKUX-Enterprise of illegal actions, Tamboli repeatedly threatens Priatek's President with a lawsuit to resign and acquiesce to all further demands. (Exhibit 64, 67)

119. During September – December 2018, Tamboli, Swenson, and Patel further extort the Managing Member to amend the operating agreement and allow them board control in exchange for allowing the Managing Member a continuing role with Priatek. (Exhibit 43, 44)

120. Extortion. Via a text message on September 21, 2018, Tamboli threatened the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

121. On or about September 22, 2018, Swenson, as part of the "minority investor group", joins the SKUX-Enterprise and begins conspiring in the extortion of the Managing member to further the operation of the SKUX-Enterprise. (Exhibit 63).

122. A November 5, 2018 e-mail from Ramos includes the "minority investor group" as recipients and corroborates that the "minority investor group" ignored the proxy vote to remove Colby and Quimby as board members. (Exhibit 35).

123. The activity of the minority investor group in furtherance of the operation of the SKUX-Enterprise is further corroborated in an e-mail chain distributed amongst Tamboli, Swenson, Colby, Quimby, Patel, and Tamboli's attorney Rich McIntyre). (Exhibit 43)

124. In December 2018, with knowledge of the hoax, Tamboli's legal counsel, Richard McIntyre, first communicates a buyout offer from the fictitious Rath Capital Partners investment firm (formed by Priatek marketing director Buckley) to Priatek's Managing Member. (Exhibit 100)

125. Even a year later, Tamboli, Swenson, Glasscock, and Shah remain intimately involved in business dealings involving operation of the SKUX-Enterprise and the I2W-Enterprise, and with the "minority investor group". (Exhibit 51).

126. In correspondence to Priatek in 2019, Quimby states, "Milind formally resigned as CEO to board on 9/24/18 after pressure from investors, including Hoshi [Tamboli], Richard Waters, Linda Swenson, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock, and others. (Exhibit 28)

127. SKUX-Enterprise associate Jon Najarian, despite having executed an advisor agreement with non-competition covenants with Priatek, breaches the agreements and leaves with Tinsley, Sampey, Douglas, and Zaccardo. (Exhibit 90, 110)

128. In particular, Najarian assists the SKUX-Enterprise by divulging confidential Priatek information in the form of a list of interested investors. (Exhibit 66)

129. Still yet, Najarian, along with his company Coin Boost, were key to Priatek funding, and were paid $80K to secure investor funding through prospective investors. Najarian met many prospective Priatek investors during a 7 city European Investor Roadshow. (Exhibit 90)

130. Chidekel solicits Richard Waters to join the SKUX Enterprise by persuading him that Priatek is violating federal securities laws. (Exhibit 68)

131. Upon their resignations, the SKUX-Enterprise forms SKUX, LLC and immediately begins extortionate demands for control of Priatek's VendXOR project. (Exhibit 25, 30)

132. Conversion of Trade Secrets (§ 1832). Alternatively, pursuant to § 1832, the SKUX-Enterprise intended to convert a trade secret (VendXOR) intended for use in interstate commerce, knowing that this action was injurious to Priatek. (Exhibit 1, 2)

133. Particularly in violation of § 1839, Tinsley obtained Priatek blockchain project's business methods and processes that Priatek had taken reasonable efforts to keep secret and the secrets had independent economic value in the commercial marketplace. (Exhibit 11, 15)

134. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

135. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever." (Exhibit 29, 68).

136. Extortion. "Minority group investor" Hoshi Tamboli, in a series of text messages, also threatens criminal liability against Priatek, Priatek employees, and investor rescissions of capital contributions – along with threats regarding the well-being of Priatek President's toddler children and spouse. (Exhibits 64, 66, 67)

137. The SKUX-Enterprise again raises allegations of SEC violations committed by Priatek, and other illegal corporate governance actions. (Exhibit 30)

138. Extortion. Further correspondence dated September 22, 2018 reflects the SKUX-Enterprise's demands for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

139. Extortion. Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member. (Exhibit 10, 103, 104)

140. Tinsley's threats were made maliciously without any lawful justification. (Exhibit 35)

141. Tinsley's threats were made with the intent to compel the Priatek President to resign, and to gain pecuniary advantage with the newly formed competing business SKUX. (Exhibit 61)

142. Extortion. Tinsley accused Priatek of violating Department of Labor laws in his demand for VendXOR assets and technology. (Exhibit 31, 42, page 4).

143. Extortion. Tinsley accused Priatek of violating Securities and Exchange Commission laws in his demand for VendXOR assets and technology. (Exhibit 42, page 4).

144. Extortion. Tinsley threatened Priatek and its managing member with harming Priatek's reputation by contacting investors to rescind their monetary investments in Priatek, and then proceeds to contact investors to prompt rescissions:

a. John and Matt Diaz (Exhibit 21: September 21, 2018 at 8:59am). Bobby's resignation from Priatek and the firing of 2 prominent board members that were pertinent to the success of the block chain project, we request our recent investment of $159, 500.00 to be refunded immediately. (Bobby Tinsley is copied). Matt Diaz has a longstanding friendship with Bobby Tinsley from high school.

b. Maria and Mark Hall (Exhibit 22: September 23, 2018) states: "it came to our attention that my mother, Brenda Camarinos, heard from someone she knows, possibly a fellow investor in Priatek, that Bobby is no longer with the company. In addition, they told her that people were saying you were not handing our investment/funds appropriately….Therefore, its with sadness that I must ask you how we can go about getting our money back."

c. Maria and Mark Hall copies Bobby Tinsley states: "Please reply on how we go about getting back our investment or we will be forced to seek legal action into this matter." (Exhibit 22, September 29, 2018)

d. Bob Quintana and Carmine Marinaro states: "In light of the developments at Priatek over the last 4-6 weeks, and since no agreements of any were ever signed, both Mr. Marinaro and I request that a full refund of the $54,000.00 be issued by 5pm EDT on Monday, October 22, 2018, and the funds returned via wire transfer (wiring info below). (Exhibit 23, October 19, 2018)

e. Marc Blumenthal and Brent Fisher: Demand for immediate return of deposited funds associated with non-final investment by Brent Fisher and Marc Blumenthal. (Exhibit 24, October 24, 2018)

145. Tinsley further withheld investors for VendXOR. (Exhibit 66)

146. Tinsley also took existing Priatek investor leads to fund SKUX, LLC. For example, an entity named Blackhawk was introduced to Priatek by Scott Matthews and the Blackhawk lead was subject to a confidentiality agreement.

147. Tinsley's malicious extortionate campaign was designed to convince the investors that the managing member is engaged in illegal acts, incompetent, and disgraceful. (Exhibit 20, 22, 23)

148. Tinsley's campaign of false, misleading, and disparaging advocacy against Priatek further injured Priatek in its ability to raise capital and led to loss of operating funds. (Exhibit 1, 2, 18)

149. Extortion. In an email dated September 22, 2018, Tinsley and the SKUX-Enterprise demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

150. On September 21, 2018, the Priatek board consent to sign a memorandum ("MOU") that offered Bobby Tinlsey and his group (Jim Sampey, Kenneth Douglas, Bob Quintana, and Bob Zaccardo) two prospective board seats on Priatek's VendXOR project. (Exhibit 56)

151. The MOU is immediately met with a counteroffer from the SKUK-Enterprise – "Bobby and his team" with demands for complete control of VendXOR. (Exhibit 25)

152. Colby via a text message informs the Priatek President that Priatek investors are involved in the counteroffer by the SKUX-Enterprise. (Exhibit 63)

153. Priatek's President resigns on September 24, 2018 because of the extortionate threats by the SKUX-Enterprise. (Exhibit 50)

154. These acts of extortion led Priatek to comply with the extortion demands and the SKUX-Enterprise absconded with VendXOR technology and assets. (Exhibit 1)

155. After, Managing Member resigns consensually, the Priatek's board effectively consents in allowing SKUX Enterprise a clear path to walk-away with Priatek technology and assets. (Exhibit 32, 41)

156. Additionally, in coordinated action with the SKUX-Enterprise, the "minority investor group", particularly Hoshi Tamboli, John Glasscock, Linda Swenson,

and Vijay Patel, reassure their fellow SKUX, LLC criminal associates to remain unconcerned with any potential legal repercussions and proceed with the schemes. (Exhibit 35)

157. Priatek invested $1,000,000 (one million dollars) in the development of the VendXOR blockchain project. (Exhibit 1)

158. While the SKUX Enterprise's Scheme 1 injures Priatek by disrupting its corporate governance and operations, and more significantly halting capital raising efforts, SKUX Enterprise immediately incorporates SKUX, LLC as a formal entity on October 15, 2018. (Exhibit 57)

159. In a brief month, SKUX, LLC has launched operations, with substantial investor funding, and "overnight", as the mirror-image of VendXOR, establishes itself as a digital coupon solution (blockchain crypto currency) market leader. (Exhibit 66)

160. SKUX, LLC is based upon VendXOR research and business – with the same common actors. (Exhibit 6, 7)

161. **SCHEME 3** – Concurrent with Scheme 2, the SKUX-Enterprise recruits VendXOR's third-party computer programmer. (Exhibit 7, 70)

162. Conversion of Trade Secrets (§ 1832). Pursuant to § 1832, the SKUX Enterprise intended to convert a trade secret (VendXOR blockchain platform) intended for use in interstate commerce, knowing that his action was injurious to Priatek. (Exhibit 1)

163. Particularly in violation of § 1839, Tinsley misappropriated Priatek's Vendxor blockchain platform that Priatek had taken reasonable efforts to keep secret and

the secrets had independent economic value in the commercial marketplace**.** Priatek's offering documents presented to investors reflected the entity as being valued at $55M. (Exhibit 3)

164. In the process of forming SKUX, LLC, and driving Priatek investor rescissions, the SKUX Enterprise recruited Moshe Joshua and Dreamdaze, Inc. to join their criminal enterprise. (Exhibit 7, 70)

165. In recruiting Joshua and Dreamdaze, Inc. the SKU-Enterprise forward Joshua and Dreamdaze, Inc. board resolutions implicating Priatek and its President of illegal actions. (Exhibit 16, 18)

166. As part of a works-for-hire contract ("Services Contract"), Moshe Joshua, and his company Dreamdaze, Inc., were paid hundreds of thousands of dollars to build the VendXOR blockchain platform component that belonged to Priatek. (Exhibit 53)

167. Along with monetary payments, Priatek regularly invoiced and communicated with Joshua and Priatek regarding the progress and scope of the blockchain platform. (Exhibit 53)

168. The Service Contract contained restrictive covenants, including confidentiality provisions, intended to protect its business assets, business plans and programs, and other proprietary information. (Exhibit 53)

169. Priatek employees assisted Joshua and Dreamdaze, Inc. in designing the VendXOR blockchain platform. This assistance was beyond managing the project and defining the scope of the project. (Exhibit 6, 15)

170. The SKUX-Enterprise invests the VendXOR platform technology into SKUX, LLC. (Exhibit 69)

171. SKUX-Enterprise's use of Priatek's proprietary information, including the Dreamdaze, Inc. code, made its work easier and more profitable that it otherwise would have been, and thus SKUX benefitted from having the VendXOR technology. (Exhibit 1, 2)

172. The SKUX Enterprise, including Tinsley, along with Douglas, Quintana, Sampey, Zaccardo, was given access to VendXOR business plan and technology as it existed in 2018. (Exhibit 15)

173. Tinsley, along with this group, were to complete the VendXOR project to launch for market. (Exhibit 15)

174. Tinsley was also involved with the business planning, and acted as a member of the Priatek Executive Team. In that capacity, he was entrusted with the VendXOR project, a large component of Priatek's business operations, and its business model and plan, various functionality, content, and concepts. The combination of such ideas, information, plans, and procedures were proprietary and confidential at the time, and constituted trade secrets. (Exhibit 10, 15)

175. Priatek had non-disclosure agreements executed by all key individuals, including Tinsley. The Priatek operating agreement, and employee handbook, contained provisions regarding the confidentiality of proprietary information. (Exhibit 3, 73)

176. Priatek intended to maintain ownership rights and interests relating to VendXOR, including all trade secrets, intellectual property rights. (Exhibit 53)

177. Tinsley agreed the trade secrets were proprietary and secret and agreed to keep them confidential. Tinsley also had an obligation to keep the trade secrets confidential. (Exhibit 1, 2)

178. Tinsley also understood that the VendXOR trade secrets were unique and novel to the marketplace. (Exhibit 11)

179. Tinsley was dissatisfied with his role and wanted control of the VendXOR project. (Exhibit 11)

180. Tinsley shared the trade secrets with the others to form SKUX, LLC, who knowingly used them, and continue to use them, to develop, launch, and/or maintain its blockchain platform. (Exhibit 11, 15)

181. Tinsley formally incorporated SKUX, LLC upon resigning from Priatek and SKUX became a direct competitor of Priatek/VendXOR. (Exhibit 1)

182. SKUX-Enterprise utilizes SKUX, LLC as the vehicle to obtain and launch VendXOR as their own technology. This also enables SKUX Enterprise to raise capital monetary funding. (Exhibit 1, 66)

183. Tinsley's unlawful knowledge and/or use of the Vendxor trade secrets enabled and allowed SKUX to come to market first, thereby obtaining investors, press coverage, advertisers, that would have otherwise benefitted Priatek.

184. Tinsley and SKUX gained a market advantage, directly and proximately resulting from their wrongdoing, usurping Priatek's potential market and related business opportunities. (Exhibit 1)

**THE FORMATION OF THE I2W-Enterprise: to illegally take the physical Priatek Kiosks, and other Priatek assets.**

185. The I2W-Enterprise initially consists of Quimby, and Ramos, and Colby and is formed on or about September 24, 2018 – when Bharvirkar resigns as Priatek President. (Exhibit 34)

186. The I2W-Enterprise remains at Priatek because of the physical Priatek Kiosks. While the SKUX-Enterprise was in possession of the digital VendXOR application, the physical Kiosks were the physical component to utilize the digital software. While the SKUX-Enterprise possessed the digital "VendXOR" software technology, the I2W-Enterprise's aim was to gain possession of the physical Kiosks. (Exhibits 1, 6)

187. The I2W-Enterprise, with associates Quimby, Colby, Ramos, and Matthews, was formed on or about September 24, 2018. (Exhibit 50)

188. At all relevant times, while Quimby was a "working" board member for Priatek, he also owned and operated a separate entity – I2W Tampa Bay, LLC – since 2016. (Exhibits 1, 81)

189. At all relevant times, I2W's other owner/operator was Jeremy Ramos – Priatek's Vice-president of Engineering. Additionally, Ramos had custody of the operating system code for the physical Priatek Kiosks. (Exhibit 76)

190. At all relevant times, Colby was a "working" Priatek board member and Chief Operating Officer. Colby is also named Priatek President upon the resignation of his predecessor, Bharvirkar. (Exhibit 48)

191. Matthews joins the I2W-Enterprise as a board member of Priatek's second board of directors. Quimby has an investment in Matthews' company iTOUCH, LLC.

192. Along with Quimby conspiring and assisting the SKUX-Enterprise in the taking of digital VendXOR, he then forms his own criminal enterprise, the I2W-Enterprise, to illegally take the physical Priatek Kiosks, and other Priatek assets. (Exhibit 5)

193. In direct circumvention of Priatek's operating agreement, the rebelling Board Members, the "minority investors", all in collusion with the I2W-Enterprise and the SKUX-Enterprise, continued their lockout of Bharvirkar – the managing member. (Exhibit 35)

194. Via a letter dated October 25, 2018, in response to Quimby and Colby's plans to run Priatek into bankruptcy, the Priatek's Managing Member informs the Priatek Investors (and Priatek Board) of the initiation of a proxy vote to remove Quimby and Colby as Board members. (Exhibits 34, 37)

195. Additionally, on October 26, 2018, the Managing Member terminates Colby from his President role at Priatek. (Exhibit 38)

196. While the proxy vote to remove Colby and Quimby is met by approval by a majority of Priatek investors, it is nonetheless ignored by the Board and the "minority investor group". The affirmative vote is instead falsely represented by the Board and the minority investor group to allow Colby and Quimby to retain their board seats, and also allow Colby to remain Priatek President. (Exhibit 35)

197. I2W-Enterprise associate Jeremy Ramos shuts off the Managing Member's access to company email and google drive. (Exhibit 28)

198. The I2W-Enterprise further ceases payment of the Managing Member's salary on October 26, 2018. (Exhibit 43)

199. On November 5, 2018, an e-mail by Jeremy Ramos states, "As I understand it the Proxy vote to remove John and Brian from the board has been rejected or revoked by a majority of investors." Copied on the email are board members: Brian Quimby, John Colby, Vijay Patel, Krishna Nallamshetty; and investors: Hoshi Tamboli Steve Grunbach, Dipak Shah, Sareet Majumdar, John Glasscock, Gary Clarin, and attorney Umera Ali. (Exhibit 35)

200. Laundering of monetary instruments (18 U.S. Code § 1956). Additionally, the I2W-Enterprise also depleted Pritatek's monetary reserves by illegally "laundering" an indeterminate monetary amount from Priatek's $1.2M cash reserves around October/November 2018, and further hastened Priatek's path towards insolvency. (Exhibit 2)

201. The money laundering is tantamount to specified unlawful activity of mail and wire fraud under § 1961 which occurred after the resignation of the Priatek President, and with Quimby and Colby gaining custody of the cash reserve.

202. With Quimby and Colby remaining at Priatek, the I2W-Enterprise criminally takes an indeterminate amount of cash from Priatek's $1.2M cash reserves within 2 months. (Exhibit 2)

203. Colby and Quimby expend cash reserves in the amount of $1.2 million without an accounting of any corresponding Priatek operating expenses. (Exhibits 2, 39)

204. Despite repeated demands, these criminal associates of the two criminal enterprises would not provide financial records to verify expenditures related to the $1.2M. (Exhibits 1, 2, 39)

205. In a letter dated April 18, 2019, Priatek legal counsel Kiefner's request for accounting records was met with silence by the criminal enterprises. (Exhibit 39)

206. The compromised second Priatek Board's correspondence to Priatek and its members addresses […"large wire transfers that depleted Priatek's remaining operating capital and financial resources."] in October/November 2018. (Exhibit 2)

**MODIFIED LIEN AGREEMENT**

207. The resignation (and subsequent lockout) of the Priatek President on September 24, 2018, because of the extortionate threats by the SKUX-Enterprise (which includes associate Quimby), provides the opportunity for the I2W-Enterprise to take Priatek assets. (Exhibit 28)

208. Additionally, assisting the SKUX-Enterprise created an opportunity for Quimby and I2W-Enterprise to obtain Priatek assets, and also to avoid prosecution of their criminal actions. (Exhibit 1)

209. I2W and Priatek had an existing lien agreement where financing provided to Priatek was secured by 51 of Priatek's physical kiosk coupon machines. (Exhibit 1)

210. In October of 2018, while prohibiting the Managing Member from accessing Priatek offices, the I2W-Enterprise executed a modified lien agreement in collusion with

the Board to include all the assets, source code, kiosks, patents, and copyrights/trademarks of Priatek. (Exhibits 1, 2, 5)

211. The modified lien agreement is another example of coordinated conduct in which both the I2W-Enterprise and the SKUX-Enterprise agreed to participate. (Exhibit 1)

212. Priatek would have to become insolvent, pursuant to the federal bankruptcy code, to Priatek default on the terms of the lien agreement. Therefore, the I2W-Enterprise, with its criminal associates still in-charge at Priatek, began to engage in transactions on behalf of Priatek with the intention to steer the company into bankruptcy. (Exhibit 32, 105 114)

213. The I2W-Enterprise began to incur additional debts and liabilities. This scheme included non-payment of expenses such as payroll and rent. (Exhibit 1)

214. <u>Mail and wire fraud</u>. On March 14, 2019, Quimby filed, on behalf of I2W, a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon the fraudulently modified agreement. (Exhibit 5)

215. The mailing/wiring of the fraudulent lien is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

216. Concurrent with the filing of the fraudulent lien agreement, I2W-Enterprise members Quimby and Colby resign as Priatek board members. Similar to the SKUX-Enterprise, Quimby and Colby resign after siphoning Priatek assets. (Exhibit 32)

217. Brian Quimby, John Colby, and Vijay Patel did not disclose the UCC filing in their joint resignation letter on March 20, 2019. (Exhibit 32)

**FRAUDULENT PATENT FILING**

218. MAIL AND WIRE FRAUD. On July 30, 2019, Quimby filed for transfer of Priatek's patent and I2W, LLC took possession of the patent when Priatek was not insolvent, and without judicial approval. (Exhibit 60)

219. After filing a complaint, the United States Patent and Trademark Office declares that Brian Quimby improperly and illegally transferred the patent. (Exhibit 9)

220. On September 6, 2019, Priatek's Managing Member demanded Quimby to return Priatek assets and patents, but Brian Quimby refused to surrender Priatek's property. (Exhibit 27)

221. The mail/wire fraud consisting of the fraudulent patent filing is incidental to an essential part of the scheme to illegally take the Priatek patent. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat. (Exhibit 60)

222. Earlier in 2019, Quimby scavenged all of Priatek's remaining assets – including many touch screen video monitors.

223. Quimby then invests these monitors into I2W, LLC. (Exhibit 52)

224. In another example of coordinated conduct in which both the I2W-Enterprise and the SKUX-Enterprise agreed to participate, Tinsley assists I2W-Enterprise in the sale of the stolen video monitors to a tele-doctor company. (Exhibit 52)â

225. **SCHEME 4.** The SKUX-Enterprise proceeds to conceal its crimes by sabotaging third-party investigations of its criminal activities.

226. Two separate independent third-party investigators are engaged by Priatek to report findings regarding the events orchestrated by the SKUX-Enterprise and the I2W-Enterprise. (Exhibit 1, 42)

227. While the investigations are scheduled to be completed in two weeks, Quimby and Colby, along with complicit minority investors, stall and sabotage the progress of both investigations. (Exhibit 1, 42)

228. According to Rich McIntyre (Hoshi Tamboli's attorney) he recommended it would be best not to be completed.

229. Priatek implores SKUX-Enterprise member Linda Swenson ("minority investor group") to produce the report to no avail. (Exhibit 43, 44)

230. The Cendrowski Firm investigation findings are not released until over a year later in late 2019 - early 2020. In particular, the findings detail that investigation was impeded by the Priatek Board. (Exhibit 42)

231. **SCHEME 5: SKUX-Enterprise continues to lockout Bharvirkar.**

232. While Priatek's President resigns on September 24, 2018, he remains Priatek's Managing Member – with John Colby soon permanently taking over as the Priatek President. (Exhibit 48)

233. In direct circumvention of Priatek's operating agreement, the rebelling Board Members, in collusion with the SKUX-Enterprise (and the "minority investor group"), continue their lockout of the Bharvirkar – the Managing Member, even though he consented to resigning as President. (Exhibit 32)

234. In particular, the lockout further prevents the Managing Member from attending to "…critical investor correspondence in motion that has now been disconnected. This needs immediate attention." (Exhibit 34).

235. The cloud over Priatek further undermines capital raising efforts.

236. The Managing Member's email and access to the google drive is shut off by Jeremy Ramos. (Exhibit 28, paragraph no. 12).

237. With the I2W-Enterprise remaining at Priatek, their members Quimby, John Colby, and Jeremy Ramos, in collusion with the SKUX-Enterprise, utilize their unfettered access and erase Priatek business records – including non-disclosure agreements, non-compete agreements, e-mails, contracts, board minutes, expense reports, and more. (Exhibit 39)

238. Subsequently, Priatek's legal counsel corresponded with both criminal enterprises with a demand to return Priatek records and other proprietary assets. (Exhibit 39).

239. With the Managing Member being denied access to Priatek's offices, The SKUX-Enterprise, particularly Richard Waters, and board members John Colby, Brian Quimby, Vijay Patel, and Krishna Nallamshetty, as well the "minority investor group" conspire to conceal their crimes. (Exhibit 32)

240. **SCHEME 6**. Both criminal enterprises (SKUX-Enterprise and the I2W-Enterprise) use common criminal associates to bankrupt Priatek to conceal the taking of Priatek assets and technology. (Exhibit 50, 51)

241. The rebelling Priatek Board commits to an investigation but instead colludes with the common associates of both criminal enterprises to expand its presence in New York to bankrupt Priatek. (Exhibit 14, 32)

242. Priatek's expansion of its New York presence is another example of coordinated conduct in which both the I2W-Enterprise and the SKUX-Enterprise agreed to participate. (Exhibit 16, 33)

243. On October 4, 2018, Priatek Board members John Colby, Brian Quimby, Vijay Patel, and Krishna Nallamshetty, with knowledge that Priatek lacked proper resources, prematurely launch Priatek coupon kiosk machines in New York City. (Exhibit 32, 33).

244. Rich McIntyre, legal counsel for Tamboli, informed Priatek's Managing Member that Quimby and Colby are inquiring about bankruptcy plans for Priatek. (Exhibit 28).

245. The premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 105)

246. 18 U.S. Code § 1952. § 1952(a) criminalizes: transportation in interstate or foreign commerce or using the mail or any facility in interstate commerce, with intent to – § 1952(a)(3): otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity – § 1952(b)(2): extortion in violation of the laws of Florida and/or of the United States.

247. Quimby and Colby, specifically, transported Priatek coupon kiosk machines across state lines to carry on the scheme where Priatek's Managing Member was extorted for possession of Priatek assets. (Exhibit 32)

248. Quimby, in particular, conspired in violation of the Hobbs Act to extort Priatek's Managing Member.

**MAINTAINING VENDXOR**

249. **SCHEME 7**. Lockout of Priatek's Managing Member to maintain ownership of VendXOR by ignoring a proxy vote to remove criminal Board Members. (Exhibit 32, 40)

250. Via a letter dated October 25, 2018, in response to Quimby and Colby's plans to run Priatek into bankruptcy, the Managing Member informs the Priatek Investors (and Priatek Board) of the initiation of a proxy vote to remove Quimby and Colby as Board members. (Exhibits 34, 37).

251. Additionally, on October 26, 2018, the Managing Member terminates Colby from his President role at Priatek. (Exhibit 38).

252. While the proxy vote to remove Colby and Quimby is met by approval by a majority of Priatek investors, it is nonetheless ignored by the Priatek Board and the "minority investor group". (Exhibit 35)

253. In another example of coordinated conduct amongst the two criminal enterprises, and the "minority investor group, the affirmative vote is instead falsely represented by the Priatek Board and the "minority investor group" to allow Colby and Quimby to retain their board seats. (Exhibit 35)

254. On November 5, 2018, an e-mail by Jeremy Ramos states, "As I understand it the Proxy vote to remove John and Brian from the board has been rejected or revoked by a majority of investors." Copied on the email are board members: Brian Quimby, John Colby, Vijay Patel, Krishna Nallamshetty; and investors: Hoshi Tamboli, Steve Grunbach, Dipak Shah, Sareet Majumdar, John Glasscock, Gary Clarin, and attorney Umera Ali. (Exhibit 35)

255. November 21, 2018, correspondence reflect the findings of an audit of the proxy vote by an independent legal counsel confirming that 63.47% of voting members elected to remove Quimby and Colby as Board Members. (Exhibit 37).

256. While the proxy vote to remove the rogue board members Brian Quimby and John Colby was successful, another vote advanced by the "minority investor group" to pass *their* amended operating agreement was unsuccessful. (Exhibit 58)

257. Nevertheless, in coordinated conduct with the two criminal enterprises, the "minority investor group" refuse to allow the Managing Member back to the office. (Exhibits 43, 44).

258. **SCHEME 8**: The two criminal enterprises create a fictitious investment firm to present a fraudulent buyout of Priatek's Managing Member's ownership interest to conceal their crimes. (Exhibit 79)

259. The Managing Member remains present and advocates for investigation of illegal acts by the two criminal enterprises – SKUX-Enterprise and others.

260. To eliminate Priatek's Managing Member and clear the way for SKUX-Enterprise and I2W-Enterprise to avoid legal culpability for their actions, the two

criminal enterprises hatch yet another scheme – this time to oust the Managing Member from Priatek.

261. In the process, Priatek, LLC is caught in the middle, when its own President Colby advances a fraudulent buyout deal for the Managing Member's interest. (Exhibit 47, 48)

262. Wire fraud. Tamboli's legal counsel, Richard McIntyre, first communicates a buyout offer for the Priatek's Managing Member ownership interest to Priatek's Managing Member. (Exhibit 100)

263. Wire fraud. On December 13, 2018, Quimby and Colby reiterated the buyout offer, to be financed by an anonymous investment firm, to the Managing Member Bharvirkar.

264. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek. (Exhibit 46)

265. Mail/wire fraud. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46).

266. However, this fraudulent deal is a stall tactic to further decimate Priatek's operations and keep the Managing Member to from pursuing investigation(s) of wrongdoing by the SKUX-Enterprise and I2W-Enterpirse. (Exhibit 47)

267. The investment firm never materializes to provide the buyout funding of the Managing Member's interest in Priatek.

268. Wire fraud. To further cause delay, around February of 2019, John Colby falsely calls the Managing Member and informs him that the investment firm renegotiated the deal with revised payment terms.

269. Wire fraud. An e-mail communication amongst Colby, Quimby, Ramos, and Bharvirkar reflects the specifics of the renegotiated offer and includes threats of criminal liability and legal action against Priatek by federal and state regulatory agencies. (Exhibit 47).

270. Mail/wire fraud. As Priatek's Managing Member and to protect Priatek's interests, under threats of extortion from John Colby, and relying on fraudulent misrepresentations, the Managing Member agrees to sign the addendum to the buyout offer on February 7, 2019. (Exhibit 48)

271. Wire fraud. Subsequently, in March of 2019, Colby calls the Managing Member to inform him that the investment firm fell through.

272. When anonymous investment firm is identified as Rath Capital Partners, it is further revealed that the entity was incorporated founded on December 13, 2018 – the very same day the buyout offer was made to the Managing Member. (Exhibit 79)

273. Still yet, the hoax company, Rath Capital Partners was founded by Jim Buckley, the director of marketing at Priatek, solely to perpetuate fraud upon Priatek. (Exhibit 74)

274. Buckley has a longstanding personal and professional relationship with SKUX-Enterprise associates Sampey and Tinsley. In particular, Sampey hired Buckley at Priatek and also at another company, ValPak, prior to Priatek. (Exhibit 35)

275. Due to Buckley's intimate relationship with SKUX-Enterprise members Sampey and Tinsley, Priatek was in the process of terminating Buckley on or about November 5, 2018. (Exhibit 35).

276. Buckley admitted to being a part of Rath Capital Partners and orchestrating the financing of the buyout offer. (Exhibit 49).

277. While Priatek was defrauded, when its Managing Member and majority interest holder was effectively incapacitated, Quimby and Colby to continue running up more debt, including non-payment to creditors, to injure Priatek. (Exhibit 105)

278. <u>Mail and wire fraud</u>. Using the mails/wires Defendants advanced their scheme in their letter (disseminated via e-mail and USPS) to Priatek and its investors, Brian Quimby, John Colby, and Vijay Patel do not disclose the UCC filing in their joint resignation letter on March 20, 2019. (Exhibit 32).

279. On March 14, 2019, Quimby filed, on behalf of I2W, a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon the fraudulently modified agreement. (Exhibit 5)

280. The March 20, 2019 letter directly references the "minority investor group" as endorsing their findings: ["this letter…echo's the sentiments of…largest investors in the company, collectively representing well over $10 million invested capital."]

281. Of all the direct evidence implicating the criminal enterprises and their schemes and conspiracies, the letter in particular characterizes the hoax Rath Capital Partners investment firm as a "credible investor". (Exhibit 32, 50)

282. The letter to Priatek investors contained material misrepresentations regarding Priatek's business operations. (Exhibit 32)

283. As a result of the communications in furtherance of fraud, Priatek investors were immediately injured by the loss of the value of investment. (Exhibit 1, 2)

284. **SCHEME 9.** The criminal enterprises again extort Priatek's Managing Member to amend the Priatek Operating Agreement and gain operational control by installing their own, compromised, Board of Directors. The directors of Priatek's new Board join the SKUX-Enterprise as criminal associates. (Exhibit 4)

285. In another example of coordinated conduct in which both the I2W-Enterprise and the SKUX-Enterprise agreed to participate, Glasscock, Quimby, and Ramos communicated their intention to initiate civil litigation against Priatek and its Managing Member. (Exhibit 91)

286. In April of 2019, Jeremy Ramos assists the SKUX-Enterprise by contacting Bharvirkar, Priatek Managing Member, to communicate Quimby and Glasscock's intention to file a personal civil lawsuit, for embezzlement and misappropriation of Priatek assets, against Bharvirkar if he does not agree to a Priatek bankruptcy filing.

287. Both SKUX-Enterprise and I2W-Enterprise intended for the threat to be communicated to Priatek's Managing Member.

288. The threat was made with malicious intent to compel Priatek's Managing Member to place Priatek in bankruptcy court. (Exhibit 1, 91)

289. On June 15, 2019, in further coordinated action among the two criminal enterprises and the "minority investment group", Quimby informed Priatek, "I have the

express support or proxy from other Priatek investors representing roughly $12 million." (Exhibit 50).

290. When the Managing Member does not comply with the threat, Glasscock, "the minority investor group" follows through with the threat and on June 17, 2019 files an arbitration action against the Managing Member. (Exhibit 91)

291. While Bharvirkar defends himself in the legal proceedings initiated against him, a Priatek investor Mike Brazerol persuades Bharvirkar to agree, as Managing Member, to amending the existing Priatek Operating Agreement. (Exhibit 4)

292. In desperation to save Priatek, and avoid defending a civil lawsuit, Bharvirkar and the majority investors agree to amend Priatek's operating agreement.

293. Under the amended agreement, the (second) Priatek Board consisted of individuals that are already (or soon become) lackeys for the same "minority investor group" who are assisting the SKUX-Enterprise and I2W-Enterprise – including Brazerol. (Exhibit 102)

294. Priatek executed an amended operating agreement on December 12, 2019 with the cooperation of the Managing Member, and assistance in securing Priatek member acquiescence to the amendment. (Exhibit 4)

295. Unlike the initial Operating Agreement where the parties to the contract are the Priatek Members/Investors and the Managing Member, the parties to the Amended Operating Agreement are Members and Managers (the "Board"). Additionally, the Second Operating Agreement provides significant authority to the newly configured

board to govern Priatek – to the extent where removal or substitution of Board members must be authorized by the Board itself. (Exhibit 3, 4)

296. The execution of the amended operating agreement is probative of further coordinated agreement amongst the criminal enterprises (and the "minority investor group") to gain control of Priatek Board seats. The Priatek Board would have authority to make financial decisions that would benefit the criminal enterprises.

297. With the (second) Priatek board installation, the new Board Members begin to exploit their positions and begin to coordinate their conduct with both the I2W-Enterprise and the SKUX-Enterprise. (Exhibit 8)

298. Additionally, by eliminating the Managing Member role in the governance of Priatek, the amended agreement further facilitates bringing Priatek to the brink of bankruptcy.

299. SCHEME 10. Transfer of I2W, LLC assets (Priatek Kiosk machines) to a new entity Free Play Media Group, LLC.

300. Free Play Media Group, LLC was formally registered as a Florida entity on August 13, 2019 to allow a transfer of the Priatek Kiosks machines from I2W to Free Play, with a corresponding change in the equity ownership of change I2W, LLC reflected in the newly formed Free Play. (Exhibit 51, 52)

301. New Board Member Scott Matthews was already compromised prior to his appointment to the board. A September 22, 2019 e-mail amongst Quimby, "minority group investor" Swenson, and Matthews documents the transfer of misappropriated Priatek assets from I2W, LLC to Free Play Media Group, LLC. Free Play Media "key

players" include its principal Quimby, and other "minority group investors" Hoshi Tamboli, Vijay Patel, and John Glasscock, and yet another compromised Board Member Bruce Kamm. (Exhibit 51).

302. Soon after, on September 29, 2019, Quimby e-mails Matthews and states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct between the two criminal enterprises and its associates – "minority investor group" – to raise capital on behalf of the I2W-Enterprise, and also iTouch Orlando, LLC.

303. The SKUX-Enterprise, particularly Tinsley, began a capital funding campaign for I2W-Enterprise to use the digital VendXOR with the Priatek machines possessed by the I2W-Enterprise. (Exhibit 52)

304. Capital was also needed to hire engineers to implement VendXOR into ITOUCH, LLC kiosks (both Priatek kiosks in the possession of iTouch Orlando, and also its own kiosks).

305. **SCHEME 11**. The two criminal enterprises continue in the concealment of their criminal acts with the compromised (second) Priatek Board. (Sept – Dec 2019).

306. The compromised Priatek Board delays the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against the criminal enterprises for the taking of digital VendXOR and physical Priatek kiosks. (Exhibit 2)

307. MAIL/WIRE FRAUD. In a May 12, 2020 letter (disseminated via e-mail and USPS) to Priatek members, the second Priatek Board knowingly makes material misstatements regarding the production of a special litigation report. (Exhibit 9)

308. Bharvirkar's inquiries, on behalf of Priatek, regarding the special litigation report are met with hostility by the Board Members.

309. One particular board member, Mike Brazerol telephones Bharvirkar, "I'm going to write a book on how you can be right but still fail. This is one of those situations."

310. Another board member, Scott Matthews, also via a telephone conversation, "Walk away from Priatek. The company is dead. I can't tell you why but walk away." Board member Scott Matthews is the equity owner of iTouch Orlando, LLC. iTouch Orlando supplies kiosk machines to Orlando-area hotels.

311. Matthews transacted with I2W, LLC and Quimby to repurpose Priatek Kiosk machines (previously taken from Priatek by Quimby), not only with ITOUCH, LLC software, but also with the digital VendXOR technology. (Exhibit 8)

312. The June 15, 2021 Priatek Member letter to the second Board additionally reflects that the ITOUCH, LLC website contains a copyright notice by I2W, LLC, which is owned by Brian Quimby. (Exhibit 8).

313. The presence of Priatek Kiosk coupon machines, containing iTouch Orlando software, at the car museum "Dezerland", along with the amusement park Seaworld, in Orlando, Florida is further probative of the second Priatek Board's collusion with Quimby (SKUX-Enterprise, I2W-Enterprise), and the "minority investors.

314. In addition, ITOUCH, LLC's registered agent with the Florida Division of Corporations is DLT Law Group, PA – a law firm operated by Priatek Board Member Gregory Karch.(Exhibit 8)

315. Quimby and Swenson ("minority investor group") have an ownership interest in ITOUCH, LLC. (Exhibit 52)

316. On June 15, 2021, 36 Priatek members signed a letter requesting the current board's resignation for non-performance, non-protection of company assets, unreported conflicts of interest, missed opportunities, non-communication, and a lack of a plan. (Exhibit 8).

317. Mail/wire fraud (18 U.S.C. §§ 1341, 1343). The Priatek Board fraudulently misrepresents it independence to Priatek and its investors to further the criminal schemes against Priatek by the SKUX-Enterprise and I2W-Enterprise. (Exhibit 2, para. 265, September 3, 2021 letter, #3).

318. Mail/wire fraud (18 U.S.C. §§ 1341, 1343). Also, in furtherance of fraud perpetrated against Priatek, a May 12, 2020 letter (disseminated via e-mail and USPS) from the Priatek board informs Priatek and its members that compromised Board Member Karch (ITOUCH, LLC and Scott Matthews' registered agent) has been appointed Priatek Outside General Counsel. (Exhibit 9).

## INITIAL OPERATING AGREEMENT ("OPERATING AGREEMENT")

319. Priatek's Operating Agreement with an effective date of June 2, 2014. (Exhibit 3)

320. Parties to the Operating Agreement were Priatek Executives, LLC (the "Managing Member") and Priatek Company Members.

## AMENDED OPERATING AGREEMENT

321. Priatek's Amended Operating Agreement with an effective date of December 12, 2019. (Exhibit 4)

322. Parties to the Amended Operating Agreement are Members and Managers (the "Board").

## COUNT I: DECLARATORY JUDGMENT
## DERIVATIVE CLAIM FOR A DECLARATORY JUDGMENT

323. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322 as if stated herein in their entirety.

324. Plaintiffs bring this Count I derivatively on behalf of Priatek for declaratory relief.

325. Plaintiffs request removal of the current board via an election of the board since the current board has perpetual control and has breached its contract and its fiduciary duties to Priatek.

326. A new board would have its interest aligned with Priatek's majority investors to secure its patents before the patents become non-proprietary.

**WHEREFORE**, Plaintiffs request declaratory judgment, as well as any and all other and further relief this Court deems just and proper under the circumstances.

**SKUX-ENTERPRISE DEFENDANTS AND CORRESPONDING RICO COUNTS**

## FACTUAL ALLEGATIONS COMMON TO RICO COUNTS
## AGAINST THE SKUX-ENTERPRISE

327. Bobby Tinsley is a culpable person, an individual, who is capable of holding a legal or beneficial interest in property.

328. Tinsley willfully or knowingly committed and conspired to the commission of racketeering activity through a pattern involving a separate association-in-fact enterprise. (Exhibit 30)

329. The SKUX-Enterprise is an association-in-fact enterprise composed of a union of individuals that is used by Tinsley to commit racketeering. (Exhibit 11)

330. Wrongdoers, other than named defendants, include compromised Priatek (second) board members. (Exhibit 8)

331. Priatek Board presently consists of five members, including Defendant Scott Matthews, who had knowledge of the SKUX-Enterprise's illegal taking of Priatek assets and technology. (Exhibit 2, 8, 52)

332. With the (second) Priatek board installation, upon the amendment of the Priatek Operating Agreement, the new Board Members begin to exploit their positions and begin to coordinate their conduct with the SKUX-Enterprise. (Exhibit 8)

333. The SKUX-Enterprise Defendants committed criminal acts which demonstrate that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. The SKUX-Enterprise has not *abandoned* its aim to shut down Priatek to conceal the taking of Priatek assets, and technology.

334. On September 29, 2019, Defendant Brian Quimby states in an email to Defendant Scott Matthews: "Jeremy Ramos and Bobby Tinsley are looped in on the

important stuff and will help with follow up." (Exhibit 52). While the email details that Bobby Tinsley, Jeremy Ramos, Vijay Patel (now former board member), among others were assisting Defendant Brian Quimby and Linda Swenson to raise capital for I2W, the email is probative on the ongoing relationships among the defendants and the cover-up of SKUX-Enterprise obtaining VendXOR technology and assets.

335. Racketeering activities included extortion to obtain technology, and confidential business processes, conversion of trade secrets, and mail/wire fraud.

336. The SKUX-Enterprise is an ongoing enterprise whose purposes were to obtain Priatek assets, cover up its interlocking schemes, drive Priatek to bankruptcy, and bring it to complete ruin. In this process, the SKUX-Enterprise laid waste to other victims as well. (Exhibit 1, 2, 15)

337. The SKUX-Enterprise associates had long standing personal and business relationships. (Exhibit 99)

338. The SKUX-Enterprise associates began pursuing the enterprise's purposes on or about July 2018. Each associate was intimately aware of the racketeering activities of the SKUX-Enterprise. (Exhibit 11)

339. Through a pattern of racketeering activity (PORA), Defendant(s) unlawfully conducted and participated directly, and indirectly, in the conduct of the affairs and activities of the enterprise.

340. The racketeering activities of the SKUX-Enterprise association-in-fact enterprise involved mail, interstate wires, or other instrumentalities of interstate commerce which had an effect on interstate and/or foreign commerce. (Exhibit 12, 18)

341. The SKUX-Enterprise used mails and wires in furtherance of its criminal activities to obtain Priatek assets and to disseminate misrepresentations to Priatek and Priatek Members.

342. The Priatek Members' monetary investment was devalued each time such misleading communications prompted them to defer to the compromised Priatek Board(s). Additionally, Priatek did not pursue existing time-sensitive ventures or new ventures based upon the misrepresentations.

343. Its racketeering activity allowed the SKUX-Enterprise to operate the company SKUX, LLC as a holding company for its ill-gotten gains.

344. The SKUX-Enterprise's predicate acts occurred over a substantial period of time. The predicate acts also pose a threat of continued criminal activity.

**OTHER VICTIMS: INJURED PRIATEK CREDITORS AND SERVICE PROVIDERS**

345. The SKUX-Enterprise's criminal acts were the proximate cause of injury to Priatek's creditors, and also its service providers.

346. The fallout from the SKUX-Enterprise's actions to criminally take Priatek's VendXOR assets, led to Priatek's defaulting on monies owed to numerous third-parties.

347. As examples, Priatek owed its legal counsel substantial legal fees of at least $220K; Priatek office lease default and eviction; Crowd Engine 75K; warehouse landlord, Mainstream America, Inc., approximately $156K; and an additional estimated $400K to various vendors. (Exhibit 105, 114)

348. Additionally, retail malls in Florida and New York were also injured when the malls were not paid rent for displaying Priatek Kiosk machines. The malls also incurred costs to dispose of non-functioning machines. (Exhibit 105)

**OTHER VICTIMS: THE INVESTORS OF SKUX, LLC**

349. SKUX, LLC solicited investors through the dissemination of private placement memorandums ("PPM"). Upon information and belief, SKUX, LLC did not disclose material facts in the PPM provided to its investors.

350. SKUX, LLC was aware of Priatek investigations regarding the improper taking of VendXOR and the potential for legal liability but did not provide investors with full and fair disclosure of all material information.

351. SKUX, LLC investors were injured when SKUX, LLC knowingly omitted material facts, including external or internal risks regarding the investment. (Exhibit 7)

352. Plaintiffs have also been injured stemming from both predicate and non-predicate acts.

353. Plaintiffs were injured by reason of violations of RICO statutes through a concrete financial loss involving physical assets and money, lost business opportunities through diminished goodwill and reputation, investor rescissions, depletion of corporate assets and monetary reserves, employee exodus, abandonment of assets. (Exhibit 1, 2)

354. The SKUX-Enterprise is in violation of § 1962(a) and (c) of the RICO Act, as this PORA involving predicate acts extended over a substantial period of time from September 9, 2018 to September 3, 2021. (Exhibit 8)

355. Nevertheless, the SKUX-Enterprise continues its criminal activity by disseminating its misrepresentation to innocent Priatek Members. Additionally, the predicate acts committed by the SKUX-Enterprise demonstrate that the racketeering enterprise, with its "investor group", has a modus operandi that poses a threat of continued criminal activity. (Exhibit 52, 59)

356. This PORA is likely to be repeated into the future as the SKUX-Enterprise continues to defraud and injure other entities, and the PORA reflects SKUX-Enterprise's ongoing mission.

357. Priatek was injured in violation of § 1962(a) from the investment of VendXOR blockchain technology and platform, obtained by the SKUX-Enterprise through racketeering acts, because Priatek lost its market share to SKUX, LLC. With SKUX, LLC utilizing VendXOR in commerce, Priatek, LLC also could no longer initiate any meaningful fundraising campaigns. (Exhibit 50)

358. In a brief month period after obtaining VendXOR, SKUX has launched operations, with substantial investor funding, and "overnight", as the mirror-image of VendXOR, establishes itself as a digital coupon solution (blockchain crypto currency) market leader. (Exhibit 7)

359. As a direct and proximate result of the Count II Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have also been injured in their business and property from the loss of VendXOR, and related technology.

## COUNT II
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – SECTION 1962(a)

## COUNT II: (RICO) – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT BOBBY TINSLEY

360. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

361. Plaintiffs bring this Count II derivatively on behalf of Priatek against Defendant Tinsley.

362. Tinsley obtained money from a pattern of racketeering activity.

363. Tinsley participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibit 25, 30, 31)

364. The derived income was used to operate the SKUX-Enterprise.

365. Tinsley participated as a principal in multiple schemes of the associated-in-fact enterprise, through multiple illegal RICO predicate acts to obtain Priatek assets. (Exhibit 1, 25, 32, 52)

366. Tinsley either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 1, 21, 22, 23, 24, 52)

367. Predicate acts committed by Tinsley are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

368. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Tinsley conspired to extort Priatek to take its digital project VendXOR. (Exhibit 25)

369. As a predicate act, Tinsley conspired with Waters to extort Priatek. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

370. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever."

371. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Tinsley again conspired to extort Priatek to take its digital project VendXOR.

372. As a predicate act, Tinsley also conspired with Tamboli to extort Priatek. Extortion. Via a text message on September 21, 2018, Tamboli threatened the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

373. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). In an email dated, September 22, 2018, Tinsley and the SKUX- Enterprise demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

374. Extortion. (18 U.S.C. § 1951 and § 836.05, Fla. Stat.). Tinsley, himself, extorts Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member. (Exhibit 10, 103)

375. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

376. Conversion of Trade Secrets (§ 1832). Pursuant to § 1832, Tinsley intended to convert a trade secret (VendXOR) intended for use in interstate commerce, knowing that his action was injurious to Priatek.

377. Particularly in violation of § 1839, Tinsley obtained Priatek blockchain project's business methods and processes that Priatek had taken reasonable efforts to keep secret and the secrets had independent economic value in the commercial marketplace. (Exhibit 11, 15)

378. Tinsley's racketeering activity violated § 1962(a) the RICO Act.

379. Priatek was injured in violation of § 1962(a) from the investment of VendXOR obtained by the racketeering acts of Tinsley and SKUX-Enterprise as alleged herein.

## COUNT II: (RICO) – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT JAMES SAMPEY

380. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

381. Plaintiffs bring this Count II derivatively on behalf of Priatek against Defendant James Sampey.

382. Sampey obtained money from a pattern of racketeering activity. (Exhibit 7)

383. Sampey participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibit 1, 2)

384. The derived income was used to operate the SKUX-Enterprise enterprise.

385. Sampey participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 12, 13, 18)

386. Sampey either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 1, 18)

387. Predicate acts committed by Sampey are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibit 1, 2, 55)

388. Mail and wire fraud. Sampey, as signatory, distributes the September 10 *and* 11, 2018 correspondence with the false allegations regarding Priatek, and its President/Managing Member using the United States postal service and electronic mail (e-mail). (Exhibit 12, 13, 93)

389. Upon reliance of the misrepresentations, Sampey is improperly installed President of Priatek by the Priatek Board. (Exhibit 61)

390. The executive change at the apex further detrimentally halts Priatek's operations and capital raising efforts. (Exhibit 17)

391. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Sampey conspired to extort Priatek to take its digital project VendXOR. (Exhibit 11, 18)

392. As a predicate act, Sampey conspired with Waters to extort Priatek. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

393. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever." (Exhibit 29)

394. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Sampey again conspired to extort Priatek to take its digital project VendXOR.

395. As a predicate act, Sampey also conspired with Tamboli to extort Priatek. Extortion. Via a text message on September 21, 2018, Tamboli threatens the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

396. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). In an email dated, September 22, 2018, Sampey and the SKUX- Enterprise demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

397. Sampey's racketeering activity violated § 1962(a) the RICO Act.

398. Priatek was injured in violation of § 1962(a) from the investment of VendXOR obtained by the racketeering acts of Sampey and SKUX-Enterprise as alleged herein.

**COUNT II: DERIVATIVE COMPLAINT (RICO) – SECTION 1962(a) AGAINST DEFENDANT RICHARD WATERS**

399. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

400. Plaintiffs bring this Count II derivatively on behalf of Priatek against Defendant Richard Waters.

401. Waters obtained money from a pattern of racketeering activity.

402. Waters participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibit 29, 68)

403. The derived income was used to operate the SKUX-Enterprise enterprise.

404. Waters participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 1, 7, 29, 32)

405. Waters either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 29, 68)

406. Predicate acts committed by Waters are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibit 29)

407. Waters was initially brought to Priatek, LLC by Tamboli to raise capital funding for the company. (Exhibit 109)

408. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

409. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever." (Exhibit 68)

410. Waters (September 19,2018) also states by text: "You have set the wheels in motion for a significant change in management giving the latest shareholders the right to rescind their investment….Your decision today keeps hope alive or kills the deal…..One

scenario everyone wins the other everyone losses and its totally your decision. My prayer is you make the right one." (Exhibit 29)

411. Still, Waters (September 20, 2018) states by text: "It's not just about investors rescinding and you have to fire people its about the mistakes made that once uncovered will jeopardize your future and your freedom….Have you ever been part of an SEC investigation? Obviously not…If they find any wrong doing they contact the FBI and responsible parties go to jail. Guess who that is? What part of this are you missing?" (Exhibit 68)

412. Again Waters (September 20, 2018) states by text: "Milind I know your side from Hoshi. I'm talking about investors that want you to step down from power. Once it's in motion. It can't be stopped. If the crypto people get wind of SEC involvement in Priatek there will be no crypto raise….Nobody, not Bobby, and certainly not me wants to see this happen to you….simply ask them what you need to do and acquiesce. This is your only viable option. I love Milind and I want everything good for you." (Exhibit 29)

413. On September 23, 2018, on two separate instances, Waters sent text messages to Milind: "Rescissions are coming and they will keep coming. By Monday it will be an avalanche of rescissions and you can stop it today. The pressure is mounting. Are you praying? Are you hearing from the Lord? You are in a storm…..Your path is one of utter destruction."; "Milind please ask your legal counsel how they can help you fund your company after all the 2018 investors rescind." "If you don't make the right decision in the next 24 hours, and sign the revised MOU, our company is going up in flames." "But you apparently believe in your righteous indignation and refuse to meet current

demands." "If your actions cause the company to fail, which is about to happen, you could face incarceration." (Exhibit 68)

414. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Waters also conspired to extort Priatek to take its digital project VendXOR.

415. As a predicate act, Waters conspired with Tamboli to extort Priatek. Extortion. Via a text message on September 21, 2018, Tamboli threatens the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

416. Waters' racketeering activity violated § 1962(a) the RICO Act.

417. Priatek was injured in violation of § 1962(a) from the investment of VendXOR obtained by the racketeering acts of Waters and SKUX-Enterprise as alleged herein.

**COUNT II: (RICO) – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT BRIAN QUIMBY**

418. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

419. Plaintiffs bring this Count II derivatively on behalf of Priatek against Defendant Brian Quimby.

420. Quimby obtained money from a pattern of racketeering activity. (Exhibit 1, 2, 52)

421. Quimby participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibit 32, 43, 52)

422. The derived income was used to operate the SKUX-Enterprise enterprise.

423. Quimby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 5, 43, 52, 60)

424. Quimby either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 32, 52)

425. Predicate acts committed by Quimby are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibit 51, 52, 61)

426. Mail and wire fraud. On December 13, 2018, Quimby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an anonymous investment firm, to the Managing Member Bharvirkar. (Exhibit 48)

427. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek. (Exhibit 46)

428. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46).

429. Mail and wire fraud. Using the mails/wires Quimby advanced SKUX-Enterprise scheme to conceal their racketeering acts in a letter – that also references the "minority investor group" as endorsing Quimby's actions (disseminated via e-mail and USPS) to Priatek and its investors. (Exhibit 5)

430. In this correspondence, Brian Quimby, John Colby, and Vijay Patel do not disclose the UCC filing in their joint resignation letter on March 20, 2019. (Exhibit 32).

431. On March 14, 2019, Quimby filed a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon a fraudulently modified agreement. (Exhibit 5)

432. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Quimby conspires to extort Priatek to take its digital project VendXOR with Tinsley. (Exhibit 14, 61)

433. Brian Quimby was specifically charged by Priatek to complete the VendXOR governance framework, investment documentation, and audit. (Exhibit 81)

434. On behalf of the SKUX-Enterprise, Tinsley recruited Quimby to criminally transfer VendXOR technology and assets to the newly formed company SKUX, LLC.

435. As a predicate act, Quimby conspired with Tinsley to extort Priatek. Extortion. (18 U.S.C. § 1951 and § 836.05, Fla. Stat.). Tinsley extorts Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member. (Exhibit 103)

436. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

437. In violation of 18 U.S. Code § 1952, Quimby then transported Priatek coupon kiosk machines across state lines to carry on the scheme where Priatek's Managing Member was extorted for possession of VendXOR. (Exhibit 32)

438. 18 U.S. Code § 1952. § 1952(a) criminalizes: transportation in interstate or foreign commerce or using the mail or any facility in interstate commerce, with intent to – § 1952(a)(3): otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity – § 1952(b)(2): extortion in violation of the laws of Florida and/or of the United States.

439. With an aim to conceal the criminal activities of the SKUX-Enterprise, the premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 50, 105)

440. Quimby's racketeering activity violated § 1962(a) the RICO Act.

441. Priatek was injured in violation of § 1962(a) from the investment of VendXOR obtained by the racketeering acts of Quimby and SKUX-Enterprise as alleged herein.

**COUNT II: RICO) – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT SCOTT MATTHEWS**

442. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

443. Plaintiffs bring this Count II derivatively on behalf of Priatek against Defendant Scott Matthews.

444. Matthews obtained money from a pattern of racketeering activity.

445. Matthews participated with intent and knowledge as a principal in the pattern of racketeering activity.

446. The derived income was used to operate the SKUX-Enterprise. (Exhibit 2, 52)

447. Matthews participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts in obtaining Priatek assets. (Exhibits 1, 2, 47, 58)

448. Matthews either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity.

449. Predicate acts committed by Matthews are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibits 1, 43, 44, 47)

450. Quimby has a monetary investment in Matthews' company iTOUCH, LLC.

451. Matthews is a compromised Priatek Board member that delayed the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against I2W-Enterprise for the taking of physical Priatek kiosks. (Exhibits 1, 2, 8, 51, 52)

452. Matthews delays the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against the criminal enterprises for the taking of digital VendXOR and physical Priatek kiosks.

453. Mail/wire fraud. In a May 12, 2020 letter (disseminated via e-mail and USPS) to Priatek members, Matthews, in his capacity as a Priatek board member, knowingly makes material misstatements regarding the production of a special litigation report.

454. Mail/wire fraud (18 U.S.C. §§ 1341, 1343). Matthews again fraudulently misrepresents it independence to Priatek and its investors to further the criminal schemes against Priatek by the I2W-Enterprise. (Exhibit 2, para. 265, September 3, 2021 letter, #3).

455. Matthews informs Priatek (Bharvirkar), via a telephone conversation, "Walk away from Priatek. The company is dead. I can't tell you why but walk away."

456. Matthews is the equity owner of iTouch Orlando, LLC. ITOUCH, LLC supplies kiosk machines to Orlando-area hotels. (Exhibit 8)

457. A September 29, 2019, e-mail to Matthews states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct

between the two criminal enterprises and its associates to raise capital on behalf of ITOUCH, LLC.

458. The SKUX-Enterprise, particularly Tinsley, began a capital funding campaign for ITOUCH, LLC to use the digital VendXOR with the Priatek machines possessed by ITOUCH, LLC. (Exhibit 52)

459. Capital was also needed to hire engineers to utilize VendXOR with ITOUCH, LLC kiosks (both Priatek kiosks in the possession of ITOUCH, LLC, and also its own kiosks). (Exhibit 52)

460. Matthews' racketeering activity violated § 1962(a) the RICO Act.

461. Priatek was injured in violation of § 1962(a) from the investment of Priatek kiosks, and technology obtained by the racketeering acts of Matthews and SKUX-Enterprise as alleged herein.

**COUNT II: (RICO) – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT HOSHI TAMBOLI**

462. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

463. Plaintiffs bring this Count II derivatively on behalf of Priatek against Defendant Tamboli.

464. Tamboli obtained money from a pattern of racketeering activity. (Exhibit 51)

465. Tamboli participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibit 43, 44, 52, 64)

466. The derived income was used to operate the SKUX-Enterprise enterprise.

467. Tamboli participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 51, 63)

468. Tamboli either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 63, 66, 67)

469. Predicate acts committed by Tamboli are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

470. Extortion. Via a text message on September 21, 2018, Tamboli threatens the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

471. Text messages from Tamboli threaten Bharvirkar. On September 21, 2018: "What you do today is going to determine whether you kill your company, wipe the investors and the employees, potentially go to jail and possibly lose your wife and kids. Back down." (Exhibit 64)

472. Another example of text message from Tamboli on October 9, 2018 to Bharvirkar states: […you have 51 percent of the voting stock but that is a loadstone around your neck because of this company fails or implodes right now it will be squarely

on your shoulders and I am telling you all the shareholders- every single one is going to come after you not underestimating the trouble you will have with the SEC and the lawsuits and all sorts of liability."] (Exhibit 28, 67)

473. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Tamboli conspires to extort Priatek to take its digital project VendXOR with Tinsley.

474. As a predicate act, Tamboli also conspired with Tinsley to extort Priatek. Extortion. (18 U.S.C. § 1951 and § 836.05, Fla. Stat.). Tinsley extorts Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member.

475. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

476. Mail and wire fraud. In December 2018, with knowledge of the hoax, Tamboli's legal counsel, Richard McIntyre, first communicates a buyout offer from the fictitious Rath Capital Partners investment firm (formed by Priatek marketing director Buckley) to Priatek's Managing Member.

477. Tamboli's racketeering activity violated § 1962(a) the RICO Act.

478. Priatek was injured in violation of § 1962(a) from the investment of VendXOR obtained by the racketeering acts of Tamboli's and SKUX-Enterprise as alleged herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count II Defendant(s), including actual damages, treble damages, equitable relief, and attorney's fees.

## COUNT III RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – SECTION 1962(c)

## COUNT III: (RICO) – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT BOBBY TINSLEY

479. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

480. Plaintiffs bring this Count III derivatively on behalf of Priatek against Defendant Tinsley.

481. Tinsley directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

482. Tinsley participated as a principal in multiple schemes of the associated-in-fact enterprise, through multiple illegal RICO predicate acts to obtain Priatek assets. (Exhibit 1, 2, 26)

483. Tinsley either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 11, 52)

484. Predicate acts committed by Tinsley are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

485. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Tinsley conspired to extort Priatek to take its digital project VendXOR.

486. As a predicate act, Tinsley conspired with Waters to extort Priatek. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

487. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever." (Exhibit 29, 68)

488. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Tinsley again conspired to extort Priatek to take its digital project VendXOR. (Exhibit 25)

489. As a predicate act, Tinsley also conspired with Tamboli to extort Priatek. Extortion. Via a text message on September 21, 2018, Tamboli threatened the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

490. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). In an email dated, September 22, 2018, Tinsley and the SKUX- Enterprise demand control of Priatek's

Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

491. Extortion. (18 U.S.C. § 1951 and § 836.05, Fla. Stat.). Tinsley, himself, extorts Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member.

492. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

493. Conversion of Trade Secrets (§ 1832). Pursuant to § 1832, Tinsley intended to convert a trade secret (VendXOR) intended for use in interstate commerce, knowing that his action was injurious to Priatek.

494. Particularly in violation of § 1839, Tinsley obtained Priatek blockchain project's business methods and processes that Priatek had taken reasonable efforts to keep secret and the secrets had independent economic value in the commercial marketplace.

495. Tinsley's racketeering activity violated § 1962(c) the RICO Act.

496. As a direct and proximate result of Tinsley's predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

**COUNT III: (RICO) – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT JAMES SAMPEY**

497. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

498. Plaintiffs bring this Count III derivatively on behalf of Priatek against Defendant James Sampey.

499. Sampey directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibit 14, 61)

500. Sampey participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 12, 13, 14)

501. Sampey participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets.

502. Sampey either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 1, 2, 18, 61)

503. Predicate acts committed by Sampey are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

504. Mail and wire fraud. Sampey, as signatory, distributes the September 10 *and* 11, 2018 correspondence with the false allegations regarding Priatek, and its

President/Managing Member using the United States postal service and electronic mail (e-mail). (Exhibit 12, 13)

505. Upon reliance of the misrepresentations, Sampey is improperly installed President of Priatek, LLC by the Priatek Board.

506. The executive change at the apex further detrimentally halts Priatek's operations and capital raising efforts.

507. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Sampey conspired to extort Priatek to take its digital project VendXOR.

508. As a predicate act, Sampey conspired with Waters to extort Priatek. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

509. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever."

510. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Sampey again conspired to extort Priatek to take its digital project VendXOR.

511. As a predicate act, Sampey also conspired with Tamboli to extort Priatek. Extortion. Via a text message on September 21, 2018, Tamboli threatens the Managing

Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

512. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). In an email dated, September 22, 2018, Sampey and the SKUX- Enterprise demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

513. Sampey's racketeering activity violated § 1962(c) the RICO Act.

514. As a direct and proximate result of Sampey's predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

## COUNT III: DERIVATIVE COMPLAINT (RICO) – SECTION 1962(c) AGAINST DEFENDANT RICHARD WATERS

515. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

516. Plaintiffs bring this Count III derivatively on behalf of Priatek, LLC against Defendant Richard Waters.

517. Waters directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

518. Waters participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 29)

519. Waters either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 7, 68)

520. Predicate acts committed by Waters are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

521. Waters was initially brought to Priatek, LLC by Tamboli to raise capital funding for the company. (Exhibit 109)

522. Extortion. During September 19-20, 2018, in a series of text messages, Richard Waters threatened criminal liability, and also threatened investor rescissions of their capital investments. (Exhibit 29)

523. Waters states in part, "It takes only 3 investor complaints to trigger a full scale SEC investigation. This you do not want….Even the best CEO can leave himself/or herself vulnerable to SEC scrutiny….display complete humility…..you will trigger a series of events that could have long lasting consequences that will negatively impact your future, Priatek's future, and the future of your family forever."

524. Waters (September 19,2018) also states by text: "You have set the wheels in motion for a significant change in management giving the latest shareholders the right to rescind their investment….Your decision today keeps hope alive or kills the deal…..One

scenario everyone wins the other everyone losses and its totally your decision. My prayer is you make the right one." (Exhibit 29)

525. Still, Waters (September 20, 2018) states by text: "It's not just about investors rescinding and you have to fire people its about the mistakes made that once uncovered will jeopardize your future and your freedom….Have you ever been part of an SEC investigation? Obviously not…If they find any wrong doing they contact the FBI and responsible parties go to jail. Guess who that is? What part of this are you missing?" (Exhibit 29)

526. Again Waters (September 20, 2018) states by text: "Milind I know your side from Hoshi. I'm talking about investors that want you to step down from power. Once it's in motion. It can't be stopped. If the crypto people get wind of SEC involvement in Priatek there will be no crypto raise….Nobody, not Bobby, and certainly not me wants to see this happen to you….simply ask them what you need to do and acquiesce. This is your only viable option. I love Milind and I want everything good for you." (Exhibit 29)

527. On September 23, 2018, on two separate instances, Waters sent text messages to Milind: "Rescissions are coming and they will keep coming. By Monday it will be an avalanche of rescissions and you can stop it today. The pressure is mounting. Are you praying? Are you hearing from the Lord? You are in a storm…..Your path is one of utter destruction."; "Milind please ask your legal counsel how they can help you fund your company after all the 2018 investors rescind." "If you don't make the right decision in the next 24 hours, and sign the revised MOU, our company is going up in flames." "But you apparently believe in your righteous indignation and refuse to meet current

demands." "If your actions cause the company to fail, which is about to happen, you could face incarceration." (Exhibit 68)

528. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Waters also conspired to extort Priatek to take its digital project VendXOR.

529. As a predicate act, Waters conspired with Tamboli to extort Priatek. Extortion. Via a text message on September 21, 2018, Tamboli threatens the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67)

530. Waters' racketeering activity violated § 1962(c) the RICO Act.

531. As a direct and proximate result of Waters' predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

**COUNT III: (RICO) – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT BRIAN QUIMBY**

532. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

533. Plaintiffs bring this Count III derivatively on behalf of Priatek against Defendant Brian Quimby.

534. Quimby directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

535. Quimby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 1, 52, 61)

536. Quimby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets.

537. Quimby either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 1, 2, 5, 44)

538. Predicate acts committed by Quimby are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

539. Mail and wire fraud. On December 13, 2018, Quimby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an anonymous investment firm, to the Managing Member Bharvirkar. (Exhibit 1)

540. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek. (Exhibit 46)

541. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46).

542. Mail and wire fraud. Using the mails/wires Quimby advanced SKUX-Enterprise scheme to conceal their racketeering acts in a letter – that also references the "minority investor group" as endorsing Quimby's actions (disseminated via e-mail and USPS) to Priatek and its investors.

543. In this correspondence, Brian Quimby, John Colby, and Vijay Patel do not disclose the UCC filing in their joint resignation letter on March 20, 2019. (Exhibit 32).

544. On March 14, 2019, Quimby filed a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon a fraudulently modified agreement. (Exhibit 5)

545. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Quimby conspires to extort Priatek to take its digital project VendXOR with Tinsley. (Exhibit 52)

546. Brian Quimby was specifically charged by Priatek to complete the VendXOR governance framework, investment documentation, and audit.

547. On behalf of the SKUX-Enterprise, Tinsley recruited Quimby to criminally transfer VendXOR technology and assets to the newly formed company SKUX, LLC.

548. As a predicate act, Quimby conspired with Tinsley to extort Priatek. Extortion. (18 U.S.C. § 1951 and § 836.05, Fla. Stat.). Tinsley extorts Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member.

549. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

550. In violation of 18 U.S. Code § 1952, Quimby then transported Priatek coupon kiosk machines across state lines to carry on the scheme where Priatek's Managing Member was extorted for possession of VendXOR. (Exhibit 32)

551. 18 U.S. Code § 1952. § 1952(a) criminalizes: transportation in interstate or foreign commerce or using the mail or any facility in interstate commerce, with intent to – § 1952(a)(3): otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity – § 1952(b)(2): extortion in violation of the laws of Florida and/or of the United States.

552. With an aim to conceal the criminal activities of the SKUX-Enterprise, the premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 105)

553. Quimby's racketeering activity violated § 1962(c) the RICO Act.

554. As a direct and proximate result of Quimby's predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

## COUNT III: RICO – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT SCOTT MATTHEWS

555. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

556. Plaintiffs bring this Count VI derivatively on behalf of Priatek against Defendant Scott Matthews.

557. Matthews directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

558. Matthews participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts in obtaining Priatek assets.

559. Matthews either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity.

560. Predicate acts committed by Matthews are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

561. Quimby has a monetary investment in Matthews' company iTOUCH, LLC.

562. Matthews is a compromised Priatek Board member that delayed the production of a promised Special Litigation Committee Report to Priatek and its

Members to avoid pursuing claims against I2W-Enterprise for the taking of physical Priatek kiosks. (Exhibits 1, 2, 8, 51, 52)

563. Matthews delays the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against the criminal enterprises for the taking of digital VendXOR and physical Priatek kiosks.

564. Mail and wire fraud. In a May 12, 2020 letter (disseminated via e-mail and USPS) to Priatek members, Matthews, in his capacity as a Priatek board member, knowingly makes material misstatements regarding the production of a special litigation report.

565. Mail and wire fraud (18 U.S.C. §§ 1341, 1343). Matthews again fraudulently misrepresents it independence to Priatek and its investors to further the criminal schemes against Priatek by the I2W-Enterprise. (Exhibit 2, para. 265, September 3, 2021 letter, #3).

566. Matthews informs Priatek (Bharvirkar), via a telephone conversation, "Walk away from Priatek. The company is dead. I can't tell you why but walk away."

567. Matthews is the equity owner of iTouch Orlando, LLC. ITOUCH, LLC supplies kiosk machines to Orlando-area hotels. (Exhibit 8)

568. A September 29, 2019, e-mail to Matthews states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct between the two criminal enterprises and its associates to raise capital on behalf of ITOUCH, LLC.

569. The SKUX-Enterprise, particularly Tinsley, began a capital funding campaign for ITOUCH, LLC to use the digital VendXOR with the Priatek machines possessed by ITOUCH, LLC. (Exhibit 52)

570. Capital was also needed to hire engineers to utilize VendXOR with ITOUCH, LLC kiosks (both Priatek kiosks in the possession of ITOUCH, LLC, and also its own kiosks). (Exhibit 52)

571. Matthews' racketeering activity violated § 1962(c) the RICO Act.

572. As a direct and proximate result of Matthews' predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

**COUNT III: (RICO) – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT HOSHI TAMBOLI**

573. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-359 as if stated herein in their entirety.

574. Plaintiffs bring this Count III derivatively on behalf of Priatek against Defendant Tamboli.

575. Tamboli participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets.

576. Tamboli participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 64, 65, 66)

577. Tamboli either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 43, 44, 52, 64, 65, 66)

578. Predicate acts committed by Tamboli are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

579. Extortion. Via a text message on September 21, 2018, Tamboli threatens the Managing Member with criminal exposure for Priatek and its employees, and also negative consequences involving his spouse and toddler children. (Exhibits 64, 66, 67).

580. Text messages from Tamboli threaten Bharvirkar. On September 21, 2018: "What you do today is going to determine whether you kill your company, wipe the investors and the employees, potentially go to jail and possibly lose your wife and kids. Back down." (Exhibit 64)

581. Another example of text message from Tamboli on October 9, 2018 to Bharvirkar states: […you have 51 percent of the voting stock but that is a loadstone around your neck because of this company fails or implodes right now it will be squarely on your shoulders and I am telling you all the shareholders- every single one is going to come after you not underestimating the trouble you will have with the SEC and the lawsuits and all sorts of liability."] (Exhibit 28, 67)

582. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Tamboli conspires to extort Priatek to take its digital project VendXOR with Tinsley.

583. As a predicate act, Tamboli also conspired with Tinsley to extort Priatek. Extortion. (18 U.S.C. § 1951 and § 836.05, Fla. Stat.). Tinsley extorts Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member. (Exhibit 103)

584. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25).

585. Mail and wire fraud. In December 2018, with knowledge of the hoax, Tamboli's legal counsel, Richard McIntyre, first communicates a buyout offer from the fictitious Rath Capital Partners investment firm (formed by Priatek marketing director Buckley) to Priatek's Managing Member. (Exhibit 100)

586. Tamboli's racketeering activity violated § 1962(c) the RICO Act.

587. As a direct and proximate result of Tamboli's predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count III Defendant(s), including actual damages, treble damages, equitable relief, and attorney's fees.

**COUNT IV**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – SECTION 1962(d)**

588. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-587 as if stated herein in their entirety.

589. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendants Swenson, Glasscock, Nalamshetty, Shah, and Patel (the "Count IV Defendant(s)").

590. As set forth above, the Count IV Defendants agreed and conspired to violate § 1962(a) and § 1962(c). Specifically, each defendant conspired to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC (§ 1962(a); or (2) conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity (§ 1962(c).

591. The Count IV Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC, and conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

592. The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d) AGAINST DEFENDANT LINDA SWENSON**

593. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

594. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Swenson.

595. Swenson intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

596. Swenson also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity. (Exhibit 63)

597. Swenson conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibits 1, 2, 28, 32, 35, 43, 44, 50, 51, 52)

598. As part of the "minority investor group" wielding material monetary influence, Swenson reassured the SKUX-Enterprise to remain unconcerned with any potential legal repercussions and proceed with the scheme to take VendXOR. (Exhibits 35, 43, 44)

599. While Swenson impedes investigations regarding the taking of VendXOR by the SKUX-Enterprise, scrutiny of the criminal acts of the SKUX-Enterprise is diverted towards Bharvirkar. (Exhibit 43, 44)

600. On or about September 22, 2018, Swenson, as part of the "minority investor group", joins the SKUX-Enterprise and begins conspiring in the extortion of the Managing member to further the operation of the SKUX-Enterprise. (Exhibit 63)

601. A November 5, 2018 e-mail from Ramos includes the "minority investor group" as recipients and corroborates that the "minority investor group" ignored the proxy vote to remove Colby and Quimby as board members. (Exhibit 35)

602. The activity of the minority investor group in furtherance of the operation of the SKUX-Enterprise is further corroborated in an e-mail chain distributed amongst Tamboli, Swenson, Colby, Quimby, Patel, and Tamboli's attorney Rich McIntyre). (Exhibit 43)

603. Even a year later, Tamboli, Swenson, Glasscock, and Shah remain intimately involved in business dealings involving operation of the SKUX-Enterprise and the I2W-Enterprise, and with the "minority investor group". (Exhibit 51)

604. In correspondence to Priatek in 2019, Quimby states, "Milind formally resigned as CEO to board on 9/24/18 after pressure from investors, including Hoshi [Tamboli], Richard Waters, Linda Swenson, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock, and others. (Exhibit 28)

605. Through her words and actions, Swenson agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

## COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d) AGAINST DEFENDANT JOHN GLASSCOCK

606. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

607. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Glasscock.

608. Glasscock intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

609. Glasscock also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity. (Exhibit 50, 51)

610. Glasscock conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibits 1, 2, 35, 50, 51, 101)

611. As part of the "minority investor group" wielding material monetary influence, Glasscock reassured the SKUX-Enterprise to remain unconcerned with any potential legal repercussions and proceed with the scheme to take VendXOR. (Exhibit 35, 51, 101)

612. While Glasscock impedes investigations regarding the taking of VendXOR by the SKUX-Enterprise, scrutiny of the criminal acts of the SKUX-Enterprise is diverted towards Bharvirkar. (Exhibits 1, 2, 32, 50)

613. On or about September 22, 2018, Glasscock, as part of the "minority investor group", joins the SKUX-Enterprise and begins conspiring in the extortion of the Managing member to further the operation of the SKUX-Enterprise. (Exhibit 63)

614. A November 5, 2018 e-mail from Ramos includes the "minority investor group" as recipients and corroborates that the "minority investor group" ignored the proxy vote to remove Colby and Quimby as board members. (Exhibit 35)

615. Even a year later, Tamboli, Swenson, Glasscock, and Shah remain intimately involved in business dealings involving operation of the SKUX-Enterprise and the I2W-Enterprise, and with the "minority investor group". (Exhibit 51)

616. In correspondence to Priatek in 2019, Quimby states, "Milind formally resigned as CEO to board on 9/24/18 after pressure from investors, including Hoshi [Tamboli], Richard Waters, Linda Swenson, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock, and others. (Exhibit 28)

617. Through his words and actions, Glasscock agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**AGAINST DEFENDANT KRISHNA NALAMSHETTY**

618. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

619. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Nalamshetty.

620. Nalamshetty intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

621. Nalamshetty also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

622. Nalamshetty conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibits 14, 61, 94)

623. As part of the "minority investor group" wielding material monetary influence, Nalamshetty reassured the SKUX-Enterprise to remain unconcerned with any potential legal repercussions and proceed with the scheme to take VendXOR. (Exhibits 32, 35)

624. While Nalamshetty impedes investigations regarding the taking of VendXOR by the SKUX-Enterprise, scrutiny of the criminal acts of the SKUX-Enterprise is diverted towards Bharvirkar. (Exhibits 32, 42)

625. On or about September 22, 2018, Nalamshetty, as part of the "minority investor group", joins the SKUX-Enterprise and begins conspiring in the extortion of the Managing member to further the operation of the SKUX-Enterprise. (Exhibit 63, 94)

626. A November 5, 2018 e-mail from Ramos includes the "minority investor group" as recipients and corroborates that the "minority investor group" ignored the proxy vote to remove Colby and Quimby as board members. (Exhibit 35)

627. In correspondence to Priatek in 2019, Quimby states, "Milind formally resigned as CEO to board on 9/24/18 after pressure from investors, including Hoshi [Tamboli], Richard Waters, Linda Swenson, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock, and others. (Exhibit 28)

628. Through his words and actions, Nalamshetty agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**AGAINST DEFENDANT VIJAY PATEL**

629. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

630. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Patel.

631. Patel intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

632. Patel also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

633. Patel conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibit 32)

634. As part of the "minority investor group" wielding material monetary influence, and a board member of the initial Priatek board, Patel reassured the SKUX-Enterprise to remain unconcerned with any potential legal repercussions and proceed with the scheme to take VendXOR.

635. On September 9, 2018, certain SKUX-Enterprise members (and other individuals – Vijay Patel, Jim Sampey, Brian Quimby, Kenneth Douglas, Krishna Nallamshetty, David Chidekel, Bobby Tinsley, Bob Quintana, John and Matt Diaz) held a meeting to remove the Bharvirkar as Priatek President. (Exhibit 61)

636. At this juncture, Patel joins the SKUX-Enterprise by acquiescing to SKUX-Enterprise's plan to remove Bharvirkar as Priatek President.

637. The SKUX-Enterprise, with its new associate Patel, unilaterally install their criminal associates Sampey as President, and Quintana as CEO of Priatek.

638. On September 10, 2018, Tinsley along with SKUX-Enterprise, falsely threatened to report Priatek for federal securities violations to remove Priatek President/Managing member from his duties. (Exhibit 12; email sent by Defendant James Sampey and David Chidekel, and copies Bobby Tinsley, Bob Quintana and the board members Krishna Nallamshetty, Vijay Patel, Brian Quimby, and John Colby. (Exhibit 12, 13)

639. On October 4, 2018, Patel with knowledge that Priatek lacked proper resources, prematurely allows the launch to Priatek coupon kiosk machines in New York City to enable the SKUX-Enterprise to conceal the taking of VendXOR. (Exhibit 32, 33)

640. A November 5, 2018 e-mail from Ramos includes the "minority investor group" as recipients and corroborates that the "minority investor group" ignored the proxy vote to remove Colby and Quimby as board members. (Exhibit 35)

641. During September – December 2018, Patel assisted the SKUX-Enterprise in forcing the Managing Member to amend the operating agreement to change board control in exchange for allowing the Managing Member a continuing role with Priatek.

642. Even a year later, Patel remains intimately involved in business dealings involving operation of the SKUX-Enterprise and with the "minority investor group". (Exhibit 51)

643. Through his words and actions, Patel agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**AGAINST DEFENDANT DIPAK SHAH**

644. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

645. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Shah.

646. Defendant Shah intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

647. Shah also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

648. Shah conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibits 1, 35, 51)

649. As part of the "minority investor group" wielding material monetary influence, Glasscock reassured the SKUX-Enterprise to remain unconcerned with any potential legal repercussions and proceed with the scheme to take VendXOR. (Exhibits 35, 51)

650. While Shah impedes investigations regarding the taking of VendXOR by the SKUX-Enterprise, scrutiny of the criminal acts of the SKUX-Enterprise is diverted towards Bharvirkar. (Exhibits 1, 2, 42)

651. On or about September 22, 2018, Shah, as part of the "minority investor group", joins the SKUX-Enterprise and begins conspiring in the extortion of the Managing member to further the operation of the SKUX-Enterprise. (Exhibit 63)

652. A November 5, 2018 e-mail from Ramos includes the "minority investor group" as recipients and corroborates that the "minority investor group" ignored the proxy vote to remove Colby and Quimby as board members. (Exhibit 35)

653. Even a year later, Tamboli, Swenson, Glasscock, and Shah remain intimately involved in business dealings involving operation of the SKUX-Enterprise and the I2W-Enterprise, and with the "minority investor group". (Exhibit 51)

654. In correspondence to Priatek in 2019, Quimby states, "Milind formally resigned as CEO to board on 9/24/18 after pressure from investors, including Hoshi [Tamboli], Richard Waters, Linda Swenson, Matt Diaz, Marc Blumenthal, Brent Fisher, John Glasscock, and others. (Exhibit 28)

655. Through his words and actions, Shah agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**DEFENDANT JON NAJARIAN**

656. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

657. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Najarian.

658. Najarian conspired to violate § 1962(c) by knowingly agreeing to facilitate a scheme which includes the operation or management of the SKUX-Enterprise. Najarian intentionally conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

659. Najarian conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, when he knowingly joined the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibit 11)

660. On July 20, 2018, while Priatek hosted a crypto summit, Tinsley disclosed his desire to become president of VendXOR to Priatek personnel. Other members of SKUX-Enterprise in attendance at the crypto summit included Defendants Bob Zaccardo,

Bob Quintana, Kenneth Douglas, Jim Sampey, David Chidekel, Jon Najarian, and Moshe Joshua. (Exhibit 11)

661. SKUX-Enterprise associate Najarian, while having executed an advisor agreement with non-competition covenants with Priatek, leaves with Tinsley, Sampey, Douglas, and Zaccardo. (Exhibit 110)

662. In particular, Najarian assists the SKUX-Enterprise by divulging confidential Priatek information in the form of a list of interested investors. (Exhibit 66)

663. Najarian, along with his company Coin Boost, were key to Priatek funding, and were paid $80K to secure investor funding through prospective investors. Najarian met many prospective Priatek investors during a 7 city European Investor Roadshow. (Exhibit 1, 66, 90)

664. Through his words and actions, Najarian agreed to the SKUX-Enterprise's criminal plan and also joined the conspiracy to carry out its multiple schemes.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**AGAINST DEFENDANT DAVID CHIDEKEL**

665. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

666. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Chidekel.

667. Defendant Chidekel intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

668. Chidekel also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity. (Exhibit 54)

669. Chidekel conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek. (Exhibit 61)

670. Chidekel was a legal advisor for Priatek's digital VendXOR blockchain project. (Exhibit 54)

671. On July 20, 2018, while Priatek hosted a crypto summit, Tinsley disclosed his desire to become president of VendXOR to Priatek personnel. Other members of SKUX-Enterprise in attendance at the crypto summit included Defendants Bob Zaccardo, Bob Quintana, Kenneth Douglas, Jim Sampey, David Chidekel, Jon Najarian, and Moshe Joshua. (Exhibit 11)

672. On September 9, 2018, certain SKUX-Enterprise members (and other individuals – Vijay Patel, Jim Sampey, Brian Quimby, Kenneth Douglas, Krishna Nallamshetty, David Chidekel, Bobby Tinsley, Bob Quintana, John and Matt Diaz) held a meeting to remove the Bharvirkar as Priatek President. (Exhibit 61)

673. With purported legal authority, Chidekel authors the September 10 and 11, 2018 letters disseminated to the Priatek board with the fraudulent misrepresentations of illegal activities occurring at Priatek.

674. Sampey, as signatory, then distributes the September 10 and 11, 2018 letters with the false allegations regarding Priatek, and its President/Managing Member. (Exhibit 12, 13)

675. These letters disseminate false accusations that the Priatek President/Managing Member is embezzling corporate assets. (Exhibits 12, 13)

676. Upon reliance of the misrepresentations, Sampey is improperly installed President of Priatek by the Priatek Board.

677. The executive change at the apex further detrimentally halts Priatek's operations and capital raising efforts.

678. Colby, a board member, in a September 12, 2018 email, implicates Chidekel as "working with unclean hands" alongside SKUX-Enterprise member Quintana to advance interests adverse to Priatek. Colby's e-mail further states: "[Chidekel] has never raised any issues regarding potential SEC violations regarding any efforts that are alleged in the board note." (Exhibit 54)

679. Through his words and actions, Chidekel agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**AGAINST DEFENDANT JAMES BUCKLEY**

680. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

681. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Buckley.

682. Buckley intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

683. Buckley also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

684. Buckley conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek.

685. Buckley held an executive leadership position at Priatek as its Director of Marketing and autonomously managed Priatek marketing functions. (Exhibit 71)

686. Buckley was a mole put in place by Sampey and Tinsley to advance the SKUX-Enterprise schemes. In particular, Sampey hired Buckley at Priatek and also at another company, ValPak, prior to Priatek.

687. In December 2018, Buckley anonymously advanced a fictitious investment group, Rath Capital Partners, to purchase the majority ownership interest of Priatek in order to obtain control of the company. (Exhibit 79)

688. Buckley admitted to being a part of Rath Capital Partners and orchestrating the financing of the buyout offer. (Exhibit 49)

689. Through his words and actions, Buckley agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**

## DEFENDANT JEREMY RAMOS

690. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

691. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Ramos.

692. Ramos intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

693. Ramos also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

694. Ramos conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek.

695. Ramos was Vice President of Engineering and Co-Founder of Priatek.

696. Ramos allowed extortion and fraudulent schemes to be perpetuated against Priatek, while acknowledging that Tinsley "was working towards his goal of taking over as president of the crypto project" and was recruited to join the SKUX-Enterprise as an associate. (Exhibit 11)

697. Ramos utilized his unfettered access and erased Priatek business records – including non-disclosure agreements, non-compete agreements, e-mails, contracts, board

minutes, expense reports, and more to allow the SKUX-Enterprise to take the digital VendXOR blockchain project.

698. Ramos assists the SKUX-Enterprise by denying Priatek's Managing Member access to Priatek offices, and then further shuts off the Managing Member's access to company email and google drive. (Exhibit 28)

699. Ramos had custody of Priatek proprietary software code which was taken by the SKUX-Enterprise. Ramos further allowed the SKUX-Enterprise to take software code intended to be delivered to Priatek by Dreamdaze, Inc.

700. In April of 2019, Ramos assists the SKUX-Enterprise by contacting Bharvirkar, Priatek Managing Member, to communicate Quimby and Glasscock's intention to file a personal civil lawsuit, for embezzlement and misappropriation of Priatek assets, against Bharvirkar if he does not agree to a Priatek bankruptcy filing. (Exhibit 91)

701. September 29, 2019, Quimby e-mails Matthews and states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct between the SKUX-Enterprise and its associates – "minority investor group" – to raise capital on behalf of the I2W-Enterprise, and also iTouch Orlando, LLC.

702. The SKUX-Enterprise, particularly Tinsley, began a capital funding campaign for I2W-Enterprise to use the digital VendXOR with the Priatek machines possessed by the I2W-Enterprise.

703. Through his words and actions, Ramos agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

## COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d) AGAINST DEFENDANT MOSHE JOSHUA

704. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

705. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Joshua.

706. Joshua intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

707. Joshua also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity.

708. Joshua conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek.

709. Joshua joins the SKUX-Enterprise to facilitate the use of the digital VendXOR technology from Priatek, LLC.

710. As part of a works-for-hire contract ("Services Contract"), Moshe Joshua, and his company Dreamdaze, Inc., were paid hundreds of thousands of dollars to build the VendXOR blockchain platform *component* that belonged to Priatek. (Exhibit 53).

711. Along with monetary payments, Priatek regularly invoiced and communicated with Joshua and Priatek regarding the progress and scope of the blockchain platform.

712. The SKUX-Enterprise invests the VendXOR platform technology into SKUX, LLC given to it by Joshua. (Exhibit 1, 2)

713. In an email dated September 22, 2018, Tinsley and the SKUX- Enterprise demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

714. Through his words and actions, Joshua agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts.

**COUNT IV – RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**AGAINST DEFENDANT DREAMDAZE TECHNOLOGY, INC.**

715. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 327-592 as if stated herein in their entirety.

716. Plaintiffs bring this Count IV derivatively on behalf of Priatek against Defendant Dreamdaze, Inc.

717. Dreamdaze, Inc. intentionally conspired to violate § 1962(a) in using or investing income that is derived from a pattern of racketeering activity in an interstate enterprise – SKUX, LLC.

718. Dreamdaze, Inc. also intentionally conspired to violate § 1962(c) by knowingly agreeing to conduct and participate in the conduct of the affairs of the SKUX-Enterprise through a pattern of racketeering activity. (Exhibit 53)

719. Dreamdaze, Inc. conspired with other defendants, including Tinsley, Tamboli, Quimby, Sampey, and Waters, in knowingly joining the ongoing SKUX-Enterprise to further its objectives to illegally take VendXOR from Priatek.

720. Dreamdaze, Inc. joined the SKUX-Enterprise to facilitate the use of the digital VendXOR technology from Priatek, LLC.

721. As part of a works-for-hire contract ("Services Contract"), Moshe Joshua, and his company Dreamdaze Technology, Inc., were paid hundreds of thousands of dollars to build the VendXOR blockchain platform *component* that belonged to Priatek. (Exhibit 53).

722. Along with monetary payments, Priatek regularly invoiced and communicated with Dreamdaze, Inc. and Priatek regarding the progress and scope of the blockchain platform.

723. The SKUX-Enterprise invests the VendXOR platform technology into SKUX, LLC given to it by Dreamdaze, Inc. (Exhibit 70)

724. In an email dated September 22, 2018, Tinsley and the SKUX- Enterprise demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

725. Through its words and actions, Dreamdaze, Inc. agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts. (Exhibit 1, 2)

726. The Count IV Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

727. As a direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Defendants agreed to participate in an endeavor to take Priatek's VendXOR project, and technology.

728. Additionally, as a direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Priatek has been injured in its business and property caused by both predicate and non-predicate acts committed to further the conspiracy.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against the Count IV Defendant(s) as follows: actual damages, equitable relief, treble damages and attorney's fees, and costs.

## I2W-ENTERPRISE DEFENDANTS AND CORRESPONDING RICO COUNTS

### FACTUAL ALLEGATIONS COMMON TO RICO COUNTS AGAINST THE I2W-ENTERPRISE

729. Brian Quimby is a culpable person, an individual, who is capable of holding a legal or beneficial interest in property.

730. Quimby willfully or knowingly committed and conspired to the commission of racketeering activity through a pattern involving a separate association-in-fact enterprise.

731. The I2W-Enterprise in an association-in-fact enterprise comprised of a union of individuals that is used by Quimby to commit racketeering.

732. The individuals associated with the enterprise included: Brian Quimby, John Colby, and Jeremy Ramos. (Exhibits 1, 32, 50, 77)

733. Wrongdoers, other than named defendants, include compromised Priatek (second) board members.

734. Priatek Board presently consists of five members, including Defendant Scott Matthews, who had knowledge of the I2W-Enterprise's illegal taking of Priatek assets and technology. (Exhibit 8)

735. With the (second) Priatek board installation, upon the amendment of the Priatek Operating Agreement, the new Board Members begin to exploit their positions and begin to coordinate their conduct with the I2W-Enterprise. (Exhibit 4)

736. The I2W-Enterprise Defendants committed criminal acts which demonstrate that the racketeering predicates are related, and that they amount to or pose

a threat of continued criminal activity. The I2W-Enterprise has not *abandoned* its aim to shut down Priatek to conceal the taking of Priatek assets, and technology. (Exhibit 5, 32)

737. On September 29, 2019, Defendant Brian Quimby states in an email: "Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up." (Exhibit 52). While the email details that Bobby Tinsley, Jeremy Ramos, Vijay Patel (now former board member), among others were assisting Defendant Brian Quimby and Linda Swenson to raise capital for I2W, the email is probative on the ongoing relationships among the defendants and the cover-up of I2W-Enterprise obtaining Priatek technology and assets.

738. Quimby has a monetary investment in iTOUCH, LLC owned by compromised Board Member Matthews. (Exhibit 52)

739. Racketeering activities included extortion to obtain technology and confidential business processes, mail/wire fraud, money laundering. (Exhibit 1, 2)

740. The racketeering activities of the I2W-Enterprise association-in-fact enterprise involved mail, interstate wires, or other instrumentalities of interstate commerce which had an effect on interstate and/or foreign commerce. (Exhibit 5, 60)

741. The I2W-Enterprise used mails and wires in furtherance of its criminal activities to obtain Priatek assets and to disseminate misrepresentations to Priatek and Priatek Members. The Priatek Members' monetary investment was devalued each time such misleading communications prompted them to defer to the compromised Priatek Board(s). Additionally, Priatek did not pursue existing time-sensitive ventures or new ventures based upon the misrepresentations.

742. The I2W-Enterprise is an ongoing enterprise whose purposes were to obtain Priatek assets, cover up its interlocking schemes, drive Priatek to bankruptcy, and bring it to complete ruin. In this process, the I2W-Enterprise laid waste to other victims as well. (Exhibits 1, 2)

743. The I2W-Enterprise members had long standing personal and business relationships.

744. The I2W-Enterprise associates began pursuing the enterprise's purposes on or about September 24, 2018. Each associate was intimately aware of the racketeering activities of the I2W-Enterprise. (Exhibits 1, 2, 26, 32, 50)

745. Through a pattern of racketeering activity (PORA), Defendant(s) unlawfully conducted and participated directly, and indirectly, in the conduct of the affairs and activities of the enterprise.

746. Its racketeering activity allowed the I2W-Enterprise to operate the company I2W, LLC as a holding company for its ill-gotten gains.

747. The I2W-Enterprise's predicate acts occurred over a substantial period of time. The predicate acts also pose a threat of continued criminal activity. (Exhibit 1, 2, 32, 50, 51, 52)

**OTHER VICTIMS: INJURED PRIATEK CREDITORS AND SERVICE PROVIDERS**

748. The I2W-Enterprise's criminal acts were the proximate cause of injury to Priatek's creditors, and also its service providers.

749. The fallout from the I2W-Enterprise's actions to criminally take Priatek's assets, led to Priatek's defaulting on monies owed to numerous third-parties.

750. As examples, Priatek owed its legal counsel substantial legal fees of at least $220K; Priatek office lease default and eviction; Crowd Engine 75K; warehouse landlord, Mainstream America, Inc., approximately $156K; and an additional estimated $400K to various vendors. (Exhibit 105)

751. Additionally, retail malls in Florida and New York were also injured when the malls were not paid rent for displaying Priatek Kiosk machines. The malls also incurred costs to dispose of non-functioning machines.

**VICTIM: PRIFUN, LLC**

752. Prifun, LLC loaned approximately $600K to Priatek as financing for the assembly of functional Priatek Kiosk coupon machines.

753. As part of the financing terms, Prifun, LLC was entitled to a percentage of revenue earned from designated Priatek kiosks machines.

754. These particular kiosks, along with other kiosks, were placed in retail malls in New York and Florida for commercial use.

755. Upon the illegal taking by the I2W-Enterprise of the underlying KIOSK software code, the software code malfunctioned, and in turn the Kiosks would not function as intended.

756. As a result, Prifun, LLC was injured when it did not receive a share of revenue promised under the terms of the financing agreement.

**OTHER VICTIMS: PROSPECTIVE INVESTORS**

757. Quimby, with a history of FINRA securities violations, continues to commit criminal acts against prospective investors with another one of his entities, Free Play Media Group, LLC. Free Play Media is used as a conduit to transfer Priatek Kiosks converted by I2W, LLC – another entity with Quimby as a principal.

758. Plaintiffs have also been injured stemming from both predicate and non-predicate acts.

759. Plaintiffs were injured by reason of violations of RICO statutes through a concrete financial loss involving physical assets and money, lost business opportunities through diminished goodwill and reputation, investor recissions, depletion of corporate assets and monetary reserves, employee exodus, abandonment of assets.

760. The I2W-Enterprise is in violation of § 1962(a) and (c) of the RICO Act, as this PORA involving predicate acts extended over a substantial period of time from September 24, 2018 to September 3, 2021.

761. Nevertheless, the I2W-Enterprise continues its criminal activity by disseminating its misrepresentation to innocent Priatek Members through its conspiring Priatek Board Member Scott Matthews. (Exhibit 8)

762. This PORA is likely to be repeated into the future as the I2W-Enterprise continues to defraud other entities, and the PORA reflects I2W-Enterprise's ongoing mission.

763. Priatek was injured in violation of § 1962(a) from the investment of Priatek kiosks, technology, and monetary reserves, obtained by the I2W-Enterprise through its racketeering acts, because Priatek lost its market presence. Devoid of its physical assets

and monetary reserves, Priatek, LLC also could no longer initiate any meaningful fundraising campaigns. (Exhibit 1, 2)

764. As a direct and proximate result of the Count II Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property from the loss of Priatek kiosks and related technology, and monetary reserves.

## COUNT V
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – SECTION 1962(a)

## COUNT V: RICO – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT BRIAN QUIMBY

765. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-764 as if stated herein in their entirety.

766. Plaintiffs bring this Count V derivatively on behalf of Priatek against Defendant Quimby.

767. Quimby obtained money from a pattern of racketeering activity. (Exhibits 2, 52)

768. Quimby participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibits 32, 50)

769. The derived income was used to operate the I2W-Enterprise. (Exhibit 52)

770. Quimby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibits 1, 2, 52, 59)

771. Quimby either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 1, 2, 5, 43, 44, 50, 51, 52, 60)

772. Predicate acts committed by Quimby are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibits 1, 2, 8, 14, 32, 36, 50, 51, 52, 61, 68, 91)

773. Laundering of monetary instruments (18 U.S. Code § 1956). Additionally, the Quimby depleted Pritatek's monetary reserves by illegally "laundering" an indeterminate monetary amount from Priatek's $1.2M cash reserves around October/November 2018, and further hastened Priatek's path towards insolvency. (Exhibits 1, 2)

774. The money laundering is tantamount to specified unlawful activity of mail and wire fraud under § 1961 which occurred after the resignation of the Priatek President, and with Quimby gaining custody of the cash reserve.

775. With Quimby remaining at Priatek, the I2W-Enterprise criminally takes an indeterminate amount of cash from Priatek's $1.2M cash reserves within 2 months. (Exhibit 2)

776. Mail and wire fraud. On December 13, 2018, Quimby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an

anonymous investment firm (Rath Capital Partners), to the Managing Member Bharvirkar. (Exhibits 47, 48, 79)

777. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek. (Exhibits 47, 48, 79)

778. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46)

779. Mail and wire fraud. On March 14, 2019, Quimby filed, on behalf of I2W, a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon the fraudulently modified agreement. (Exhibit 5)

780. The mailing/wiring of the fraudulent lien is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

781. Concurrent with the filing of the fraudulent lien agreement, I2W-Enterprise members Quimby and Colby resign as Priatek board members. Quimby and Colby resign after siphoning Priatek assets. (Exhibit 32)

782. Quimby did not disclose the UCC filing in the joint resignation letter to Priatek on March 20, 2019. (Exhibit 32)

783. Mail and wire fraud. On July 30, 2019, Quimby filed for transfer of Priatek's patent and I2W, LLC took possession of the patent when Priatek was not insolvent, and without judicial approval. (Exhibit 60)

784. After filing a complaint, the United States Patent and Trademark Office declares that Brian Quimby improperly and illegally transferred the patent. (Exhibit 9)

785. On September 6, 2019, Priatek's Managing Member demanded Quimby to return Priatek assets and patents, but Brian Quimby refused to surrender Priatek's property. (Exhibit 27)

786. The mail/wire fraud consisting of the fraudulent patent filing is incidental to an essential part of the scheme to illegally take the Priatek patent. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

787. Quimby conspired to extort Priatek with the SKUX-Enterprise. (Exhibit 24)

788. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Quimby conspires to extort Priatek with the SKUX-Enterprise to take its digital project VendXOR with Tinsley. (Exhibits 25, 47)

789. While Tinsley recruited Quimby to transfer VendXOR technology and assets to the newly formed company SKUX, LLC, Tinsley extorted Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member. (Exhibit 11, 32, 43)

790. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25)

791. In violation of 18 U.S. Code § 1952, Quimby then transported Priatek coupon kiosk machines across state lines to carry on the scheme where Priatek's Managing Member was extorted for possession of VendXOR. (Exhibit 32)

792. 18 U.S. Code § 1952. § 1952(a) criminalizes: transportation in interstate or foreign commerce or using the mail or any facility in interstate commerce, with intent to – § 1952(a)(3): otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity – § 1952(b)(2): extortion in violation of the laws of Florida and/or of the United States.

793. With an aim to conceal the criminal activities of the I2W-Enterprise, the premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 1, 2, 14)

794. Quimby's racketeering activity violated § 1962(a) the RICO Act.

795. Priatek was injured in violation of § 1962(a) from the investment of Priatek kiosks, and technology obtained by the racketeering acts of Quimby and I2W-Enterprise as alleged herein.

## COUNT V: RICO – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT JOHN COLBY

796. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-764 as if stated herein in their entirety.

797. Plaintiffs bring this Count V derivatively on behalf of Priatek against Defendant Colby.

798. Colby obtained money from a pattern of racketeering activity. (Exhibit 2)

799. Colby participated with intent and knowledge as a principal in the pattern of racketeering activity. (Exhibits 32, 47)

800. The derived income was used to operate the I2W-Enterprise. (Exhibit 2, 52)

801. Colby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibits 1, 2, 47, 58)

802. Colby either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity.

803. Predicate acts committed by Colby are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibits 1, 43, 44, 47)

804. <u>Laundering of monetary instruments (18 U.S. Code § 1956)</u>. Additionally, the Colby depleted Pritatek's monetary reserves by illegally "laundering" an indeterminate monetary amount from Priatek's $1.2M cash reserves around

October/November 2018, and further hastened Priatek's path towards insolvency. (Exhibit 2)

805. The money laundering is tantamount to specified unlawful activity of mail and wire fraud under § 1961 which occurred after the resignation of the Priatek President, and with Colby gaining custody of the cash reserve.

806. With Colby remaining at Priatek, the I2W-Enterprise criminally takes an indeterminate amount of cash from Priatek's $1.2M cash reserves within 2 months. (Exhibit 2)

807. Mail and wire fraud. On December 13, 2018, Colby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an anonymous investment firm, to the Managing Member Bharvirkar. (Exhibit 79, 100)

808. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek. (Exhibit 1, 46, 100)

809. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46)

810. Wire fraud. To further cause delay, around February of 2019, John Colby falsely calls the Managing Member and informs him that the investment firm renegotiated the deal with revised payment terms. (Exhibit 48)

811. Wire fraud. Subsequently, in March of 2019, Colby calls the Managing Member to inform him that the investment firm fell through.

812. The mailing/wiring regarding the hoax investment firm is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines. (Exhibits 47, 48, 100)

813. Mail and wire fraud. On March 14, 2019, on behalf of I2W, a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses, is filed by the I2W-Enterprise to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon a fraudulently modified agreement. (Exhibit 5)

814. The mailing/wiring of the fraudulent lien is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

815. Concurrent with the filing of the fraudulent lien agreement, I2W-Enterprise members Quimby and Colby resign as Priatek board members. Quimby and Colby resign after siphoning Priatek assets. (Exhibit 32)

816. Colby did not disclose the UCC filing in the joint resignation letter to Priatek on March 20, 2019. (Exhibit 32)

817. Colby's racketeering activity violated § 1962(a) the RICO Act.

818. Priatek was injured in violation of § 1962(a) from the investment of Priatek kiosks, and technology obtained by the racketeering acts of Colby and I2W-Enterprise as alleged herein.

**COUNT V: RICO – SECTION 1962(a) DERIVATIVE COMPLAINT AGAINST DEFENDANT SCOTT MATTHEWS**

819. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-764 as if stated herein in their entirety.

820. Plaintiffs bring this Count V derivatively on behalf of Priatek against Defendant Scott Matthews.

821. Matthews obtained money from a pattern of racketeering activity.

822. Matthews participated with intent and knowledge as a principal in the pattern of racketeering activity.

823. The derived income was used to operate the I2W-Enterprise. (Exhibit 2, 52)

824. Matthews participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts in obtaining Priatek assets. (Exhibits 1, 2, 47, 58)

825. Matthews either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity.

826. Predicate acts committed by Matthews are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results. (Exhibits 1, 43, 44, 47)

827. Quimby has a monetary investment in Matthews' company iTOUCH, LLC.

828. Matthews is a compromised Priatek Board member that delayed the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against I2W-Enterprise for the taking of physical Priatek kiosks. (Exhibits 1, 2, 8, 51, 52)

829. Matthews delays the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against the criminal enterprises for the taking of digital VendXOR and physical Priatek kiosks.

830. Mail and wire fraud. In a May 12, 2020 letter (disseminated via e-mail and USPS) to Priatek members, Matthews, in his capacity as a Priatek board member, knowingly makes material misstatements regarding the production of a special litigation report.

831. Mail and wire fraud (18 U.S.C. §§ 1341, 1343). Matthews again fraudulently misrepresents it independence to Priatek and its investors to further the criminal schemes against Priatek by the I2W-Enterprise. (Exhibit 2, para. 265, September 3, 2021 letter, #3).

832. Matthews informs Priatek (Bharvirkar), via a telephone conversation, "Walk away from Priatek. The company is dead. I can't tell you why but walk away."

833. Matthews is the equity owner of iTouch Orlando, LLC. ITOUCH, LLC supplies kiosk machines to Orlando-area hotels. (Exhibit 8)

834. A September 29, 2019, e-mail to Matthews states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct between the two criminal enterprises and its associates to raise capital on behalf of ITOUCH, LLC.

835. The SKUX-Enterprise, particularly Tinsley, began a capital funding campaign for ITOUCH, LLC to use the digital VendXOR with the Priatek machines possessed by ITOUCH, LLC. (Exhibit 52)

836. Capital was also needed to hire engineers to utilize VendXOR with ITOUCH, LLC kiosks (both Priatek kiosks in the possession of ITOUCH, LLC, and also its own kiosks). (Exhibit 52)

837. Matthews' racketeering activity violated § 1962(a) the RICO Act.

838. Priatek was injured in violation of § 1962(a) from the investment of Priatek kiosks, and technology obtained by the racketeering acts of Matthews and I2W-Enterprise as alleged herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count V Defendant(s), including actual damages, treble damages, equitable relief, and attorney's fees.

## COUNT VI
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – SECTION 1962(c)

## COUNT VI: RICO – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT BRIAN QUIMBY

839. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-764 as if stated herein in their entirety.

840. Plaintiffs bring this Count VI derivatively on behalf of Priatek against Defendant Quimby.

841. Quimby directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

842. Quimby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets. (Exhibit 28, 61)

843. Quimby either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity. (Exhibit 32, 42)

844. Predicate acts committed by Quimby are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

845. <u>Laundering of monetary instruments (18 U.S. Code § 1956)</u>. Additionally, the Quimby depleted Pritatek's monetary reserves by illegally "laundering" an indeterminate monetary amount from Priatek's $1.2M cash reserves around October/November 2018, and further hastened Priatek's path towards insolvency. (Exhibit 2)

846. The money laundering is tantamount to specified unlawful activity of mail and wire fraud under § 1961 which occurred after the resignation of the Priatek President, and with Quimby gaining custody of the cash reserve.

847. With Quimby remaining at Priatek, the I2W-Enterprise criminally takes an indeterminate amount of cash from Priatek's $1.2M cash reserves within 2 months. (Exhibit 2)

848. Mail and wire fraud. On December 13, 2018, Quimby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an anonymous investment firm (Rath Capital Partners), to the Managing Member Bharvirkar. (Exhibit 46)

849. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek.

850. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46).

851. Mail and wire fraud. On March 14, 2019, Quimby filed, on behalf of I2W, a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon the fraudulently modified agreement. (Exhibit 5)

852. The mailing/wiring of the fraudulent lien is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

853. Concurrent with the filing of the fraudulent lien agreement, I2W-Enterprise members Quimby and Colby resign as Priatek board members. Quimby and Colby resign after siphoning Priatek assets. (Exhibit 32)

854. Quimby did not disclose the UCC filing in the joint resignation letter to Priatek on March 20, 2019. (Exhibit 32)

855. Mail and wire fraud. On July 30, 2019, Quimby filed for transfer of Priatek's patent and I2W, LLC took possession of the patent when Priatek was not insolvent, and without judicial approval. (Exhibit 60)

856. After filing a complaint, the United States Patent and Trademark Office declares that Brian Quimby improperly and illegally transferred the patent. (Exhibit 9)

857. On September 6, 2019, Priatek's Managing Member demanded Quimby to return Priatek assets and patents, but Brian Quimby refused to surrender Priatek's property. (Exhibit 27)

858. The mail/wire fraud consisting of the fraudulent patent filing is incidental to an essential part of the scheme to illegally take the Priatek patent. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

859. Quimby conspired to extort Priatek with the SKUX-Enterprise.

860. Conspiracy to violate 18 U.S.C. § 1951, "Hobbs Act"). Quimby conspires to extort Priatek with the SKUX-Enterprise to take its digital project VendXOR with Tinsley. (Exhibit 14, 61)

861. While Tinsley recruited Quimby to transfer VendXOR technology and assets to the newly formed company SKUX, LLC, Tinsley extorted Priatek on multiple occasions. As one example, Tinsley verbally informs Priatek President that he will injure the reputation of Priatek by imputing illegal acts to the Priatek President/Managing Member. (Exhibit 10, 103)

862. Tinsley's extortionate demand coincides with correspondence dated September 22, 2018 reflecting the SKUX-Enterprise's demand for control of all governance, business, and technological facets of VendXOR. (Exhibit 25)

863. In violation of 18 U.S. Code § 1952, Quimby then transported Priatek coupon kiosk machines across state lines to carry on the scheme where Priatek's Managing Member was extorted for possession of VendXOR.

864. 18 U.S. Code § 1952. § 1952(a) criminalizes: transportation in interstate or foreign commerce or using the mail or any facility in interstate commerce, with intent to – § 1952(a)(3): otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity – § 1952(b)(2): extortion in violation of the laws of Florida and/or of the United States.

865. With an aim to conceal the criminal activities of the I2W-Enterprise, the premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 16)

866. Quimby's racketeering activity violated § 1962(c) the RICO Act.

867. As a direct and proximate result of Tinsley's predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

**COUNT VI: RICO – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT JOHN COLBY**

868. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-764 as if stated herein in their entirety.

869. Plaintiffs bring this Count VI derivatively on behalf of Priatek against Defendant Colby.

870. Colby directly and indirectly participated in the conduct of the SKUX-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

871. Colby participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets.

872. Colby either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity.

873. Predicate acts committed by Colby are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

874. Laundering of monetary instruments (18 U.S. Code § 1956). Additionally, the Colby depleted Pritatek's monetary reserves by illegally "laundering" an indeterminate monetary amount from Priatek's $1.2M cash reserves around October/November 2018, and further hastened Priatek's path towards insolvency. (Exhibit 2)

875. The money laundering is tantamount to specified unlawful activity of mail and wire fraud under § 1961 which occurred after the resignation of the Priatek President, and with Colby gaining custody of the cash reserve.

876. With Colby remaining at Priatek, the I2W-Enterprise criminally takes an indeterminate amount of cash from Priatek's $1.2M cash reserves within 2 months. (Exhibit 2)

877. Mail and wire fraud. On December 13, 2018, Colby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an anonymous investment firm, to the Managing Member Bharvirkar.

878. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek.

879. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46)

880. Wire fraud. To further cause delay, around February of 2019, John Colby falsely calls the Managing Member and informs him that the investment firm renegotiated the deal with revised payment terms.

881. Wire fraud. Subsequently, in March of 2019, Colby calls the Managing Member to inform him that the investment firm fell through.

882. The mailing/wiring regarding the hoax investment firm is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines.

883. Mail and wire fraud. On March 14, 2019, on behalf of I2W, a Florida UCC lien in "Manufactured Kiosk Units", including patents, trademarks, software, licenses, is filed by the I2W-Enterprise to fraudulently attempt a lien on Priatek's Kiosk machines and patent based upon a fraudulently modified agreement. (Exhibit 5)

884. The mailing/wiring of the fraudulent lien is incidental to an essential part of the scheme to illegally take Priatek Kiosk machines. The fraud committed upon Priatek is codified in § 817.155, Fla. Stat.

885. Concurrent with the filing of the fraudulent lien agreement, I2W-Enterprise members Quimby and Colby resign as Priatek board members. Quimby and Colby resign after siphoning Priatek assets. (Exhibit 32)

886. Colby did not disclose the UCC filing in the joint resignation letter to Priatek on March 20, 2019. (Exhibit 32)

887. Colby's racketeering activity violated § 1962(c) the RICO Act.

888. As a direct and proximate result of Tinsley's predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

## COUNT VI: RICO – SECTION 1962(c) DERIVATIVE COMPLAINT AGAINST DEFENDANT SCOTT MATTHEWS

889. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-764 as if stated herein in their entirety.

890. Plaintiffs bring this Count VI derivatively on behalf of Priatek against Defendant Matthews.

891. Matthews directly and indirectly participated in the conduct of the I2W-Enterprise with intent and knowledge as a principal in the pattern of racketeering activity.

892. Matthews participated as a principal in multiple schemes of the associated-in-fact enterprise, through numerous illegal RICO predicate acts to obtain Priatek assets.

893. Matthews either (1) committed - or aided, abetted, counseled, commanded, induced, or procured the commission of - two or more alleged predicate acts that make up the alleged pattern of racketeering activity; or (2) willfully caused the commission of two or more alleged predicate acts that make up the alleged pattern of racketeering activity.

894. Predicate acts committed by Matthews are all related to one another in a pattern of racketeering acts. These predicate acts all have similar participants, purposes, victims, methods, or results.

895. Quimby has a monetary investment in Matthews' company iTOUCH, LLC.

896. Matthews is a compromised Priatek Board member that delayed the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against I2W-Enterprise for the taking of physical Priatek kiosks. (Exhibits 1, 2, 8, 51, 52)

897. Matthews delays the production of a promised Special Litigation Committee Report to Priatek and its Members to avoid pursuing claims against the criminal enterprises for the taking of digital VendXOR and physical Priatek kiosks.

898. Mail and wire fraud. In a May 12, 2020 letter (disseminated via e-mail and USPS) to Priatek members, Matthews, in his capacity as a Priatek board member, knowingly makes material misstatements regarding the production of a special litigation report.

899. Mail and wire fraud (18 U.S.C. §§ 1341, 1343). Matthews again fraudulently misrepresents it independence to Priatek and its investors to further the criminal schemes against Priatek by the I2W-Enterprise. (Exhibit 2, para. 265, September 3, 2021 letter, #3).

900. Matthews informs Priatek (Bharvirkar), via a telephone conversation, "Walk away from Priatek. The company is dead. I can't tell you why but walk away."

901. Matthews is the equity owner of iTouch Orlando, LLC. ITOUCH, LLC supplies kiosk machines to Orlando-area hotels. (Exhibit 8)

902. A September 29, 2019, e-mail to Matthews states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct between the two criminal enterprises and its associates to raise capital on behalf of ITOUCH, LLC.

903. The SKUX-Enterprise, particularly Tinsley, began a capital funding campaign for ITOUCH, LLC to use the digital VendXOR with the Priatek machines possessed by ITOUCH, LLC. (Exhibit 52)

904. Capital was also needed to hire engineers to utilize VendXOR with ITOUCH, LLC kiosks (both Priatek kiosks in the possession of ITOUCH, LLC, and also its own kiosks). (Exhibit 52)

905. Matthews' racketeering activity violated § 1962(c) the RICO Act.

906. As a direct and proximate result of Matthews' predicate racketeering acts and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as alleged herein.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against the Count VI Defendant(s), including actual damages, treble damages, equitable relief, and attorney's fees.

**COUNT VII**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – SECTION 1962(d)**

907. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 729-906 as if stated herein in their entirety.

908. Plaintiffs bring this Count VII derivatively on behalf of Priatek against Defendants Ramos.

909. As set forth above, Ramos agreed and intentionally conspired to violate § 1962(a) and § 1962(c). Specifically, Ramos conspired to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise – I2W, LLC (§ 1962(a); or (2) conduct and participate in the conduct of the affairs of the I2W-Enterprise through a pattern of racketeering activity (§ 1962(c). (Exhibit 11, 52)

910. Ramos intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise – I2W, LLC, and conduct and participate in the conduct of the affairs of the I2W-Enterprise through a pattern of racketeering activity.

911. Ramos knew that his actions were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

912. Defendant Ramos conspired with other defendants, Quimby and Colby, in knowingly joining the ongoing I2W-Enterprise to further its objectives to illegally take Priatek kiosks and technology from Priatek, LLC. (Exhibits 1, 52)

913. Ramos was Vice President of Engineering and Co-Founder of Priatek, LLC. (Exhibits 6, 76)

914. Ramos allowed extortion and fraudulent schemes to be perpetuated against Priatek, LLC. (Exhibit 11)

915. Ramos utilized his unfettered access and erased Priatek business records – including non-disclosure agreements, non-compete agreements, e-mails, contracts, board minutes, expense reports, and more to allow the I2W-Enterprise to take Priatek kiosk machines and associated technology. (Exhibits 1, 50)

916. Ramos assists the I2W-Enterprise by denying Priatek's Managing Member access to Priatek offices, and then further shuts off the Managing Member's access to company email and google drive. (Exhibit 28)

917. Ramos assists the I2W-Enterprise to embezzle and launder Priatek monetary assets. (Exhibit 2)

918. Ramos disregards an affirmative proxy vote by Priatek members to remove Colby and Quimby as Priatek board members. (Exhibit 35)

919. In October of 2018, Ramos assisted the I2W-Enterprise to modify a lien agreement to allow I2W, LLC an illegal transfer of Priatek assets, source code, kiosks, patents, and copyrights/trademarks. (Exhibits 1, 2, 5)

920. Ramos assists the I2W-Enterprise to threaten Priatek with criminal liability and legal action by federal and state regulatory agencies to force a buyout of the Managing Member's interest in Priatek. (Exhibit 47)

921. In April of 2019, Ramos assists the I2W-Enterprise by contacting Bharvirkar, Priatek Managing Member, to communicate Quimby's intention to file a personal civil lawsuit, for embezzlement and misappropriation of Priatek assets, against Bharvirkar if he does not agree to a Priatek bankruptcy filing. (Exhibit 91)

922. September 29, 2019, Quimby e-mails Matthews and states: ["…Jeremy Ramos and Bobby Tinsley are looped in on the important stuff and will help with follow up."] (Exhibit 52). This correspondence contains communications of coordinated conduct amongst Ramos and the SKUX-Enterprise – to raise capital on behalf of the I2W-Enterprise, and also iTouch Orlando, LLC. (Exhibit 52)

923. A capital funding campaign is initiated for I2W-Enterprise to use the digital VendXOR with the Priatek machines possessed by the I2W-Enterprise. (Exhibit 52)

924. Through his words and actions, Ramos agreed to the plan and also joined the conspiracy to carry out its multiple schemes and/or predicate acts. (Exhibit 1, 50, 52)

925. Ramos intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, and conduct and participate in the conduct of the affairs of the enterprise

through a pattern of racketeering activity. Ramos knew that his predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

926. As a direct and proximate result of Ramos' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Defendants agreed to participate in an endeavor to take Priatek's physical assets, monetary reserves, and technology.

927. Additionally, as a direct and proximate result of Ramos' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Priatek has been injured in its business and property caused by both predicate and non-predicate acts committed to further the conspiracy

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count VII Defendant as follows: actual damages, equitable relief, treble damages and attorney's fees, and costs.

## FACTUAL ALLEGATIONS COMMON TO BREACH OF FIDUCIARY DUTIES COUNTS AGAINST COUNT VIII AND COUNT IX DEFENDANT(S)

## COUNT VIII
## BREACH OF FIDUCIARY DUTIES (INCLUDING CARE AND LOYALTY)

928. While Priatek, LLC was incorporated with the State of Florida as a limited liability company, its corporate structure was designed to operate as a corporation.

929. Priatek, LLC installed a board of directors, President, Vice-President(s), COO/CFO (Chief Operating Officer/Chief Financial Officer).

930. Priatek placed these Defendants in a position of trust and confidence, Defendants accepted their respective positions and proceeded to act in Priatek's best interests, and that Defendant failed to do so.

931. The Defendants' fiduciary duties arose from both an express relationship of a principal and agency relationship, and also an implied relationship.

932. Priatek and its Managing Member delegated and assigned managerial duties to certain board members – the "working" board members were Brian Quimby, James Sampey, Kenneth Douglas, Bob Quintana, and John Colby with high level company powers. (Exhibit 1, 6, 86, 87, 106)

933. Priatek, LLC and its Managing Member also delegated and assigned managerial duties to an executive team that was composed of individuals charged with responsibility for high-level company functions.

934. Priatek Executive Team ("Priatek Executive Team") was comprised of:

a. Jeremy Ramos: Vice President of Engineering and Co-Founder of Priatek (and also equity ownership interest in I2W)

b. John Colby: COO/CFO of Priatek and co-founder until August of 2018 then converted to solely COO

c. Bobby Tinsley: Vice President of Innovation with digital VendXOR crypto-currency blockchain project

d. Bob Zaccardo: VP of Business Development of Priatek

e. James Buckley: Director of Marketing of Priatek

f. Richard Waters: fundraising and investor consultant for Priatek

935. Each individual of the "working" board and Priatek Executive Team had rights and powers to manage and control the business affairs of the limited liability company.

936. Each individual was subject to non-competition agreements and non-disclosure agreements.

937. The individuals of the "working" board and the Priatek Executive Team exercised actual control where they channeled the company into a particular outcome.

938. However, these individuals breached their fiduciary duties when they did not act in the best interest of Priatek, and instead engaged in self-dealing and conflicted transactions with competing interests and third-party entities.

**COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT JOHN COLBY**

939. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

940. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Colby.

941. With the first Priatek Board of Directors, Colby was a "working" board member with high level company powers. (Exhibit 47, 48)

942. Additionally, Colby held the positions of COO/CFO of Priatek until August of 2018, and was then converted to solely COO.

943. Defendant Colby held an executive leadership position at Priatek as Chief Operating Officer and autonomously managed operational aspects of Priatek. (Exhibit 38)

944. As an official overseeing the interests of Priatek, Colby was privy to confidential information that further established him as a fiduciary.

945. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties.

946. Colby acted in his own self-interest and to benefit third-party entities SKUX, LLC and I2W, LLC. Colby was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 47)

947. In acts of self-preservation, Colby joined criminal enterprises SKUX-Enterprise and I2W-Enterprise to the detriment of Priatek. (Exhibit 32)

948. Colby also allows the taking of physical Priatek Kiosks machines, and technology by the I2W Enterprise and I2W, LLC. (Exhibit 5)

949. Colby does not cooperate with multiple third-party investigations of wrongdoing by the SKUX-Enterprise and I2W-Enterprise. (Exhibits 31, 42).

950. When Priatek's President resigns on September 24, 2018, Colby is installed as the Priatek President.

951. While denying access to Priatek offices to Priatek's Managing Member, Colby destroyed Priatek business records – including non-disclosure agreements, non-compete agreements, e-mails, contracts, board minutes, expense reports, and more.

952. After an affirmative proxy vote by the Priatek members, Colby ignored being fired terminated as President and refuses to step down as a board member. (Exhibits 37, 38)

953. Colby took actions to drive Priatek into bankruptcy.

954. In October of 2018, while prohibiting the Managing Member from accessing Priatek offices, Colby executed a modified lien agreement to allow I2W, LLC a security interest in Priatek assets, source code, kiosks, patents, and copyrights/trademarks. (Exhibits 1, 2, 5).

955. Colby prematurely expands Priatek's New York City operations, with knowledge that Priatek lacked proper resources. (Exhibit 32, 33).

956. The premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 105)

957. Colby advanced a fraudulent buyout offer for the Managing Member's interest as a stall tactic to further decimate Priatek's operations and keep Priatek's Managing Member from pursuing investigation(s) of wrongdoing by the SKUX-Enterprise and I2W-Enterprise. (Exhibit 46)

958. Colby further extorted the Managing Member to sign a buyout offer with threats of criminal liability and legal action against Priatek by federal and state regulatory agencies. (Exhibit 47)

959. Colby schemed to embezzle and launder Priatek monetary assets. (Exhibit 2)

960. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

## COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT JAMES BUCKLEY

961. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

962. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Buckley.

963. Buckley held an executive leadership position at Priatek as its Director of Marketing and autonomously managed Priatek marketing functions.

964. Buckley was in control of managing weekly marketing goals on behalf of Priatek. (Exhibit 71)

965. As an official overseeing the interests of Priatek, Buckley was privy to confidential information that further established him as a fiduciary. (Exhibit 74)

966. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties. (Exhibit 35)

967. Buckley acted in his own self-interest and to benefit his outside venture Rath Capital Partners. Buckley was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 1, 2)

968. Buckley allowed fraudulent schemes to be perpetuated against Priatek.

969. Buckley was a mole put in place by Jim Sampey and Bobby Tinsley to advance schemes to injure Priatek's value. (Exhibit 35)

970. In December 2018, Buckley anonymously advanced a fictious investment group, Rath Capital Partners, to purchase the majority ownership interest of Priatek in order to obtain control of the company. (Exhibit 79)

971. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

**COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT JEREMY RAMOS**

972. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

973. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Ramos.

974. At all relevant times Ramos was Vice President of Engineering and Co-Founder of Priatek (and also equity ownership interest in I2W)

975. Ramos held an executive leadership position at Priatek as Vice President of Engineering and autonomously managed the software technology for the Priatek's VendXOR blockchain project. Ramos also had custody of the operating system software code necessary for Priatek Kiosks to function. (Exhibit 6)

976. As an official overseeing the interests of Priatek, Ramos was privy to confidential information that further established him as a fiduciary.

977. Defendant Ramos held an executive leadership position at Priatek as its Vice President of Engineering and autonomously oversaw his duties.

978. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties.(Exhibit 3)

979. Ramos acted in his own self-interest and to benefit third-party entities SKUX, LLC and I2W. Ramos was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest.

980. In acts of self-preservation, Ramos joined criminal enterprises SKUX-Enterprise and I2W-Enterprise to the detriment of Priatek.

981. Ramos also allows the taking of physical Priatek Kiosks machines, and technology by the I2W-Enterprise and I2W, LLC.

982. Ramos allowed extortion and fraudulent schemes to be perpetuated against Priatek, while acknowledging that Tinsley "was working towards his goal of taking over as president of the crypto project" and was recruited to join the SKUX-Enterprise as an associate. (Exhibit 11)

983. Ramos schemes to deny Priatek's Managing Member access to Priatek offices, and then further shuts off the Managing Member's access to company email and google drive. (Exhibit 28)

984. Ramos destroyed Priatek business records – including non-disclosure agreements, non-compete agreements, e-mails, contracts, board minutes, expense reports, and more. (Exhibit 39)

985. Ramos schemed to embezzle and launder Priatek monetary assets. (Exhibit 2)

986. Ramos disregards an affirmative proxy vote by Priatek members to remove Colby and Quimby as Priatek board members. (Exhibit 35)

987. In October of 2018, Ramos schemed to modify a lien agreement to allow I2W, LLC an illegal transfer of Priatek assets, source code, kiosks, patents, and copyrights/trademarks. (Exhibits 1, 2, 5)

988. Ramos had custody of Priatek proprietary software code which was taken by the SKUX-Enterprise. Ramos further allowed the SKUX-Enterprise to take software code intended to be delivered to Priatek by Dreamdaze Technology, Inc.

989. Ramos schemes to threaten Priatek with criminal liability and legal action by federal and state regulatory agencies to force a buyout of the Managing Member's interest in Priatek. (Exhibit 47)

990. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

## COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT BOBBY TINSLEY

991. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

992. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Tinsley.

993. Tinsley held an executive leadership position at Priatek as its Vice President of Innovations and autonomously managed the operational aspects of VendXOR to bring the VendXOR project to market.

994. As an official overseeing the interests of Priatek, Tinsley was privy to confidential information that further established him as a fiduciary.

995. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties. (Exhibit 3)

996. Tinsley acted in his own self-interest and to benefit his outside venture SKUX, LLC. Tinsley was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest.

997. Tinsley unilaterally asserts himself as EVP (executive vice-president) and co-founder of Priatek to third-parties. (Exhibit 10)

998. To further benefit himself financially demanded control of Priatek's digital blockchain project VendXOR.

999. In complete insubordination, when Tinsley's demands are unmet, Tinsley threatens Priatek President, "Wait until you see what I do to you." (Exhibit 11)

1000. Tinsley maligned the Priatek President with false allegations to the Board regarding financial and accounting irregularities by Priatek and its President.

1001. Tinsley caused Priatek to take formal actions that benefited himself at the expense of the harmed Priatek members and Priatek. (Exhibit 63)

1002. Tinsley recruits and/or attempts to recruit Priatek executives to assist him in removing the Priatek President from office. (Exhibit 14)

1003. Tinsley recruits and/or attempts to recruit Priatek executives to assist him in the illegal taking of Priatek assets. (Exhibit 11, 25)

1004. Tinsley exploited his position to sabotage Priatek funding efforts from prospective investors. (Exhibit 29)

1005. While employed at Priatek, Tinsley began planning the formation of SKUX, LLC to compete against Priatek. (Exhibit 11)

1006. Tinsley allowed extortion and fraudulent schemes to be perpetuated against Priatek. (Exhibit 22, 23, 25)

1007. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

## COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT BOB ZACCARDO

1008. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

1009. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Zaccardo.

1010. Zaccardo held an executive leadership position at Priatek as its Vice President of Business Development. Zaccardo was a key executive and performed management functions for closing deals with CBS network, and developing deals with Walmart and Albertsons. Innovations and autonomously managed the operational aspects of VendXOR to bring the VendXOR project to market. (Exhibit 87, 88)

1011. As an official overseeing the interests of Priatek, Zaccardo was privy to confidential information that further established him as a fiduciary.

1012. Defendant Zaccardo held an executive leadership position at Priatek as its Vice President of Development and autonomously oversaw his duties.

1013. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties. (Exhibit 3)

1014. Zaccardo acted in his own self-interest and to benefit his outside venture SKUX, LLC. Zaccardo was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 6, 7)

1015. Zaccardo allowed extortion and fraudulent schemes to be perpetuated against Priatek. (Exhibit 83)

1016. Anthony Nguyen (Director of VendXOR) stated that he was approached by Bob Zaccardo (VP of Business Development) to join the formation of their new new entity SKUX, LLC and reap a "larger share of the cryptocurrency project." (Exhibit 15)

1017. On September 6, 2018, Bob Zaccardo emails Tinsley: "Paul says Kenny's token agreement is total bullshit. These guys are trying to screw all of us. Not good." Zaccardo believed proposed shares of VendXOR should have been larger**.** (Exhibit 83)

1018. While Zaccardo was raising capital for Priatek and its digital blockchain company VendXOR, he advanced schemes for the illegal taking of VendXOR.

1019. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

## COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT JAMES SAMPEY

1020. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

1021. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Sampey.

1022. Sampey was a "working board member and performed high-level duties on behalf of Priatek.

1023. Sampey was provided access to VendXOR business plan and technology as it existed in 2018 to bring the digital blockchain project to market.

1024. As an official overseeing the interests of Priatek, Sampey was privy to confidential information that further established him as a fiduciary.

1025. Defendant Sampey owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties. (Exhibit 12, 13, 61)

1026. Sampey acted in his own self-interest and to benefit his outside venture SKUX, LLC. Sampey was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 61)

1027. Sampey allowed extortion and fraudulent schemes to be perpetuated against Priatek. (Exhibit 18)

1028. Sampey maligned the Priatek President by disseminating false allegations regarding financial and accounting irregularities by Priatek and its President.

1029. Upon reliance of the misrepresentations, Sampey is improperly installed President of Priatek by the Priatek Board until he and his fellow SKU-Enterprise associates leave to form SKUX, LLC. (Exhibit 7)

1030. To further benefit himself financially, Sampey demanded control of Priatek's digital blockchain project VendXOR.

1031. While at Priatek, Sampey began planning the formation of SKUX, LLC to compete against Priatek.

1031. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

**COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT KENNETH DOUGLAS**

1032. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

1033. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Douglas.

1034. Douglas was a "working board member and performed high-level duties on behalf of Priatek.

1035. Douglas also held an executive leadership position at Priatek as its Vice President of Strategic Relationships. Douglas was a key executive and autonomously performed management functions. (Exhibit 88)

1036. Douglas was provided access to VendXOR business plan and technology as it existed in 2018 to develop the foundation component as the sole point of contact for Dreamdaze, Inc. and Moshe Joshue. (Exhibit 98, 99)

1037. As an official overseeing the interests of Priatek, Douglas was privy to confidential information that further established him as a fiduciary.

1038. Defendant Douglas owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties. (Exhibit 3)

1039. Douglas acted in his own self-interest and to benefit his outside venture SKUX, LLC. Douglas was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 1, 25, 32)

1040. Douglas allowed extortion and fraudulent schemes to be perpetuated against Priatek. (Exhibit 11, 15)

1041. Douglas maligned the Priatek President by disseminating false allegations regarding financial and accounting irregularities by Priatek and its President. (Exhibit 61).

1042. To further benefit himself financially, Douiglas demanded control of Priatek's digital blockchain project VendXOR. (Exhibit 83).

1043. While at Priatek, Douglas began planning the formation of SKUX, LLC to compete against Priatek.

1044. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

**COUNT VIII – DERIVATIVE COMPLAINT**
**AGAINST DEFENDANT ROBERT QUINTANA**

1045. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

1046. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Quintana.

1047. With the first Priatek Board of Directors in an advisory capacity, Quintana was a "working" board member with high level company powers.

1048. As a high-level advisory member for both Priatek and its VendXOR project, Quintana had intimate knowledge of VendXOR blockchain technology.

1049. As an official overseeing the interests of Priatek, Quintana was privy to confidential information that further established him as a fiduciary.

1050. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties. (Exhibit 3)

1051. Quintana acted in his own self-interest and to benefit third-party entity SKUX, LLC. Quintana was a high-level Priatek leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 61)

1052. Quintana allowed extortion and fraudulent schemes to be perpetuated against Priatek. (Exhibit 14)

1053. Quintana maligned the Priatek President by disseminating false allegations regarding financial and accounting irregularities by Priatek and its President. (Exhibit 23)

1054. In acts of self-preservation, Quintana actively participates in meetings to remove Priatek's President from power and is then appointed interim CEO of Priatek by the Board. (Exhibit 61)

1055. Another board member, in a September 12, 2018 email, implicates Quintana with advancing interests adverse to Priatek. (Exhibit 54)

1056. Quintana personally convinces at least one Priatek member to request a rescission of the member's capital investment.

1057. In an email dated September 22, 2018, "Bobby and team" demand control of Priatek's Vendxor blockchain project and its technology and assets. Exhibit 25. ("Bobby and team" include James Sampey, Quintana, Bob Zaccardo, Moshe Joshua, and Dreamdaze, Inc.).

1058. On September 21, 2018, the Priatek board consent to sign a memorandum ("MOU") that offered Bobby Tinlsey and his group (Jim Sampey, Kenneth Douglas, Bob Quintana, and Bob Zaccardo) two prospective board seats on Priatek's VendXOR project. (Exhibit 56)

1059. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

## COUNT VIII – DERIVATIVE COMPLAINT AGAINST DEFENDANT BRIAN QUIMBY

1060. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 as if stated herein in their entirety.

1061. Plaintiffs bring this Count VIII derivatively on behalf of Priatek against Defendant Quimby.

1061. As a "working board member, Quimby oversaw Priatek's finances and budgets. Brian Quimby was specifically recruited by Priatek to complete the VendXOR governance framework, investment documentation, and audit. Quimby is also the principal owner of I2W. In particular from July 20, 2018 onward Quimby breached his

fiduciary duties to Priatek. Quimby took over Colby's duties regarding the management of Priatek financials and budgets.

1062. Defendant Quimby held a management leadership position at Priatek and autonomously managed Priatek financials and budgets. (Exhibit 81)

1063. As an official overseeing the interests of Priatek, Quimby was privy to confidential information that further established him as a fiduciary. (Exhibit 82)

1064. Defendant owed fiduciary duties of care and loyalty to Priatek and has breached his fiduciary duties.

1065. Quimby acted in his own self-interest and to benefit third-party entities SKUX, LLC and I2W, LLC. Quimby was a Priatek high-level leader that advanced conflicted transactions where he had personal, self-interest. (Exhibit 5, 52)

1066. Quimby took actions to drive Priatek into bankruptcy.

1067. Quimby assisted in advancing false allegations against Priatek's President allowing the SKUX-Enterprise to gain executive leadership roles, including the appointment of Sampey as President. (Exhibit E61).

1068. Quimby consented to the taking of digital VendXOR blockchain technology by SKUX, LLC after the resignation of the Priatek President. (Exhibits 1, 32).

1069. Quimby concealed the collaborative actions of the "minority investor group" and SKUX, LLC from Priatek and its Members by disseminating untruths regarding improper actions taken by Priatek's President. (Exhibits 32, 43, 44).

1070. Quimby would not pursue and/or impeded Priatek's investigations to facilitate recovery of VendXOR technology from SKUX, LLC.

1071. Quimby was instrumental in the taking of physical Priatek Kiosks machines, and technology by the I2W Enterprise and I2W, LLC. (Exhibit 5)

1072. In October of 2018, while prohibiting the Managing Member from accessing Priatek offices, Quimby executed a modified lien agreement to allow I2W, LLC a security interest in Priatek assets, source code, kiosks, patents, and copyrights/trademarks. (Exhibits 1, 2, 5).

1073. Quimby prematurely expanded Priatek's New York City operations, with knowledge that Priatek lacked proper resources. (Exhibit 32 and 33).

1074. The premature New York City expansion attempt results in the depletion of Priatek's capital reserves and the abandonment of shipped kiosks. The cumulative losses exceed $2 million to Priatek. (Exhibit 50, 105)

1075. Quimby advanced a fraudulent buyout offer for the Managing Member's interest as a stall tactic to further decimate Priatek's operations and keep Priatek's Managing Member from pursuing investigation(s) of wrongdoing by the SKUX-Enterprise and I2W-Enterprise.

1076. As a direct and proximate result of the foregoing breaches of fiduciary duty, Priatek has sustained damages, as alleged herein.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against the Count VIII Defendant(s) including actual damages, equitable relief, and attorney's fees.

**COUNT IX**
**CONSPIRACY TO BREACH FIDUCIARY DUTIES (INCLUDING CARE AND LOYALTY) AGAINST DEFENDANT SKUX, LLC**

1077. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322, along with Paragraphs 928-938 and 1060-1076 as if stated herein in their entirety.

1078. Plaintiffs bring this claim derivatively on behalf of Priatek and against Defendant SKUX, LLC.

1079. SKUX, LLC and Brian Quimby conspired to breach fiduciary duties owed to Priatek.

1080. To conceal the taking of Priatek's digital VendXOR project, SKUX, LLC executive Tinsley (and its legal counsel Chidekel) direct Quimby's actions leading to the resignation of Priatek's President. Tinsley and Chidekel were former colleagues of Quimby at Priatek, LLC and assisted Quimby in the strategy and narrative of the concealment of the taking of Priatek assets and technology.

1081. Quimby assisted in advancing false allegations against Priatek's President.

1082. Quimby concealed the collaborative actions of the "minority investor group" and SKUX, LLC from Priatek and its Members by disseminating untruths regarding improper actions taken by Priatek's President. (Exhibits 32, 43, 44)

1083. Additionally, Quimby's resignation letter is an example of shifting blame upon the Managing Member while not disclosing that SKUX, LLC illegally obtained Priatek's assets.

1084. Quimby would not pursue and/or impede Priatek's investigations to facilitate recovery of VendXOR technology from SKUX, LLC. (Exhibit 42, 43)

1085. Quimby consented to the taking of digital VendXOR blockchain technology by SKUX, LLC after the resignation of the Priatek President. (Exhibits 1, 32)

1086. As part of a works-for-hire contract ("Services Contract"), Moshe Joshua, and his company Dreamdaze, Inc., were paid hundreds of thousands of dollars to build the VendXOR blockchain platform component that belonged to Priatek. (Exhibit 53)

1087. In conspiracy with Quimby in control at Priatek, SKUX, LLC recruits Dreamdaze, Inc. and Moshe Joshua to facilitate the use of VendXOR at the newly formed entity.

1088. SKUX, LLC knew or should have known that Dreamdaze, Inc. was a party to a contract that prohibited unauthorized of Priatek's proprietary information.

1089. On December 13, 2018, Quimby advanced a fraudulent buyout deal, for the Priatek Managing Member's interest to be financed by an anonymous investment firm (Rath Capital Partners), to the Managing Member Bharvirkar.

1090. Under the terms of the buyout proposal of the Priatek's Managing Member equity for $2.7M, the Managing Member would receive $875,000 and the remaining $1.85M would be allocated to Priatek. (Exhibit 46)

1091. With Colby, President and Bharvirkar, Priatek Managing Member as signatories, a unit transfer agreement (disseminated via e-mail and USPS) was executed on December 21, 2018. (Exhibit 46)

1092. The hoax company, Rath Capital Partners was founded by Priatek marketing director Buckley, under the direction of SKUX, LLC, solely to perpetuate fraud upon Priatek.

1093. Buckley has a longstanding personal and professional relationship with SKUX, LLC associates Sampey and Tinsley. In particular, Sampey hired Buckley at Priatek and also at another company, ValPak, prior to Priatek.

1094. Due to Buckley's intimate relationship with SKUX, LLC members Sampey and Tinsley, Priatek was in the process of terminating Buckley on or about November 5, 2018. (Exhibit 35)

1095. Buckley admitted to being a part of Rath Capital Partners and orchestrating the financing of the buyout offer. (Exhibit 49)

1096. SKUX-LLC is a party to a civil conspiracy that entered into an agreement where Quimby breached fiduciary duties, including duties of care and loyalty, owed to Priatek *to* misappropriate company assets and drive the company into bankruptcy.

1097. SKUX, LLC was aware of Quimby's fiduciary duties to Priatek to not put self-interest and personal or other considerations ahead of the interests of Priatek.

1098. In concert, SKUX, LLC engaged in separate overt acts, in agreement with Quimby, causing damages to Priatek as alleged herein.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against the Count IX Defendant including actual damages, equitable relief, and attorney's fees.

**COUNT X – CONSPIRACY (THROUGH ABUSE OF ECONOMIC POWER) DERIVATIVE CLAIM against DEFENDANT SKUX, LLC**

1099. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322 as if stated herein in their entirety.

1100. Plaintiffs bring this Count X derivatively on behalf of Priatek against Defendant SKUX, LLC.

1101. Defendant SKUX, LLC is a party to a civil conspiracy that entered into an agreement where SKUX, LLC and co-conspirators by virtue of their combination possessed a peculiar power of coercion.

1102. Upon the incorporation of SKUX, LLC, key Priatek individuals aligned with the "minority investor group" left to join the newly formed entity. (Exhibits 35, 43, 44, 64, 67, 68)

1103. Along with SKUX, LLC, this combination comprised of several economic groups including the "minority investor group", compromised Priatek board of directors, key Priatek executives with conflicting outside business ventures. (Exhibits 32, 35, 43, 44, 50, 64, 67, 68)

1104. After taking VendXOR from Priatek, LLC, SKUX, LLC began conspiring to impedes investigations regarding the taking of VendXOR, and also diverts scrutiny of its own wrongdoing towards Priatek and its Managing Member Bharvirkar. (Exhibits 1, 2, 32, 42, 50)

1105. The conspirators and Defendant SKUX, LLC exercised absolute control over Priatek decisions. (Exhibit 32, 35, 50)

1106. SKUX, LLC, through its employee Tinsley, maliciously coerced Priatek's President to resign on September 25, 2018, in order to allow the conspirators to obtain Priatek assets. (Exhibits 25, 63, 96)

1107. Defendant then further contacted investors to persuade them to rescind their monetary investments by providing false information to force Priatek President Bharvirkar to resign. (Exhibits 20, 21, 22, 23)

1108. SKUX, LLC was aware of the other individuals' fiduciary duties to Priatek members to not put self-interest and personal or other considerations ahead of the interests of Priatek and its members. (Exhibits 16, 17, 18)

1109. SKUX, LLC manipulated and controlled both Priatek Board of Directors. (Exhibits 32, 51, 52)

1110. SKUX, LLC exercised actual control where they channeled the company into a particular outcome. (Exhibit 1)

1111. In concert, SKUX, LLC engaged in an orchestrated series of self-interested actions to the detriment of Priatek. (Exhibits 1, 2)

1112. SKUX, LLC's overt acts, in agreement amongst the other parties to the conspiracy, caused damages to Priatek as alleged herein.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against the Count X Defendant including actual damages, equitable relief, and attorney's fees.

## COUNT XI – CONVERSION OF CORPORATE ASSETS

## COUNT XI – CONVERSION OF CORPORATE ASSETS
## AGAINST DEFENDANT SKUX, LLC

1113. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322 as if stated herein in their entirety.

1114. Plaintiffs bring this Count XI derivatively on behalf of Priatek against SKUX, LLC.

1115. SKUX, LLC converted VendXOR for its gain and intended to deprive Priatek of rightful possession. VendXOR represented a $1 Million investment by Priatek. (Exhibit 1)

1116. SKUX, LLC obtained VendXOR blockchain project's proprietary and confidential business model and plan, various functionality, content, and concepts. The combination of such ideas, information, plans, and procedures were proprietary and confidential. (Exhibits 1, 15)

1117. Priatek had non-disclosure agreements executed by all key individuals. The Priatek operating agreement also contained provisions regarding the confidentiality of proprietary information. (Exhibits 3, 31, 73, 80)

1118. As a material component of VendXOR, SKUX, LLC conversion of VendXOR included its blockchain platform. The blockchain platform was developed using confidential and private Priatek proprietary information. (Exhibits 6, 15, 31)

1119. SKUX, LLC was aware Priatek unlawfully consented to the taking of VendXOR by a compromised board and "minority investor group" and sought a return of its property. (Exhibits 1, 25, 30, 69, 94, 97)

1120. Additionally, on April 18, 2019, the Priatek's legal counsel corresponded with SKUX, LLC with a demand to return VendXOR and other proprietary assets. (Exhibit 39).

1121. As a direct and proximate result of the conversion of VendXOR, and other assets, Priatek has sustained damages, as alleged herein.

**COUNT XI – CONVERSION OF CORPORATE ASSETS AGAINST DEFENDANT I2W, LLC**

1122. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322 as if stated herein in their entirety.

1123. Plaintiffs bring this Count XI derivatively on behalf of Priatek against I2W, LLC.

1124. I2W, LLC converted Priatek's physical and technology assets, and monetary funds.

1125. I2W, LLC converted Priatek Kiosks for its gain and intended to deprive Priatek of rightful possession. (Exhibits 1, 2, 26)

1126. On July 30, 2019, Quimby filed for transfer of Priatek's patent and I2W, LLC took possession of the patent when Priatek was not insolvent, and without judicial approval. (Exhibit 60)

1127. I2W, LLC also converted Priatek touch-screen video monitors for its gain and intended to deprive Priatek of rightful possession.

1128. I2W, LLC was aware Priatek unlawfully consented to the taking of Priatek by a compromised board and "minority investor group" and sought a return of its property. (Exhibits 1, 2, 27, 28)

1129. Additionally, on September 6, 2019, the Priatek provided a Final Demand Notice to I2W Tampa Bay, LLC with a demand to return Priatek assets. (Exhibit 27)

1130. With Quimby and Colby remaining at Priatek, I2W, LLC converts an indeterminate amount of cash from Priatek's $1.2M cash reserves. (Exhibit 2)

1131. Priatek's cash reserves are converted by I2W, LLC, and its principal Quimby, while there are no corresponding financial records regarding the missing money. (Exhibits 1, 2, 39)

1132. In a letter dated April 18, 2019, Priatek, LLC legal counsel Kiefner's request for accounting records from Quimby is met with silence. (Exhibit 39)

1133. The compromised second Priatek Board's correspondence to Priatek and its members addresses […"large wire transfers that depleted Priatek's remaining operating capital and financial resources."] in October/November 2018. (Exhibit 2)

1134. As a direct and proximate result of the conversion of Priatek Kiosks and other assets, Priatek has sustained damages, as alleged herein.

**COUNT XI – CONVERSION OF CORPORATE ASSETS AGAINST DEFENDANT iTOUCH, LLC**

1135. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322 as if stated herein in their entirety.

1136. Plaintiffs bring this Count XI derivatively on behalf of Priatek against iTOUCH, LLC.

1137. iTOUCH, LLC converted Priatek Kiosks, sold by Quimby, for its gain and intended to deprive Priatek of rightful possession. (Exhibits 2, 8, 9, 51, 52)

1138. iTOUCH, LLC sought to use digital VendXOR technology with the physical Priatek kiosks in its possession. (Exhibits 2, 8, 9, 51, 52)

1139. iTOUCH, LLC also converted Priatek touch-screen video monitors for its gain and intended to deprive Priatek of rightful possession.

1140. iTOUCH, LLC was aware Priatek unlawfully consented to the taking of Priatek assets by Quimby and compromised board(s). (Exhibits 2, 8, 9, 51, 52)

1141. ITOUCH, LLC's principal Scott Matthews is a compromised board member of the (second) Priatek Board. (Exhibits 2, 8, 9, 51, 52)

1142. ITOUCH, LLC also knew, or should have known, that Priatek subsequently sought a return of its property via a Priatek investor letter dated June 15, 2021 to the Priatek Board. (Exhibit 1, 2, 9, 27, 51, 52)

1143. As a direct and proximate result of the conversion of Priatek Kiosks and other assets, Priatek has sustained damages, as alleged herein.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment against the Count XI Defendant(s) including actual damages, equitable relief, and attorney's fees.

**COUNT XII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP DERIVATIVE CLAIM against DEFENDANT SKUX, LLC**

1144. Plaintiffs incorporate the allegations made in Paragraphs 1 through 322 as if stated herein in their entirety.

1145. SKUX, LLC tortiously interfered in the business relationship between Priatek and Dreamdaze, Inc. by knowingly causing the breach by Dreamdaze, Inc. of its contract with Priatek.

1146. As part of a works-for-hire contract ("Services Contract"), Moshe Joshua, and his company Dreamdaze, Inc., were paid hundreds of thousands of dollars to build the VendXOR blockchain platform component that belonged to Priatek. (Exhibit 53).

1147. The Service Contract contained restrictive covenants, including confidentiality provisions, intended to protect its business assets, business plans and programs, and other proprietary information, including using confidential information for any purpose other than to further Priatek business.

1148. SKUX, LLC knew or should have known that Dreamdaze, Inc. was a party to a contract that prohibited unauthorized of Priatek's proprietary information.

1149. Priatek assisted Dreamdaze, Inc., and its principal Moshe Joshua, in designing the VendXOR blockchain platform. This assistance was beyond managing the project and defining the scope of the project. Priatek also provided Dreamdaze, Inc. access to confidential and private information.

1150. In close temporal proximity to the formal incorporation of SKUX, LLC, and while working on behalf of Priatek, Joshua and Dreamdaze, Inc. schemed to provide SKUX, LLC private and confidential information for use at such competing business.

1151. SKUX, LLC is a business that directly competes with Priatek. SKUX, LLC has benefited by the use of Priatek's confidential information and trade secrets by making its work easier and more profitable that it otherwise would have been.

1152. SKUX, LLC has possession of Priatek's confidential information and continues to use such information to compete against Priatek.

1153. SKUX, LLC has taken the foregoing actions with the intention of causing Priatek irreparable harm when it maliciously persuaded Dreamdaze, Inc. to breach the contract.

1154. SKUX, LLC obtained proprietary technology that Plaintiff developed through its considerable efforts and substantial expenditures of money.

1155. SKUX, LLC's illegal actions were the proximate cause of damages incurred by Priatek.

1156. All conditions precedent to bringing this action have been performed or satisfied, or have otherwise occurred or been discharged.

**WHEREFORE**, Priatek demands judgment against SKUX, LLC for damages, costs, interest, and such other relief in law or equity that this Court deems just and proper.

## ADDITIONAL PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment as follows:

a) For an order deeming this action to be a proper derivative action and Plaintiffs to be proper and adequate derivative plaintiffs;

b) Enter judgment according to the declaratory relief sought;

c) All appropriate equitable and injunctive relief;

d) For an order awarding judgment in an amount to be determined at trial, punitive damages, and prejudgment interest, together with costs of suit and reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper;

e) For an order awarding judgment against the Defendant(s) for Plaintiffs RICO claims in an amount to be determined at trial, including actual damages, treble damages and attorney's fees, and equitable relief to prevent and restrain RICO violations.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action.

Respectfully submitted on this 1st day of September, 2022,

***/s/ Derek P. Usman***
Derek P. Usman
Florida Bar No. 0120303
Email: derek@usmanfirm.com
**The Usman Law Firm, P.A.**
505 E Jackson Street
Suite 305
Tampa, FL 33602
(813) 377-1197 telephone
*Attorney for Plaintiffs*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746(2), under penalties of perjury, I verify that I have read the forgoing VERIFIED SECOND AMENDED DERIVATIVE COMPLAINT AND DEMAND FOR JURY TRIAL and that the facts stated in it are true and correct.

Executed on September 1, 2022.

*/s/ Dean Trew* *
Dean Trew

* I hereby certify that I have the signed original of this document that is available for inspection during normal business hours by the Court or a party to this action.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of September, 2022, a true and correct copy of the foregoing has been provided electronically through the Court's CM/ECF filing system to all registered recipients.

***/s/ Derek P. Usman***
Derek P. Usman, Esq.
Florida Bar No. 0120303
Email: derek@usmanfirm.com
**The Usman Law Firm, P.A.**
505 E Jackson Street
Suite 305
Tampa, FL 33602
(813) 377-1197 telephone
Attorney for Plaintiffs